UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF VERMONT

| | |
|---|---|
| ANNESSA LEWIS, <br>    Plaintiff, <br><br>    v. <br><br>BELLOWS FALLS CONGREGATION OF <br>JEHOVAH'S WITNESSES, BELLOWS <br>FALLS, VERMONT, INC., <br>WATCHTOWER BIBLE AND TRACT <br>SOCIETY OF NEW YORK, INC., and <br>NORTON TRUE, <br>    Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)   CIVIL ACTION NO. 1:14-cv-205<br>)<br>)<br>)<br>)<br>) |

## DEFENDANT WATCHTOWER BIBLE AND TRACT SOCIETY OF NEW YORK, INC.'S MOTION FOR PROTECTIVE ORDER

Watchtower Bible and Tract Society of New York, Inc. ("Watchtower"), by and through counsel, moves this honorable Court pursuant to F.R.C.P. 26(c)(1) to protect from discovery, or in the alternative to limit the scope of disclosure of, documents requested in numbers 65 and 67[1] of *Plaintiff's First Set of Requests for Production of Documents to Defendant Watchtower* ("Plaintiff's Request for Production"). In support of its motion, Watchtower submits the following memorandum of law.

## Memorandum of Law

### I.    Introduction

Plaintiff Annessa Lewis ("Lewis") alleges in her First Amended Complaint ("Ct.") that Norton True ("True"), an adult member of the Bellows Falls Congregation of Jehovah's Witnesses, Vermont ("Congregation") where she and her parents attended, abused her when she was a minor. Lewis wants Watchtower to produce documents that contain confidential and privileged

---

[1] *See* Watchtower's Responses to Plaintiff's First Set of Requests for Production at Nos. 65 and 67, attached as **Exhibit B** to Affidavit of Barbara Blackman, Esq.

information about people and situations completely unrelated to her, her alleged abuser, or the Congregation.

For good cause shown, this motion seeks protection from the discovery of documents that are not sought for a legitimate purpose. The documents 1) are patently irrelevant and will not lead to the discovery of relevant information; 2) contain constitutionally protected and private information about third-parties unrelated to the allegations in the Complaint; 3) Most of the documents contain minister-communicant-privileged information; 4) Some contain attorney-client-privileged information; and 5) some contain attorney work product. Watchtower asks the Court to issue a protective order preventing disclosure of these confidential documents in response to Plaintiff's Request for Production numbers 65 and 67.

## II.    Statement of Facts

Plaintiff, born January 10, 1987, alleges that True sexually molested her in his barn – not on congregation property and not at a religious function – before she was five years old. Ct. ¶ 49. She also says he molested her on multiple occasions, but does not say when or where. Ct. ¶ 50. But pp. TRUE0127-True0128 and TRUE0130-TRUE0131 of the Vermont State Police report attached to the Declaration of John O. Miller as Exhibit D reports that "the 9 year old" [Annessa Lewis] said that True had touched her once in his barn when she was about five years old, during the summer after she was in preschool. That places the alleged abuse during the summer of 1991 or 1992.

True had served as a ministerial servant[2] from 1976 until 1986, but in 1991 and 1992 he was not serving in any appointed capacity.

---

[2] Like deacons in some churches, ministerial servants are attendants or ushers. They also hold microphones, set up the stage for the speaker, and provide other similar duties. They may have speaking parts on mid-week meetings, and some occasionally give Bible-based discourses on Sundays. Ministerial servants are not authorized to hear confessions and are not viewed as clergy based on the beliefs and practices of Jehovah's Witnesses.

Plaintiff asserts multiple claims against the local Congregation and against Watchtower including, but not limited to, negligent supervision, negligent hiring, and failure to warn Plaintiff (or her parents) how to avoid the risk of sexual abuse. Ct. ¶¶ 84, 85, 88, 91.

Plaintiff claims that the Congregation and Watchtower knew that True was a pedophile. Ct. ¶¶ 61, 62, 65 82, 86, 90.  She says True abused at least three minors before he abused her. Ct. ¶61.  She does not elaborate– no names, no dates, no locations:  nothing.  The only incident of which Watchtower is aware involved True's step-grand-daughter, R.B.  In May, 1990, R.B., told a Congregation elder that True had once touched her breast.  True later explained that he inadvertently brushed her breast as he tried to keep her from falling out of bed. *See* Miller Declaration, Exhibit D, Vermont State Police report, p. TRUE0137.  It is unknown whether anyone reported the incident to the police earlier; if it was reported, the police did not arrest True and no charges were filed against him.  Plaintiff says this incident and two others for which she provides no detail put the Congregation and Watchtower on notice of True's propensity to molest children.

## III.   Documents at Issue

Plaintiff sent Requests for Production to Watchtower on May 20, 2015.  (Exh. "C".)  The Court signed the stipulated Discovery Order on August 26, 2015, making Watchtower's responses to Lewis' production requests due on September 16, 2015, which deadline Watchtower met. (Exh "A".)

### A.   Records of internal investigation of persons accused of wrongdoing (i.e., sin) requested from all jurisdictions from 1960 to present.

Although the alleged instances of molestation in this case occurred in 1991 or 1992, Plaintiff's Request for Production No. 67 seeks documents "referencing any allegations of sexual abuse of children within the Jehovah's Witnesses Church since **1960**."  Request No. 67 is not limited to abuse by persons serving in appointed positions in congregations.  It is not limited to

alleged abusers who are or were Jehovah's Witnesses.  It is not limited geographically.  If a non-Witness uncle abused a child who happened to attend a congregation of Jehovah's Witnesses anywhere in the United States, Plaintiff wants all documents about it.

The types of documents that could exist that reflect claims of child abuse include: notices from congregation elders that someone was disfellowshipped, copies of letters from a body of elders in one congregation to another body of elders that an alleged abuser is moving to the latter congregation, and notes taken by lawyers and their staff about calls from elders seeking legal advice on whether the law of their state requires ministers to report child abuse allegations.  Many will contain confessions of alleged abusers.  Some contain notes of conversations with victims, parents, and others in the congregation who have information pertinent to the claim.

Elders investigate allegations of sin committed by congregation members and form "judicial committees" to assist members who have engaged in serious sins.  Declaration of Douglas Chappel ¶ 10.  The goals of the investigation and judicial committee are to keep the congregation spiritually and morally clean, to give erring ones Biblical counsel to help them regain their spiritual health and restore their relationship with God, and to provide spiritual assistance to the victims and their families.  *Id.*

Elders also hear reports from members about a wide range of issues, including accounts by children attending congregations about abuse by neighbors, relatives, teachers, and others not connected with any congregation.  Elders who hear allegations of child abuse call Watchtower's Legal Department for legal advice on reporting requirements and the Service Department of the U.S. Branch Office of Jehovah's Witnesses ("Service Department") for Bible-based spiritual advice.

All spiritual communications and contemporaneous notes generated by elders are considered private and confidential by all involved. Each State has privilege and confidentiality laws that apply to these confidential communications and the records that document them. All documents generated by Watchtower's Legal Department are considered attorney-client privileged. The elders call for and receive legal advice from their religious organization's in-house attorneys. Thus, each elder is considered the Legal Department lawyer's client. Each document generated by the Service Department is considered an extension of the minister-communicant privilege since the elders in the Service Department are consulted for the purpose of helping the congregation elders find Bible Scriptures that apply to the situation so that the congregation elders can spiritually shepherd those involved.

Any documents that are responsive to Request 67 that pertain to Plaintiff, her sister Miranda, or R.B., have either been produced or identified on a privilege log and are available for in-camera review. Also, documents that pertain to another individual, B.S., whom True was alleged to have touched after the dates asserted by the Plaintiff, have been identified in a privilege log and are also available for in-camera review. Documents that concern anyone else have not been identified—they are so patently irrelevant to the issues in this lawsuit, so privileged, and so replete with constitutionally-protected privacy issues that an attempt to locate them has not been undertaken.

**B.      Documents received by Watchtower in response to Watchtower's letter to All Bodies of Elders, dated March 14, 1997.**

Plaintiff's Request for Production No. 65 seeks all documents received by Watchtower in response to a March 14, 1997, letter that was sent to the Bodies of Elders of all congregations in the United States (the "1997 Letter"). See Miller Decl. ¶ 7, and Exh. "E" thereto, a copy of the 1997 letter.

The 1997 Letter was written by the Service Department, an ecclesiastical body that provides spiritual assistance to all of the congregations of Jehovah's Witnesses in the United States. The letter was a private communication between the Service Department and elders serving in all congregations throughout the United States, seeking information to help verify that each elder and ministerial servant who was then serving or who would be recommended for appointment in the future met the Scriptural qualifications.[3]

The 1997 Letter directed bodies of elders to write a confidential letter to the Service Department providing information about *anyone* who was then currently serving in an appointed position, or who had ever before served, who was known to have ever committed child sexual abuse. The 1997 Letter also directed that the bodies of elders inform the Service Department when *any* member of the congregation, known to have ever committed any sort of child sexual abuse, moves from one congregation to another congregation.[4]  Responses were sent by bodies of elders in congregations in various States.

No responses to the 1997 Letter were sent that involve Plaintiff, her parents, R.B., B.S., or True. The only responses that exist concern others.   Significantly, since the letter was written in 1997, all responses that were submitted post-date the latest date Plaintiff could have been abused, 1992.

---

[3] Local congregations of Jehovah's Witnesses receive spiritual oversight from a small group of ordained ministers who serve as congregation elders. Chappel Decl. ¶ 7.  The Service Department communicated to congregations on Watchtower letterhead until March 15, 2001.  After that date, the Service Department ceased communicating through Watchtower.

[4] At present, when one of Jehovah's Witnesses moves from one congregation to another, a letter of introduction is sent from elders in the former congregation to the elders in the new congregation to allow the body of elders in the new congregation to assess the member's spiritual condition and possible need for pastoral care.  If the member served in an appointed position in the former congregation, the letter of introduction contains a recommendation whether the member should continue to serve in the new congregation.  Chappel Decl. ¶ 10.

### C.      Documents generated by Watchtower's Legal Department

Watchtower's Legal Department documents have been located that concern telephone calls from congregation elders about Norton True and the legal advice given to the elders. The documents are identified on Watchtower's privilege log. In addition to those attorney-client-privileged documents Plaintiff wants every discussion between congregation elders and Watchtower's Legal Department attorneys and paralegals in which legal advice was sought and provided, from every jurisdiction in the United States, since 1960, including those documents that Watchtower's Legal Department created while providing legal advice related to responses to the 1997 Letter.

## IV.   This Court Should Issue a Protective Order to Prevent the Production of the Documents Sought By Plaintiff

### A.      The Court has Broad Discretion to Either Prohibit Certain Discovery Or Craft a Protective Order

The Court has broad authority to prevent or limit discovery through the issuance of a protective order.[5] The purpose of a protective order is to provide a safeguard for parties and other persons in light of the otherwise broad reach of discovery. *Pietrangelo v. Alvas Corp.*, 2010 U.S. Dist. LEXIS 95112, *7 (D. Vt. Apr. 23, 2010); *In re Subpoena Issued to Dennis Friedman*, 350 F.3d 65, 69 (2d Cir. 2003).[6]

---

[5] *See* Federal Rules of Civil Procedure, Rule 26(c) (2015) (hereinafter "FRCP 26(c)"). On motion by one responding to a discovery request, the court "may, for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense ..." FRCP 26(c)(1).

[6] Upon petition of a party or other person, the Court has authority to provide protection, including: forbidding the discovery; specifying terms, including time and place for discovery; prescribing a discovery method other than that selected by the party; limiting the scope of discovery to certain materials or matters; limiting the persons attending discovery; sealing depositions; requiring that a trade secret or other confidential research, development or commercial information not be revealed or be revealed only in a specified way; and requiring that the parties simultaneously file specified discovery under seal. FRCP 26(c)(1)(A)-(H). The Court is not limited by these categories, but has wide discretion to impose other limits on discovery. *United States v. CBS*, *supra*.

A party resisting discovery need only show "good cause" for issuance of a protective order. FRCP 26(c)(1); *Bombard v. Volp*, 44 F. Supp. 3d 514, 529, (D. Vt. 2014). A properly asserted claim of *privilege* is good cause for protective order. *Id.*; *Foltz v. State Farm Mut. Auto. Ins. Co.*, 331 F3d 1122, 1130 (9th Cir. 2003); *Scott v. Hammock*, 133 F.R.D. 610, 619 (D. Utah 1990) (issuing protective order and finding that religious privilege must be broadly construed to include communications made within the LSD church disciplinary proceedings).[7] Even if "good cause" for a protective order is shown, the Court must still balance the interests in allowing the discovery against the relative burdens to the parties (and nonparties). *Bombard*, 44 F. Supp. 3d at 529.

The Court may craft its protective orders, depending upon the relief sought by the moving party and the facts of the case. For example, the Court may stay discovery on a matter completely pending resolution of a dispositive motion. *See e.g., Black Diamond Sportswear, Ltd. v. Black Diamond Equip., Inc.*, 2004 U.S. Dist. LEXIS 1328, (D. Vt. Feb. 2, 2004) ("[I]t is common for district courts to stay discovery when resolution of a preliminary matter may dispose of the entire case. The fact that resolution of the motion to transfer may dispose of this entire case militates in favor of staying discovery pending resolution of that motion . . .").

When appropriate, the Court may grant a protective order to restrict the discovery to the present lawsuit. This relief is particularly justified if "the federal action had been brought chiefly for the purpose of exploiting the liberal discovery devices available in federal civil actions" for use in another action. *Dove v. Atlantic Capital Corp.* 963 F2d 15, 19 (2nd Cir. 1992). Since Plaintiff's sister Miranda Lewis[8] filed a state court action alleging similar harm against the same defendants, it would be proper to apply the limits expressed in *Dove* to the discovery sought in this lawsuit.

---

[7] The factors a Court may consider to determine whether "good cause" is shown for issuance of a protective order include: "the harm to the party seeking the protective order and the importance of disclosure to the non-moving party." *Bombard*, 44 F. Supp. 3d at 529 (D. Vt. 2014).

[8] Miranda Lewis' lawsuit is filed in *Miranda Lewis v. Bellows Falls Congregation et al*, Docket No. 548-10-14WrCl, State of Vermont Superior Court, Windsor Unit, Civil Division.

**B.      Plaintiff's Requests for All Internal Investigation Records from 1960 to Present As Well as Responses to the March 1997 Letter Should Be Prohibited as Patently Irrelevant.**

Information is not discoverable if it is irrelevant. FRCP 26(b)(1); *see e.g., Shovah v. Mercure*, 879 F. Supp. 2d 416, 425, 2012 BL 182246, 7 (D. Vt. 2012) (striking overly broad discovery requests and requests seeking information predating priest's contact with Vermont).[9] There is no relevance of records about child abuse from around the nation (and 30 years prior to the alleged molestation in this case) to the issues in this lawsuit.   All society knows of the increasing scourge of child abuse and is striving to eliminate this plague from its midst.  Jehovah's Witnesses realize the importance of not appointing men who are known to have abused children as is evidenced on the face of the 1997 Letter.  How are reports of child abuse of children who attend congregations other than Bellows Falls committed by men other than Norton True relevant to whether Watchtower and Bellows Falls did the right thing in connection with Norton True and Plaintiff?

The scope of the request is not reasonably limited by geography; nor is the time frame of records sought (from 1960 to date and from 1997 to date) limited to the time period involved in this lawsuit.  Plaintiff wants documents about child abuse no matter whether it happened in Texas or Vermont, and documents about appointed men who once served or were serving in Alaska or Kentucky in 1997 and who were alleged to or suspected of having abused a child.

**C.      Plaintiff's Requests should not be allowed because they seek privileged information.**

The fact that most of the information contained in the documents Plaintiff seeks was obtained from minister-penitent and minister-communicant-privileged communications is ignored

---

[9] *See* 2015 Proposed Amendments to Fed. R. Civ. P. 26.  Pending Congressional review, revised Rule 26 will further limit discovery to "any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case." (emphasis on the amendment)

by Plaintiff, as are the facts that some potentially responsive records are attorney-client privileged and some protected by the attorney work product doctrine.

The initial consideration to determine whether the Defendant has shown good cause for a protective order is whether the information is privileged. A properly asserted claim of *privilege* is good cause for protective order. *Std. Inv. Chtd., Inc.*, 2008 U.S. Dist. LEXIS 4617 at *14; *Foltz*, 331 F.3d at 1130; *Scott*, 133 F.R.D. at 619. The documents Plaintiff wants produced enjoy several types of privileges including the priest-penitent or clergy-counseling privilege of the state where the congregation is located and, for some of the documents, the attorney-client privilege for documents created by in-house counsel and staff at the Watchtower's Legal Department.

Most of the information in the response letters was gained in private, confidential communications between elders and persons accused, elders and victims, elders and parents, and elders and others in the congregation who had pertinent information about the abuse, the victim, or the abuser. The letters typically do not specify who provided which information, but they name the victim(s), perpetrator(s), accusers, and others. Determining what communications require preservation of a statutory privilege would require a massive effort to ascertain the sources of information, research the then-existing minister-communicant privilege, and determine who wants their privacy protected and who will waive it. Since none of the letters provides information potentially relevant to any issue in this lawsuit, there is no reason to undertake that effort.

Before a body of elders of a congregation sends a response letter to the Service Department about an incident of sexual abuse, the elders speak with the accused and he either confesses or explains why the accusation is untrue. The elders frequently speak with an accuser—sometimes the child him or herself, usually the child's parent(s). The elders speak with others who know of the incident or of similar incidents involving the accused. Many response letters to the Service

Department contains the details of each of these communications and names the persons with whom the elders spoke.

All of the elders in the Bellows Falls Congregation were at all times relevant to this lawsuit ordained ministers and spiritual shepherds of the congregation.[10]   *Id.*   Similarly, elders in the Service Department are ordained ministers and spiritual shepherds who answer questions from elders in congregations of Jehovah's Witnesses across the United States who call or write to the Service Department for spiritual assistance or guidance, in keeping with Proverbs 11:14.   *Id.*   The religious privilege applies to any communications between the local elders and the Service Department.

Congregation elders are responsible for the spiritual encouragement and instruction of congregation members as well as for pastoral care. (Chappel Decl. ¶ 8.)  Elders frequently provide spiritual counsel and advice to congregation members concerning confidential personal matters. *Id.*  Congregation elders may hear confidential confessions and other private communications so they can provide spiritual guidance and counsel based on the Holy Scriptures.[11]   *Id.*

When a serious sin is confirmed by elders, a judicial committee (usually three elders) is appointed by the body of elders to help the one who has erred regain his spiritual health and to ensure that the congregation remains spiritually and morally clean. (Chappel Decl. ¶ 11.)  The judicial committee may privately or publicly reprove or disfellowship (expel) the erring one depending on their judgment of his repentance. (*Id.*, ¶12.)  When a member is publicly reproved

---

[10] Before a person is appointed as an elder, he must meet Scriptural qualifications, must be recommended by his congregation elders, must also be recommended by the circuit overseer (traveling elder) who is serving the congregation, and must appointed by the Service Department at the United States Branch headquarters. Chappel Decl. ¶ 7.  Once an individual is appointed to serve as a congregation elder, an announcement is made to the congregation and the individual is officially vested with ministerial authority in the congregation as an appointed elder. *Id.*

[11] *See, e.g.*, Proverbs 11:13; Proverbs 20:19; Proverbs 25:9.

or disfellowshipped, an announcement is made to the congregation that "[name] has been reproved" or "[name] is no longer one of Jehovah's Witnesses." *Id.* If a congregation member is disfellowshipped, the judicial committee notifies the Service Department. *Id.* The report of disfellowshipping includes the name of the disfellowshipped person, the date on which the disfellowshipping was announced to the congregation, and the Scriptural basis for disfellowshipping. *Id.* Most reports of disfellowshipping include brief descriptions of the sin committed and the circumstances of the sinful conduct. *Id.* Elders give attention to the victim and his or her family, providing spiritual guidance and comfort during confidential meetings with them.

The confidentiality of spiritual communications between congregation members and congregation elders is a fundamental religious belief and teaching of Jehovah's Witnesses. Chappel Decl. ¶ 13; *see* V.R.E. 505(b).[12] Jehovah's Witnesses accept the Bible's admonition to confess one's sins to God[13] and believe there is a great benefit in speaking to congregation elders confidentially about spiritual matters. *Id.* Accordingly, Jehovah's Witnesses encourage those who are distressed or spiritually weak to approach the congregation elders, confide in them, and receive spiritual assistance. *Id.*

Because open and free communication between congregation members and elders is so important to the elders' pastoral responsibilities in caring for the spiritual welfare of congregation members, Jehovah's Witnesses place great emphasis on privacy and confidentiality, and congregants expect that their private communications with elders will remain confidential. Chappel Decl. ¶ 14. If an elder were compelled to disclose confidential information, his credibility

---

[12] Vermont Rule of Evidence 505(b) provides that "[a] person has a privilege to refuse to disclose and to prevent another from disclosing a confidential communication by the person to a member of the clergy in his or her professional character as spiritual advisor." *See* F.R.E. 501 ("[I]n a civil case, state law governs privilege....").

[13] *See, e.g.*, Leviticus 16:21; Numbers 5:6-7; James 5:16; 1 John 1:9.

and effectiveness as an elder would be severely compromised. *Id.* Congregation members would not be inclined to disclose their personal problems if those problems could later be revealed in litigation. *Id.*

Jehovah's Witnesses do not consider the confidentiality of spiritual communications with congregation elders to be limited to confessions. Chappel Decl. ¶ 15. According to the beliefs and practices of Jehovah's Witnesses, confidentiality extends to all confidential communications of a spiritual nature, including those made in the course of elders' investigations into wrongdoing or judicial committee proceedings. *Id.* Based on their understanding of Scripture, Jehovah's Witnesses keep all congregation files, notes, papers, reports, minutes or other documents prepared in conjunction with, or as a result of, spiritual communications confidential. *Id.* Disclosure of such documents would at least impair and possibly destroy the effectiveness of the elders' role as spiritual shepherds. *Id.*

Plaintiff's blanket request for all correspondence about child abuse would require legal analysis of whether correspondence from each congregation meets the applicable minister-communicant privilege in the jurisdiction where the communication was had. In the United States, many states have their own definitions of a "penitent," a "member of the clergy," a "penitential communication," and other types of "confidential communication." *See e.g.*, *Berry v. Watchtower Bible and Tract Society of New York, Inc.* (N.H. 2005) 879 A.2d 1124 (New Hampshire Supreme Court recognized that confidential, spiritual communications made to two or more elders of Jehovah's Witnesses were privileged). Plaintiff's Requests 65 and 67 ask Watchtower to disregard all privileges.

Plaintiff's broad request seeks documents created and maintained by legal counsel and their staff at Watchtower's Legal Department. When elders hear allegations of abuse, they call

Watchtower Legal for legal advice about their state's reporting laws. Each State has its own child abuse reporting requirements on which Watchtower's in-house attorneys advise elders. Plaintiff's request includes all documents created and maintained by Watchtower's in-house attorneys in disregards of the attorney-client privilege.

### D. Plaintiff's Requests Should Be Denied Because of the Constitutional Right to Privacy Enjoyed By Persons Named in the Documents Plaintiff Seeks

The responses to the 1997 Letter contain highly sensitive, private information from victims, penitents, and others, who enjoy a constitutional right to privacy and who would not want their information disclosed to total strangers, without their knowledge and permission.

Most of the documents Plaintiff seeks concern people whose names have never been publicized; accuseds who have never been prosecuted or sued; victims who for their own reasons want to maintain their privacy; elders who took confessions and had private conversations with others in the congregation; and congregations of worshipers who want their privacy honored. None has consented to their names or situations being disclosed. Chappel Decl. ¶ 25.

The right to privacy has developed since its inception in 1923 in *Meyer v. Nebraska*, 262 U.S. 390 (1923) where the Supreme Court prohibited states from interfering with the private decisions of educators and parents to shape the education of their children. In *Griswold v. Connecticut*, 318 U.S. 44 (1965), the Court applied *Meyer* to strike down a law that prohibited possession, sale, and use of contraceptives by married couples. Among other reasons expressed for the decision was "a zone of privacy" guaranteed by the Bill of Rights as one of the "other rights retained by the people." *Stanley v. Georgia*, 394 U.S. 557 (1969) extended the right of privacy to an individual's right to possess and view pornography in his own home. *Roe v. Wade* (1972) extended it to women's right to have an abortion. *Cruzan v. Missouri Department of Health*, 497 U.S. 261 (1990) held that individuals' privacy rights allow them to decide to terminate life-

prolonging medical treatments (although the state may impose conditions on the exercise of that right).  In *Lawrence v. Texas*, 539 U.S. 558 (2003), the Court held that liberty and privacy interests were violated when Texas enforced a homosexual sodomy law against to gay men. See also *Bohn v. Dakota County* (8th Cir. 1985) 772 F.2d 1433, 1436, n. 4 (reputation of parents were protectable liberty interests when found by county to be child abusers, exposing them to public opprobrium).

The Privacy Act of 1974, 5 U.S.C. § 552a, prevents unauthorized disclosure of personal information held by the federal government.  A person has the right to review their own personal information, ask for corrections, and be informed of any disclosures.  The Children's Online Privacy Protection Act, 16 CFR Part 312, enforces a parent's right to control what information websites collect about their children.  These statutes reflect the public policy of the United States to protect validly-held privacy rights of individuals.

No one has asked the individuals named in the documents Plaintiff seeks whether they want their names or the details about the allegations of their abuse—or the fact of their having been abused—to be shared with anyone (assuming that each such person could be located and queried, which is highly unlikely).  A court order giving such information to Plaintiff would erode and ignore the privacy of those named.  Will Plaintiff's attorney contact those he can find?  Will he contact their family members, their employers, or worse, put the information in the hands of others who could put such information online, to the shame and humiliation of those involved?  Imagine the revulsion a parent would feel as his son or daughter learned the parent had been sexually abused as a child.  Or perhaps worse, that their father, when he was a teenager, had abused a child.  The dissemination of such sensitive information could ruin the lives of the people involved and their families.  To what end does the plaintiff in this case need this information?

The disclosure of private information about third parties contained in the subject documents implicates the third parties' freedom of association. *See Church of Hakeem, Inc. v. Superior Court*, 110 Cal. App. 3d 384, 387 (1980) (real parties in interest failed to make the required showing of compelling state interest, and thus anonymity of membership list of religious organization remained protected by members' right of associational privacy). As the *Church of Hakeem* court explained, the U.S. Supreme Court has declared that "all legitimate organizations are the beneficiaries of these (privacy of association) protections" and the right to associate for the advancement of beliefs is protected "whether the belief sought to be advanced pertains to political, economic or religious matters." *Id*. Many, if not most, of the subject documents disclose the names of individual Jehovah's Witnesses who have no connection whatsoever to this lawsuit, and unavoidably reveal those persons' association with Jehovah's Witnesses. To allow disclosure of such information would infringe the right of anonymity those persons enjoy under their constitutional right of freedom of association.

Where, as here, information is sought that would violate non-parties' constitutional privacy rights if the information were disseminated, the "ordinary yardstick" for discoverability is inapplicable. *Juarez v. Boy Scouts of America, Inc.*, 81 Cal.App.4th 377, 392. (2000). "It is not enough to show the matters encompassed by the right of privacy are merely relevant to the issues of ongoing litigation." *Id*. The correct test for discoverability of constitutionally protected private information requires "a careful balancing of the *compelling **public** need*"—not merely a particular litigant's alleged need—"for discovery against the fundamental right of privacy." *Ombudsman Services of Northern California v. Superior Court*, 154 Cal.App.4th 1233, 1251 (2007).

If the name of an accused labeled as a "known child abuser" because of an act of abuse committed when young were revealed to the public, that person e could lose his job, his income,

and his home.  The victim could be re-traumatized.  This would be true, even if the victim's name were withheld, simply by publishing the name of his/her abuser whom the victim would know. The victim's parents could suffer shame.  Others in the congregation who relied on confidentiality would be subject to embarrassment and could lose friends relied on for decades.  The constitutional right to privacy is well-founded, and requires an inquisitor to show compelling public need to overcome it.

  **E.**  **Plaintiff's Requests should not be allowed for other good cause shown.**

  Watchtower objects that Requests 65 and 67 are overly broad and unduly burdensome, to the point of being oppressive and harassing.  The responses to the 1997 Letter are presently under review but no review of documents has ever been undertaken to try to find documents that reference "any allegations of sexual abuse of children within the Jehovah's Witnesses Church since 1960."  To try to comply with that inquiry  would require a search of electronic files using terms like "abuse," "child abuse," "child sexual abuse," "pedophilia," "molest," "molested," "molestation," "porneia," "fornicate," "fornicated," "fornication," "sexual misconduct," "misconduct with a child," "gross sin," "gross sexual sin," "harassment," "fondle," "touched," "raped," "maltreated," "accosted," "depraved," "depravity," "victimized," "violated," "defiled," "seduced," and others, together with tense variations of each term.  After culling out those that do not deal with child sexual abuse, one would have to determine what privacy interests exist, what minister-penitent privileges exist, and what attorney-client privileges exist, each based upon the laws of the states where the communications occurred.  A manual search would be needed to find documents that have not been scanned and those whose scanning did not produce a searchable electronic file.  Quite a few letters from congregation elders to the Service Department were hand-

written.  Given the duration of files sought, 1960-on, such a search would take many months—or years—to search the over 14,500 congregation files in the Service Department.

As for the responses to the 1997 Letter, a state-by-state search is underway, to enable Watchtower to demonstrate to the trial court in the lawsuit of *Padron v. Doe 1 et al*, Case No. 37-2013-00067529-CU-PO-CTL (Superior Court of the State of California for the County of San Diego) that they contain nothing relevant.  Even if all identifying details were redacted, their content merely shows that some men who had abused a child in their past later served in an appointed capacity in a congregation *other* than the Bellows Falls Congregation.  None of that information can lead to admissible evidence in this case.

Plaintiff claims the documents she seeks relate to Watchtower's institutional knowledge of child abuse, supporting her theory that Watchtower was negligent or grossly negligent by appointing or retaining True as a ministerial servant.  That theory has three problems.  First, neither Watchtower nor the Congregation considered True to be a proven child molester.  The R.B. allegation that preceded the dates on which Lewis claims to have been abused was never substantiated or pursued in any arena, most notably because R.B. quickly recanted the allegation. (Reimann Decl. ¶ 9). Second, True was not appointed in any capacity in the congregation when Plaintiff says True abused her – he was merely a fellow congregant. (Reimann Decl. ¶ 7, 8).  Third, the alleged abuse occurred at True's home when Plaintiff was visiting at the Trues' home.  (Exhibit D, pp. 3-4 attached to Miller Decl.)

The responses to the 1997 Letter do not describe persons determined by criminal courts to be abusers, but those whom *elders* (i.e., laypersons) considered "known" abusers.  Each letter is a confidential spiritual communication between Service Department elders and local elder bodies for the purpose of seeking spiritual advice and guidance in accordance with the Holy Scriptures.

*See* V.R.E. 505(b).  The reported abuse ranges from tan 18-year-old who had sex with his 14-year-old girlfriend to a man serving as an elder having touched a young child inappropriately.  Such information would not be probative of (i) Watchtower's knowledge of True's alleged propensities during the relevant time; (ii) Watchtower's alleged negligent supervision of True during the relevant time; (iii) Watchtower's alleged failure to warn Plaintiff or her parents or report to law enforcement authorities the risk of abuse by True; or (iv) Watchtower's alleged failure to warn, train, or educate plaintiff about how to avoid sexual abuse; or any other theory of liability Plaintiff can assert.  Evidence of institutional knowledge of child abuse from other jurisdictions does nothing to advance Plaintiff's claim.

Plaintiff says the documents show that Watchtower should have told her or her parents about the danger that True posed.  But the same problems render this proposed use immaterial.  No court in the nation has held that an organization, let alone a church, must warn its members about an allegation of past abuse by a fellow member.  Particularly that is so when the alleged abuse occurred at the alleged abuser's home during private, non-church-related activities.

In sum, the response letters from congregation elders around the nation to the 1997 Letter and the documents about alleged or confessed abuse of children attending congregations of Jehovah's Witnesses from around the United States have no bearing on any issue in this lawsuit.  There is simply no probative value in correspondence not related to Plaintiff, True, or any other documents not involving the Bellows Falls Congregation.  Defendants have provided Plaintiff a copy or privilege log of all records in their possession pertaining to allegations of child abuse committed by Norton True against third parties and to allegations of abuse of Plaintiff.

It is not unheard of for counsel to use the liberal discovery process in Federal Court to solicit additional clients.  *Dove v. Atlantic Capital Corp.* 963 F2d 15, 19 (2nd Cir. 1992).  The Court

should be wary of such use of civil discovery that is tangentially related at best to the litigation of the case at bar.

**V.    Plaintiff's Requests unconstitutionally entangle the Court in Watchtower's religious beliefs, practices and internal discipline and governance**

The discovery sought in Requests 65 and 67 impinges on Watchtower's state and federal constitutional rights of free exercise of religion.  One reason elders take confessions about gross sins is to help the sinners repent, turn their sinful conduct around, and recover their relationship with God.  They also administer spiritual discipline within the congregation.  For many decades, the U.S. Supreme Court has recognized the right of religions to discipline its members.  To require a religious entity to subject its disciplinary practices to scrutiny by forcing it to produce its discipline records in discovery would have a chilling effect on the practices of the religion.  No longer would churches feel free to administer Biblical admonishment; rather, nothing short of disfellowshipping (excommunication) would be permissible in cases of molestation.

To honor Plaintiff's request for information to demonstrate Jehovah's Witnesses' beliefs and practices for handling child sexual abuse allegations against a congregation member, this Court must entangle itself in religion in violation of the First Amendment to the U.S. Constitution and Chap. 1, Art. 3, of the Vermont Constitution of 1786. *Serbian Eastern Orthodox Diocese v. Milivojevich*, 426 U.S. 696, 709 (1976).

"[T]he First Amendment … gives special solicitude to the rights of religious organizations." *Hosanna-Tabor Evangelical Lutheran Church v. EEOC*, 565 U.S. ___, ___, 132 S.Ct. 694, 706 (2012).  If the conduct sought to be deterred is motivated by religious belief, the constitutional protections of religious liberty come into play.  Religious freedom, like other First Amendment freedoms, is "delicate and vulnerable, as well as supremely precious in our society.  The threat of sanctions may deter their exercise almost as potently as the actual application of sanctions….

Because First Amendment freedoms need breathing space to survive, government may regulate in the area only with narrow specificity." *NAACP v. Button*, 371 U.S. 415, 433 (1963), citing *Cantwell v. Connecticut*, 310 U.S. 296 (1940); *see*, *Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 532 (1993) ("At a minimum, the protections of the Free Exercise Clause pertain if the law at issue … regulates or prohibits conduct … undertaken for religious reasons.").

An examination and evaluation of the reasonableness of Jehovah's Witnesses' standards for congregation membership, appointment of elders or ministerial servants, or discipline or expulsion of congregation members will unavoidably entangle the court and jury in matters of faith and doctrine. *See*, *Kedroff v. Saint Nicholas Cathedral*, 344 U.S. 94, 116 (1952) (First Amendment gives religious organizations the "power to decide for themselves, free from state interference, matters of … faith and doctrine"); *Concord Christian Center v. Open Bible Standard Churches*, 132 Cal.App.4th 1396, 1409 (2005) ("The First and Fourteenth Amendments of the federal constitution—and their counterpart in the California constitution (Cal. Const., art. I, § 4)—impose limitations on the jurisdiction of civil courts over the internal affairs and administration of ecclesiastical institutions."); cf. *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. ___, ___, 134 S.Ct. 2751, 2779 (2014) ("[I]t is not for us to say that [the plaintiffs'] religious beliefs are mistaken or insubstantial.  Instead, our 'narrow function … in this context is to determine' whether the line drawn reflects 'an honest conviction.'"), quoting *Thomas v. Review Bd.*, 450 U.S. 707, 716 (1981).

The very "process of inquiry" by means of broad, intrusive discovery into religious doctrines, practices, and reasons for ecclesiastical decisions impinges religious liberty. *NLRB v. Catholic Bishop of Chicago*, 440 U.S. 490, 502 (1979); *Alcazar v. Corp. of the Catholic Archbishop of Seattle*, 598 F.3d 668, 672-73 (9th Cir. 2010) ("Judicial entanglement into religious doctrine has substantive and procedural components. . .  As for the procedural dimension, the very

process of civil court inquiry into the clergy-church relationship can be sufficient entanglement.")[14]; cf. *Bollard v. California Province of the Society of Jesus*, 196 F.3d 940, 948-49 (9th Cir. 1999) ("On a substantive level, applying [a] statute to the clergy-church employment relationship creates a constitutionally impermissible entanglement with religion if the church's freedom to choose its ministers is at stake.").   Discovery into a religious organization's development of doctrine, standards, and practices for handling internal church discipline "inject[s] the civil courts into substantive ecclesiastical matters." *Presbyterian Church v. Mary Elizabeth Blue Hull Memorial Presbyterian Church*, 393 U.S. 440, 451 (1969).

The danger of "interaction between church and state" is what the Establishment Clause prohibits. *Lynch v. Donnelly*, 465 U.S. 668, 684 (1984).  For that reason, judicial processes and internal disciplinary actions are not properly considered by civil courts. *Watson v. Jones*, 80 U.S. 679, 733 (1871) ("in so far as the fundamental laws of the church confer powers on its tribunals, the civil courts will recognize them, and where civil rights are involved, will give effect to their exercise ***without inquiring into the motives or grounds of action*** of the ecclesiastical tribunal") (emphasis added); *Horsman v. Allen*, 129 Cal. 131, 138-39 (1900) (ecclesiastical and theological controversies including "matters of faith, discipline, and the general polity and tenets of the church are ***issues beyond the jurisdiction of secular courts***.") (emphasis added).

## VI.    Conclusion

For the foregoing reasons, defendant Watchtower Bible and Tract Society of New York, Inc. respectfully requests the Court issue a protective order preventing the production of documents in response to Plaintiff's Request for Production Nos. 65 and 67 to Watchtower in accord with the protections urged above.

---

[14] (Vacated in part on another point and adopting the relevant argument *en banc* at 627 F.3d 1288.)

Dated at Burlington, Vermont this 13th day of October, 2015.

                                  WATCHTOWER BIBLE AND TRACT
                                  SOCIETY OF NEW YORK, INC.

                                  /s/ Pietro J. Lynn
                                  Pietro J. Lynn, Esq.
                                  Sean M. Toohey, Esq.
                                  Lynn, Lynn & Blackman, P.C.
                                  76 St. Paul Street, Suite 400
                                  Burlington, VT 05401
                                  plynn@lynnlawvt.com