UNITED STATES DISTRICT COURT

FOR THE

DISTRICT OF VERMONT

ANNESSA LEWIS,                                  )
     Plaintiff                                )
                            )
        v.                                    )       Docket No. 1:14-cv-205
                            )
BELLOWS FALLS CONGREGATION OF                   )
JEHOVAH'S WITNESSES, BELLOWS                     )
FALLS, VERMONT, INC.; WATCHTOWER                )
BIBLE AND TRACT SOCIETY OF NEW                  )
YORK, INC.; and NORTON TRUE,                    )
     Defendants                               )

PLAINTIFF'S OPPOSITION TO DEFENDANT WATCHTOWER BIBLE AND
TRACT SOCIETY OF NEW YORK, INC.'S MOTION FOR PROTECTIVE ORDER

Plaintiff Annessa Lewis, by her attorneys, Gravel & Shea PC, opposes the Motion for

Protective Order ("Motion") filed by Defendant Watchtower Bible and Tract Society of New

York, Inc. ("Watchtower") as follows:

Introduction

Through its Motion, Watchtower seeks a blanket determination that many documents,

containing possibly thousands of pages of relevant information regarding Watchtower's

institutional awareness of child molestation by Jehovah's Witnesses, are privileged.  Watchtower

has not looked for, or identified, many of these documents.  Instead, Watchtower asks this Court

to defer to Watchtower simply because it is a religious organization.

The documents at issue are important to Plaintiff's claims but also to permit her to respond to Watchtower's defenses.

This category of documents does not qualify for any privilege and the First Amendment does not prevent the disclosure of the documents. The Court should deny Watchtower's Motion.

I.     DOCUMENTS SHOWING WATCHTOWER'S INSTITUTIONAL AWARENESS OF CHILD MOLESTATION BY JEHOVAH'S WITNESSES ARE RELEVANT FOR SEVERAL PURPOSES.

The scope of discovery in civil actions is broad.

> Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense . . . For good cause, the court may order discovery of any matter relevant to the subject matter involved in the action. Relevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence.

Fed. R. Civ. P. 26(b)(1). Despite this broad standard, Watchtower seeks to avoid production of vital information on the basis of its alleged irrelevance.

A.     Complaints Of Childhood Sexual Abuse From 1960 (Plaintiff's Request For Production Number 67).

Watchtower's Motion involves two specific document requests. Plaintiff's request number 65 seeks all documents received by the Service Department in response to a letter Watchtower sent to all congregations on March 14, 1997 (hereinafter "Molestation Files"). Request number 67 seeks all documents involving allegations or complaints of childhood sexual abuse made known to Watchtower since 1960. Each request seeks the same type of information: evidence regarding Watchtower's institutional knowledge of the risk and prevalence of childhood sexual abuse by Jehovah's Witnesses, as well as the handling of those allegations by Watchtower. The documents are directly relevant to several separate issues in this action.

gravel & shea | ATTORNEYS AT LAW
76 St. Paul Street
Post Office Box 369
Burlington, Vermont  05402-0369
A PROFESSIONAL CORPORATION

- 2 -

1.    Evidence Of Watchtower's Awareness Of Childhood Sexual Abuse By Jehovah's Witnesses Is Necessary To Respond To Its Standard Of Care Defense.

The requested documents are relevant in responding to the Defendants' anticipated defense that during the early to mid-1990s when Norton True ("True") was accused of molesting R.B., and when he molested Plaintiff, society generally had less awareness of the dangers of child molestation than it does now, and that Defendants' actions must be judged by what was known at the time, rather than by contemporary standards.[1]  For instance, in past litigation Watchtower designated Monica Applewhite, Ph.D., as its standard of care expert.  In each instance, Dr. Applewhite offered the following "key opinion":

> [t]he knowledge base regarding sexual abuse of minors and the associated skills and protocols designed to prevent, detect, investigate and respond have developed on an incremental basis from the 1930's [sic] until today.  Any examination of reasonable care must be considered within a historical framework that acknowledges the recent growth in awareness and specific knowledge or warning signs.

*See* Declaration of Devin M. Storey, October 29, 2015, ("Storey Decl.") Exhibit 3 at 1, Exhibit 4 at 1.  In other words, Watchtower will seek to excuse its neglect in responding to allegations of child sexual abuse against True by arguing that society was generally uninformed about child molestation at the time of the prior complaint.  Discovery of these materials will allow Plaintiff to respond to this contention by showing that Watchtower possessed ample knowledge about the risk of child molestation by Jehovah's Witnesses, regardless of the level of societal awareness.  The documents are necessary to rebut Watchtower's defense.

---

[1] This is a typical defense by institutional defendants in child sexual abuse cases that originated years in the past.



gravel &
shea | ATTORNEYS AT LAW
76 St. Paul Street
Post Office Box 369
Burlington, Vermont  05402-0369
A PROFESSIONAL CORPORATION

- 3 -

2.      Watchtower's Awareness Of Molestation By Jehovah's Witnesses Is Relevant To Assessing The Reasonableness Of Watchtower's Policies And Efforts To Educate Its Members.

It is undisputable that Watchtower developed policies and practices for responding to allegations of childhood sexual abuse and for monitoring members who had been accused of molestation.  *See* Storey Decl., Exhibits 1, 2, 5, 6.  Watchtower also endeavored to develop policies and educational materials regarding childhood sexual abuse that it chose to distribute to Elders, Ministerial Servants, members and parents.  The information requested is necessary to permit a jury to assess the reasonableness and quality of Watchtower's policies and training materials to determine whether they were sufficient to enable the Elders to properly supervise agents (such as True) who previously had been accused of molestation.  The reasonableness of the Elders' supervision of True is a central inquiry to both of Plaintiff's negligence theories here and in negligent supervision cases in general.

The discovery also may show that Watchtower was unreasonable in failing to strengthen these policies, or to implement new policies over time that should have prevented Defendant True from molesting Plaintiff.  It is also likely that the training materials and methodology are so deficient (in light of the number of molestation complaints received) that the sheer volume of complaints would justify amending the complaint to include an additional cause of action alleging Watchtower's negligent failure to train or educate its membership about the foreseeable threat of molestation by congregation members.  However, it only is by seeing this material that Plaintiff's counsel will be able to make that determination.

3.      Evidence Of Watchtower's Awareness Of Molestation By Jehovah's Witnesses Will Highlight The Unreasonableness Of Watchtower's Decision To Accept True's Denials That He Molested Several Minors.

Jehovah's Witness Elders learned of True's molestation of at least four minors (R.B., B.S., Miranda Lewis and Plaintiff).  Despite True's incredulous excuses (i.e. he had his hands in



76 St. Paul Street
Post Office Box 369
Burlington, Vermont  05402-0369
A PROFESSIONAL CORPORATION

Plaintiff's pants because he thought a bee may have flown under her overalls), Defendants accepted True's denials and never took any action against him.[2]  Evidence showing Watchtower's institutional awareness of child molestation is relevant to assessing the reasonableness of True's denials.[3]  A defendant with a greater degree of knowledge regarding childhood sexual abuse would be expected to look at an accused molester's excuses with a greater degree of sophistication than an organization that had never previously dealt with molestation.  The discovery is relevant to evaluating the reasonableness of Defendants' actions.

    4.    Evidence Of Watchtower's Awareness Of Molestation By Jehovah's Witnesses Will Highlight The Unreasonableness Of Watchtower's Decision To Accept R.B.'S Recantation Of Her Allegation Against True.

Watchtower contends that shortly after True was accused of molesting R.B., the victim recanted her accusation.  Motion at 18.  However, the evidence also shows that Elders met with R.B. and informed her that slander is a serious matter, thus likely precipitating the recantation through intimidation.  *See* Storey Decl., Exhibit 21 at 9.

Watchtower's specific institutional awareness of the way child molesters operate, how victims respond to intimidation, the frequency with which such victims recant accusations, only

---

[2] At least three of these accusations (R.B., Miranda Lewis and Plaintiff) were known directly to both Watchtower and Bellows Falls Congregation of Jehovah's Witnesses, Bellows Falls, Vermont, Inc. ("Bellows Falls Congregation").  The fourth allegation (B.S.) was known to Bellows Falls Congregation and may have been known to Watchtower.

[3] Watchtower contends that its institutional knowledge is irrelevant because:  (1) Defendants did not consider him to be a "known" molester; (2) True allegedly did not hold an appointed position at the time he molested Plaintiff; and (3) Plaintiff was not abused at the Kingdom Hall.  Motion at 18.  None of the considerations undermine the relevance of the materials.  The information contained in the documents may demonstrate the unreasonableness of Defendant's refusal to acknowledge the danger posed by True; whether True was in an appointed position is disputed, but regardless evidence of institutional awareness is relevant to its efforts to monitor him after learning of the allegations; and the location of the abuse is inconsequential since True used his position to gain access to Plaintiff.



to have the molester go on to abuse others, all are relevant to assessing the reasonableness of Defendants' decision to accept the recantation or in questioning a minor so aggressively.

        5.      The Requested Materials Are Important In Determining Watchtower's Responsibility For Punitive Damages And The Appropriate Amount Of Such Damages.

Evidence of Watchtower's awareness of molestation by Jehovah's Witnesses is relevant to determining if Watchtower is liable for punitive damages.  Punitive damages are appropriate when a defendant has acted with malice.  *Shortle v. Central Vermont Public Service Corp.,* 137 Vt. 32, 33 (1979).  "This may be shown by conduct manifesting personal ill will or carried out under circumstances evidencing insult or oppression, or even by conduct showing a reckless or wanton disregard of one's rights."  *Id.*  The requested materials will demonstrate Watchtower's awareness of the risk of molestation to its minor congregants and its habitual disregard of that risk.  The materials likely also will demonstrate that Watchtower had a history of tolerating molestation of minors or disbelieving allegations; that Watchtower affirmatively created policies requiring Elders to cover up allegations and protect molesters from criminal prosecution; and that Watchtower refused to enact or strengthen policies in response to evidence of an obvious risk.  These facts would be sufficient to show malice.

The documents also are relevant in evaluating the appropriate amount of punitive damages.  "The most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct."  *Shahi v. Madden,* 183 Vt. 320, 334 (2008), citing *State Farm Mutual Automobile Insurance Co. v. Campbell,* 538 U.S. 408, 123 S.Ct. 1513 (2003).  "In assessing the reprehensibility of a defendant's actions, a jury may consider whether 'the conduct involved repeated actions or was an isolated incident.'"  *Carpentier v. Tuthill,* 195 Vt. 52, 57 (2013).  In *Carpentier,* the Supreme Court of Vermont noted:



gravel &
shea | ATTORNEYS AT LAW
76 St. Paul Street
Post Office Box 369
Burlington, Vermont  05402-0369
A PROFESSIONAL CORPORATION

- 6 -

> [c]ertainly, evidence that a defendant has repeatedly engaged in prohibited conduct while knowing or suspecting that it was unlawful would provide relevant support for an argument that strong medicine is required to cure the defendant's disrespect for the law. Our holdings that a recidivist may be punished more severely than a first offender recognize that repeated misconduct is more reprehensible than an individual instance of malfeasance.

195 Vt. at 57, citing *BMW of N. Am., Inc. v. Gore,* 517 U.S. 559, 576–77, 116 S.Ct. 1589 (1996).

Watchtower's response to molestation allegations is relevant to assessing the reprehensibility of its actions and inactions in this case.  *See Carpentier*, 195 Vt. at 59, discussing *Gryger v. Burke,* 334 U.S. 728, 732, 68 S.Ct. 1256 (1948) ("an individual's acts may be considered more reprehensible, and thus subject to a heightened penalty, because they are repetitive.")

B.   The March 14, 1997 Body Of Elders Letter (Plaintiff's Request For Production Number 65).

On March 14, 1997, Watchtower sent a Body of Elders ("BOE") letter to each congregation of Jehovah's Witnesses in the United States.  *See* Storey Decl., Exhibit 1.  That letter addressed a matter "of serious concern" – molestation of children within the organization. The letter was aimed at protecting children.  *See* Storey Decl., Exhibit 1 at p. 1, ¶ 2; p. 2, top of page heading, ¶¶ 1, 2, 3.  The letter instructed elders:

> [i]t may be possible that some who were guilty of child molestation were or are now serving as elders, ministerial servants, or regular or special pioneers. . . . the body of elders should discuss this matter and give the Society a report on anyone who is currently serving or who formerly served in a Society-appointed position in your congregation who is known to have been guilty of child molestation in the past. . . [¶] . . . In your report please answer the following questions: How long ago did he commit the sin?  What was his age at the time?  What was the age of his victim(s)?  Was it a one-time occurrence or a practice?  If it was a practice, to what extent?  How is he viewed in the community and by the authorities?  Has he lived down any notoriety in the community?  Are members of the congregation aware of what took place?  How do they and/or his victim(s) view him?  Has he ever been disfellowshipped, reproved, counseled, or otherwise dealt with?  If he has moved to another congregation, please identify the

gravel &
shea | ATTORNEYS AT LAW

76 St. Paul Street
Post Office Box 369
Burlington, Vermont  05402-0369

A PROFESSIONAL CORPORATION

- 7 -

congregation to which he has moved.  Was that congregation advised of his past conduct of child molestation, and, if so, when? [If you have not advised them, this should be done now, and you should send a copy of your letter to the Society in a 'Special Blue' envelope.]  This information should be sent to the Society along with any other observations that the body of elders has.  Please send this to the Society in the 'Special Blue" envelope so that the factors involved may be given due consideration; this information is not to be made available to those not involved.[4]

*See* Storey Decl., Exhibit 1 at 2-3.

On July 20, 1998, Watchtower published an additional BOE following up on the March 14, 1997 BOE.  This second BOE makes clear that Watchtower was concerned about legal liability since "court officials and lawyers will hold responsible any organization that knowingly appoints former child abusers to positions of trust, if one of these, thereafter, commits a further act of child abuse."  *See* Storey Decl., Exhibit 2 at 1.  Although these documents are relevant for the same reasons as the previous category, Plaintiff has gathered four responsive documents that were publicly filed in other litigation.  These documents, as exemplars, show the clear relevance of this category of report:

- The August 31, 1998 letter regarding Jonathan Kendrick notes that Watchtower had been provided all the necessary information years earlier on November 15, 1993.  *See* Storey Decl., Exhibits 8, 10.

- The October 2, 1998 letter regarding James Henderson shows that Watchtower was made aware of Henderson's molestation of children when he was disfellowshipped in 1994 for child molesting.  *See* Storey Decl., Exhibit 11.

- The July 24, 1999 letter regarding Gonzalo Campos shows Watchtower was aware of Campos' molestation of children years earlier as a result of judicial committees in 1986 and 1995.  *See* Storey Decl., Exhibit 12 at 2.  The letter showed the Elders covered up for Campos, noting: "[t]he community does not

_____

[4] "Special Blue" envelopes all are directed to the Watchtower Service Department; not the Legal Department.  As such, these reports are sent from non-lawyers in local congregations to non-lawyers in the Watchtower Service Department.  These reports are not and cannot be protected by the attorney-client privilege.

gravel &
shea | ATTORNEYS AT LAW

76 St. Paul Street
Post Office Box 369
Burlington, Vermont  05402-0369

A PROFESSIONAL CORPORATION

- 8 -

know of all this and there was no publicity about this.  Everything took place in the congregation and because of that he was not prosecuted."  *Id. at* 1.

- The November 16, 2006 letter regarding Gilbert Simental shows the Elders' efforts to suppress knowledge of the molestation, noting "[s]ome talk among a couple of sisters occurred and we talked to them about keeping the matter confidential."  *See* Storey Decl., Exhibit 13 at 1.

These examples show Watchtower was aware of complaints about the individual before the responsive reports were prepared (Kendrick in 1993 / Henderson in 1994 (disfellowshipped) / Campos in 1995 (disfellowshipped)).  Some of these documents evidence how congregations, following Watchtower's policies, covered-up abuse and protected child molesters.  *See* Storey Decl., Exhibit 12 at 1, ["[t]he community does not know of all this and there was no publicity about this.  Everything took place in the congregation and because of that he was not prosecuted"].  *See* Storey Decl., Exhibit 13 at 1.  Finally, the Kendrick situation is particularly analogous.  Like the R.B. allegation in this action, the molester was accused of touching the breast of the minor while she slept.  At the time of that allegation, the Elders were informed that he had also touched the breast of a second minor female, but (like True) the molester successfully denied the allegation as an accidental touching.  *See* Storey Decl., Exhibit 10.

These examples have striking and immediately apparent relevance to establishing Watchtower's state of knowledge and correspondingly, the reasonableness of Watchtower's actions in this case.  If these four examples that Plaintiff's counsel obtained from other litigation have such strong relevance to the issues in this action, what might the rest show?  Watchtower does not want Plaintiff to find out.

C.   Several Courts Have Considered And Permitted Discovery Of A Defendant's Institutional Knowledge Of Childhood Sexual Abuse By Its Agents.

In circumstances similar to those presented in this action, courts have required institutional defendants to produce institution-wide evidence of sexual molestation.  In *T.S. v.*


gravel & shea
ATTORNEYS AT LAW
76 St. Paul Street
Post Office Box 369
Burlington, Vermont  05402-0369
A PROFESSIONAL CORPORATION

- 9 -

*Boy Scouts of America*, the trial court ordered the Boy Scouts to produce decades-worth of its "Ineligible Volunteer Files" – which chronicle allegations of molestation by scout personnel nationwide.  157 Wash.2d 416, 419 (Wash. 2006).  The trial court rejected the Boy Scouts' motion for protective order, which argued that the files were irrelevant since they did not involve the plaintiffs' abuser, the request was burdensome, and production would violate the privacy rights of third parties.  *Id.* at 420.  The Supreme Court of Washington affirmed the decision of the trial court.  *Id.* at 432.  In *Doe v. Corporation of Presiding Bishop of Jesus Christ of Latter-Day Saints*, the Supreme Court of Oregon went a step further than its colleagues in Washington and issued an order permitting 1,247 specific Ineligible Volunteer Files to be made available to the public.  352 Or. 77, 81, 102-103 (Ore. 2012); *see also Doe v. U.S. Swimming, Inc.*, 200 Cal.App.4th 1424, 1428 (Cal.App. 2011) (defendant ordered to produce 1,864 documents showing sexual abuse nationwide over ten year period); *Hutchison v. Luddy*, 414 Pa.Super. 138 (PA 1992) (Diocese ordered to produce all allegations of molestation received over 15 years.)[5]

_____

[5] On the other side of the equation is *Juarez v. Boy Scouts of America* (Cal.App. 2000) 81 Cal.App.4th 377, which will likely be cited by Watchtower's in its reply brief, and where the trial court's order denying discovery of the Ineligible Volunteer Files was affirmed on appeal. The *Juarez* court went to great length to detail the ineptitude of the plaintiff's lawyer, recognizing that the lawyer did not respond to defendant's discovery requests and made virtually no effort to establish why the Ineligible Volunteer Files were relevant.  *Id.* at 391-392.  Even so, the court hedged on the relevance issue noting that the plaintiff had not shown that the evidence "is directly relevant to any *disputed* issue in this case."  *Id.* at 392 (italic emphasis in original.)  The scope of discovery had been curtailed by an issue sanction imposed against the plaintiff that established that the defendants did not know, and had no reason to know, that the Scout leader that molested the plaintiff was a threat to molest children.  *Id.* at 386.  Moreover, the court recognized that the scope of discovery had been further eroded since other issues for which the files may be relevant had been conceded by the defendants.  *Id.* at 392.  *Juarez* is an aberration resulting from a combination of bad lawyering by the plaintiff's attorney and an issue sanction that truncated the scope of discovery.  Neither is present here.  This Court should follow the weight of authority, which supports production of the requested documents.

gravel & shea | ATTORNEYS AT LAW
76 St. Paul Street
Post Office Box 369
Burlington, Vermont  05402-0369
A PROFESSIONAL CORPORATION

- 10 -

D.      Although The Requests Are Similar, They Are Complementary Rather Than Duplicative.

Watchtower likely will contend that Plaintiff's request number 67 seeking child abuse complaints known to Watchtower since 1960 is duplicative of the request for the Molestation Files. This would be incorrect. Both requests have holes that the other request is necessary to fill. For instance, the request for the Molestation Files is limited because reports only were required if the molester had held, or currently holds, an appointed position as a Ministerial Servant, Elder or Special or Regular Pioneer. *See* Storey Decl., Exhibit 1. Thus, if the molester never held one of these positions, no report was necessary. The Molestation Files were also limited to "known" molesters. *Id.* As Watchtower argues, although True had been accused of molestation, and held an appointed position, no report was sent because he was not considered a "known" molester. Motion at 18. Finally, there have been circumstances where a report should have been sent, but never was. *See* Storey Decl. at ¶ 8; *see also* Exhibit 7 [asking for letter that was not sent by local congregation]; Exhibit 8 [thinking an earlier letter sufficient]. A request for only the Molestation Files will result in production of only a partial inventory of complaints known to Watchtower.

Similarly, a request for all molestation complaints abuse since 1960 has holes. This results generally from Watchtower's past document retention policies. Prior to the time of the molestation in this case, Watchtower did not have a policy of retaining molestation allegations in perpetuity. Such a retention policy was not put in place until the July 20, 1998 BOE letter was issued. *See* Storey Decl., Exhibit 2 at 1 ["any correspondence put in the confidential congregation file about an individual accused of child molestation, proven or otherwise, should be marked "Do Not Destroy" and be kept indefinitely"]. As of 2003, Watchtower's retention policy still permitted the purging and destruction of documents not marked "Do Not Destroy."


gravel &
shea | ATTORNEYS AT LAW
76 St. Paul Street
Post Office Box 369
Burlington, Vermont  05402-0369
A PROFESSIONAL CORPORATION

*See* Storey Decl., Exhibit 14 at 7-1.  Thus, many documents relating to past allegations of

misconduct prior to 1998 were not retained.  While the two requests seek similar materials with

similar relevance, the requests are complementary and designed to ensure full production of

existing documents relating to the full breadth of Watchtower's institutional awareness of

childhood sexual abuse within the Jehovah's Witnesses.

II.     THE RELIGIOUS PRIVILEGE DOES NOT APPLY TO THE COMMUNICATIONS IN
        THE SUBJECT DOCUMENTS.

While requesting a protective order excusing it from producing *any* documents

responsive to Plaintiff's requests, Watchtower concedes that some of the requested documents

are *unprivileged*.  Motion at 2 ["*[m]ost* of the documents contain minister-communicant-

privileged information"] (emphasis added).  Regardless of this concession, none of the

documents at issue qualify for the religious privilege, which states that: "[a] person has a

privilege to refuse to disclose and to prevent another from disclosing a confidential

communication by the person to a clergyman in his professional character as spiritual adviser."

V.R.E. 505(b).  "A communication is 'confidential' if made privately and not intended for

further disclosure except to other persons present in furtherance of the purpose of the

communication."  V.R.E. 505(a)(2).

Defendant's unreasonably broad assertion of this privilege fails for three reasons.  First,

Watchtower has not established that any communication was "confidential."  Second,

Watchtower has not made a showing that any of the communications were made to a member of

the clergy acting as a "spiritual advisor."  *See State v. Nunez,* 162 Vt. 615, 616 (1994) (privilege

proponent bears burden of establishing application of privilege.)  Third, each communication

was re-disclosed by the local congregation to Watchtower (who now possesses the documents),



gravel &
shea | ATTORNEYS AT LAW
76 St. Paul Street
Post Office Box 369
Burlington, Vermont  05402-0369
A PROFESSIONAL CORPORATION

- 12 -

and Watchtower has made no showing that these disclosures were made in furtherance of the purpose of the original communication.  This privilege does not apply.

A.      Watchtower's Policies And Practices For Responding To Child Molestation Allegations Allow For Widespread Dissemination And Preclude A Finding That Such Communications Were "Confidential."

To be privileged, Watchtower must establish that each communication was "confidential," meaning "made privately and not intended for further disclosure except to other persons present in furtherance of the purpose of the communication."  V.R.E. 505(a)(2). Watchtower has not made, and cannot make, that showing with respect to any of the withheld documents.  Jehovah's Witnesses use established procedures for responding to allegations of child molestation.  The nature of these proceedings demonstrates the generally non-confidential nature of such allegations and refutes Defendant's claims of privilege.

Not all allegations of childhood sexual abuse are considered confidential by Jehovah's Witnesses.  *See* Storey Decl., Exhibit 15 at 70:9-71:11.  When Elders learn of a complaint of childhood sexual abuse, their first action is always to call the Watchtower Legal Department for advice.  *See* Storey Decl., Exhibit 16 at 119:6-121:22; Exhibit 17 at 271:1-272:24; Exhibits 5, 6. In some instances, the Legal Department then connects the Elders to a different Department at Watchtower (the Service Department) for further action.  *See* Storey Decl., Exhibit 16 at 123:16-124:2.  In fact, Elders have always been encouraged to contact the Service Department for direction.  *Id.* at 118:15-119:5.

After contacting the Legal Department, the Elders have complete discretion to contact the authorities to report the abuse, even if they are not mandatory reporters, and even if the communicant does not want the Elder to report.  A reporting Elder would face no repercussions within the organization.  *See id.* at 272:25-274:22; Exhibit 15 at 68:25-71:20.  After contacting the Legal Department, the Elders investigate the allegations.  *See* Storey Decl., Exhibit 16 at



gravel &
shea | ATTORNEYS AT LAW
76 St. Paul Street
Post Office Box 369
Burlington, Vermont  05402-0369
A PROFESSIONAL CORPORATION

66:3-67:13.  This investigation can result in the formation of a Judicial Committee and imposition of punishment ranging from a private censure (reproof) to disfellowshipping (expulsion from the organization).  *Id*. at 74:12-16, 80:16-82:18, 87:6-92:12.

A disfellowshipped member has the right to appeal the decision of the Judicial Committee.  *Id*. at 94:10-14.  In which case, a traveling Elder known as a Circuit Overseer assembles a three person appeal committee handpicked from different congregations to hear the appeal.  *Id*. at 94:15-95:20.  Regardless of the decision of the appeal committee, the Service Department is contacted about the allegations.  *Id*. at 40:22-44:22, 100:12-101:6.

A disfellowshipped member can apply for reinstatement.  *Id*. at 107:3-19.  Depending on the length of time that has passed, a completely different set of Elders than those that heard the original molestation complaint may consider such a request.  *Id*. at 109:16-110:8.  Watchtower would inform those Elders of the details of the molestation.  *Id*. at 110:9-15.  Later, it is possible a different set of Elders will consider the details and decide whether the molester should be given privileges in the congregation.  *See* Storey Decl., Exhibit 1.

It is also the Jehovah's Witness policy to send a letter of introduction when a congregant moves from one congregation to another.  *Id*. at 2.  "*It is imperative that this be done when one who is known to have been a child molester moves*.  The secretary should write on behalf of the elders to the new congregation's Body of Elders and outline this publisher's background."  *Id*. (emphasis in original)  Finally, on March 14, 1997, Watchtower ordered every congregation in the United States to send a report to Watchtower detailing each instance in which a known child molester held an appointed position as a Ministerial Servant or Elder in that Congregation.  The report was required to contain detailed information answering twelve specific questions posed by Watchtower.  *Id*. at 2-3.

gravel &
shea | ATTORNEYS AT LAW
76 St. Paul Street
Post Office Box 369
Burlington, Vermont  05402-0369
A PROFESSIONAL CORPORATION
- 14 -

Because potentially dozens of individuals not present for the original communication may ultimately review any statement or information provided in connection with a complaint of child molestation by a Jehovah's Witness, information obtained through this process is not confidential.  Keeping information within the church is not sufficient to qualify as a penitential communication.  A greater degree of confidentiality is required.  V.R.E. 505.  As discussed below, Watchtower has not shown what the original communicant's purpose was in making the allegedly privileged communications, or how these subsequent disclosures could possibly be in furtherance thereof.  Finally, the fact that the documents at issue are in the possession of Watchtower – who was not a party to the original communications - shows the unprivileged nature of the communications.

> B.   Defendant Has Not Established That Any Communication Was Made To A Member Of The Clergy In His Capacity As A Spiritual Advisor.

In *State v. Nunez*, the defendant was convicted of two counts of burglary and an additional count of assault.  162 Vt. at 615.  The defendant initiated a call to the victim's priest, and after the priest mentioned that the victim's home had been burglarized, the defendant confessed to the crime.  *Id.* at 616.  Even though the defendant initiated the telephone call with the minister and confessed to a crime, the privilege failed because the defendant did not establish that the minister was acting in his capacity as the penitent's spiritual advisor.  *Id.*  This failure prevented the application of the privilege.  *Id.*

For the same reason, Watchtower's assertions of privilege fail.  Watchtower repeatedly, and baldly, claims that documents contain information of conversations protected by the minister-communicant privilege, but does not provide any detail about the communication that would allow Plaintiff or this Court to evaluate the claim of privilege as to any specific document.



As the privilege proponent, Watchtower bore the burden of establishing these facts. *See State v. Nunez,* 162 Vt. 615, 616 (1994).  Its failure to do so dooms the assertion of privilege.

As a practical matter, a Jehovah's Witness Elder may receive knowledge that a member has molested a child in numerous ways.  The victim, or a victim's mother (as happened in this case), may report the molestation to the Elders seeking disciplinary action against the molester.  A victim may report his own molestation and, in the course of making the report, may suggest that another child also may have been abused.  A witness may report her suspicions to the Elders, seeking to protect children from being exposed.  The elders may learn of the abuse through law enforcement or in the context of a custody battle.  The molester could confess to the Elders or the molester's spouse may go to the Elders to inform them of the abuser's actions.  The permutations are endless.  In most of these circumstances, the Elders are not being contacted as a spiritual adviser.  Watchtower's failure to demonstrate why the particular communications it seeks to withhold as privileged is fatal to its claim of privilege.

C.     Watchtower Has Not Established That The Re-Disclosure Of The Allegedly Privileged Communication To Watchtower By The Local Elders Was For The Same Purpose As The Underlying Communication.

As we have noted, an Elder may receive molestation complaints in myriad ways. Watchtower's failure to make any effort to demonstrate the circumstances under which any particular communication was made causes the assertion of privilege to fail.  Assuming, *arguendo,* that every single communication referenced in the responsive documents was intended to be confidential and was made to a clergyman in his capacity as a "spiritual adviser," the privilege assertion still fails – Watchtower cannot show that the original communications were "not intended for further disclosure except to other persons present in furtherance of the purpose of the communication."  V.R.E. 505(a)(2).



Watchtower has generically argued that communications in the context of judicial committees are confidential and intended "to help the one who has erred regain his spiritual health and to ensure the congregation remains spiritually and morally clean."  Motion at 11. Even assuming this to be true, Elders are permitted or required to make several distinct types of re-disclosure; all for purposes different than the original communicant's purpose.  For instance, an Elder is required to contact Watchtower's Legal Department with the information.  This disclosure, which must be made in connection with all reports of child molestation (*see* Storey Decl., Exhibit 5), is not made for the purpose of the communicant's spiritual rehabilitation; it is made to determine if the Elders are mandatory reporters.  Elders are also required to send a letter of introduction to a molester's new congregation if he moves.  *See* Storey Decl., Exhibit 1. Clearly these disclosures are for the purpose of protecting children in the new congregation by informing the Elders of the need to monitor the molester.  Information may be disclosed when a disfellowshipped molester seeks reinstatement.  Such a disclosure is made to determine if the molester meets minimum criteria for reinstatement, which is different than the original purpose of rehabilitation.  Finally, the March 14, 1997 letter itself required re-disclosure to Watchtower to protect children and to help the Defendants escape legal liability.  *Id.*  These documents were demanded by Watchtower itself, rather than being sent in response to any confidential request for spiritual advice.

These re-disclosures are all made for different purposes than the original communication. Neither complaints made regarding childhood sexual abuse, nor responses to the March 14, 1997 Body of Elders Letter are privileged because the underlying communications were disclosed for purposes other than "in furtherance of the purpose of the [original] communication."

gravel &
shea | ATTORNEYS AT LAW

76 St. Paul Street
Post Office Box 369
Burlington, Vermont  05402-0369
A PROFESSIONAL CORPORATION

III.    THE FIRST AMENDMENT IS NOT A DISCOVERY PRIVILEGE AND HAS NO
        APPLICATION TO THIS DISCOVERY DISPUTE.

There is no First Amendment privilege to withhold relevant information in discovery. Instead, the principle cited by Watchtower merely prohibits the courts from becoming involved in intra-church disputes.  For example, in circumstances where two parties are fighting over who is the rightful Bishop of a Diocese (*Serbian Eastern Orthodox Diocese v. Milivojevich,* 426 U.S. 696 (1976)), or a minister is suing a church employer for re-instatement (*Hosanna-Tabor Evangelical Lutheran Church and School v. E.E.O.C.,* 132 S.Ct. 694 (2012)), resolution of the issue forces a religious defendant to accept a secular court's judgment about who is qualified to serve as a minister of the religion.[6]  The decision of the courts to abstain from making such decisions is premised "on a perceived danger that in resolving intrachurch disputes the State will become entangled in essentially religious controversies or intervene on behalf of groups espousing particular doctrinal beliefs." *General Council on Finance and Administration of United Methodist Church v. Superior Court,* 439 U.S. 1355, 1373 (1978).[7]  This Court's

---

[6] "Requiring a church to accept or retain an unwanted minister, or punishing a church for failing to do so, intrudes upon more than a mere employment decision. . . . By imposing an unwanted minister, the state infringes the Free Exercise Clause, which protects a religious group's right to shape its own faith and mission through its appointments." *Hosanna-Tabor*, 426 U.S. at 706.  Nothing in this discovery dispute – or on a broader scope, in this action – forces the Defendant to accept an unwanted minister.  The action simply seeks to hold a religious defendant responsible for the consequences of its decision to employ an agent that is a child molester.  *See Malicki v. Doe,* 814 So.2d 347, 351 (2002) ("[w]e conclude that the First Amendment does not provide a shield behind which a church may avoid liability for harm caused to an adult and a child parishioner arising from the alleged sexual assault or battery by one of its clergy.")

[7] The First Amendment "embraces two concepts,—freedom to believe and freedom to act. The first is absolute but, in the nature of things, the second cannot be. Conduct remains subject to regulation for the protection of society." *Cantwell v. Connecticut,* 310 U.S. 296, 303-04 (1940), fn. omitted.  Because the conduct of religious parties is subject to regulation, it is clear that considerations of ecclesiastical abstention "are not applicable to purely secular disputes between third parties and a particular defendant, albeit a religious affiliated organization. . ." *General Council on Finance,* 439 U.S. at 1374.

gravel &
shea   | ATTORNEYS AT LAW

76 St. Paul Street
Post Office Box 369
Burlington, Vermont  05402-0369

A PROFESSIONAL CORPORATION

- 18 -

resolution of the pending issue - whether documents in Watchtower's possession may be discovered – is not an internal church dispute and in no way implicates the First Amendment.

In *Turner v. Roman Catholic Diocese of Burlington, Vermont,* 186 Vt. 396, 415-18 (2009), the Vermont Supreme Court similarly recognized the limited reach of *Serbian* and similar cases.  Citing *General Council on Finance*, the court found that "[t]his case is not an intrachurch dispute; the claim was not brought under church law, nor did it seek to enforce the duties of defendant according to religious beliefs."  *Id.* at 417.  Accordingly, the court found that the leading First Amendment case cited by Watchtower – *Serbian* – had no place in a civil action alleging negligence in permitting childhood sexual abuse to occur.  *Id.*

Watchtower advances a sweeping First Amendment argument, claiming that the mere production of documents showing Watchtower's knowledge of childhood sexual abuse complaints by Jehovah's Witnesses would inexplicably amount to "[a]n examination and evaluation of Jehovah's Witnesses' standards for congregation membership, appointment of elders and ministerial servants, or discipline or expulsion of congregation members."  Motion at 21.  This is inaccurate.  As noted by the Ohio Court of Appeal in *Niemann v. Cooley*:

> Canon 489 [of the Catholic Code of Cannon Law] calls for the destruction of documents of criminal cases in matters of morals where the criminal has died or ten years have passed. Were we to decide whether that canon is fair, or whether it comports with our civil view of due process, or were we to decide the merits of disciplinary action, if any, taken by the Archdiocese against Father Cooley, we would be clearly stepping over the line of involvement in the ecclesiastical affairs of the church. . . . [¶] . . . However, we find nothing in the discovery rules promulgated by the Ohio Supreme Court, or the order of the trial judge in this case for an *in camera* inspection, which interferes with or entangles the state in the rights to believe and practice the religion of one's choice, which are the freedoms protected by the First Amendment.

gravel &
shea | ATTORNEYS AT LAW
76 St. Paul Street
Post Office Box 369
Burlington, Vermont  05402-0369
A PROFESSIONAL CORPORATION

93 Ohio.App.3d 81, 89-91 (Ohio.App. 1994).[8]  The same reasoning controls here.  Plaintiff is not seeking to question whether the Jehovah's Witnesses properly applied their rules, or whether they are fair.  Plaintiff is simply seeking documents showing what Watchtower knew about molestation of children.  The First Amendment does not allow a religious organization a curtain behind which to hide documents showing its knowledge of the threat of molestation to its members.

## IV.   WATCHTOWER HAS NOT ESTABLISHED HOW PRODUCTION OF THE DOCUMENTS WOULD UNDERMINE ANY THIRD PARTY'S OSTENSIBLE RIGHT OF PRIVACY.

Watchtower argues expansively that any third party whose name appears in the subject documents possesses a privacy right sufficient to prevent production.  Motion at 14-17.  Watchtower identifies the molesters themselves, victims and their families, Elders who fielded or responded to molestation allegations, and every member of every congregation (and the congregation itself) in which a reported molestation occurred as possessing such interests.  Motion at 14.  Watchtower does not cite any cases in which the Federal Constitutional right of

---

[8] Nor is *Niemann* the only court to find that a religious organization may be compelled to produce such documents without violating the First Amendment.  *See Roman Catholic Archbishop of Los Angeles v. Superior Court,* 131 Cal.App.4th 417, 430 (Cal.App. 2005) (rejecting several First Amendment arguments of Archbishop seeking to avoid compliance with criminal subpoena in child molestation case); *Society of Jesus of New England v. Com,* 441 Mass. 662, 667-668 (Mass. 2004) (rejecting church autonomy argument in criminal prosecution of priest accused of molestation, noting that "enforcement of the subpoena [does not] require the court to decide anything touching on 'doctrine, canon law, polity, discipline, [or] ministerial relationships'"); *Hutchison v. Luddy,* 414 Pa.Super. 138, 149, 150 (PA. 1992) ("[n]either the discovery rules adopted by the Pennsylvania Supreme Court nor the order entered by the trial court [compelling production of Diocese-wide molestation allegations] in this case interferes with the free exercise of religion"); *Com. v. Stewart,* 436 Pa.Super. 262, 270 (PA. 1994) ("where the only action required of a religious institution is the disclosure of relevant, non-privileged documents to an adversary in civil litigation, such action, without more, poses no threat of governmental interference with the free exercise of religion.")



gravel &
shea | ATTORNEYS AT LAW

76 St. Paul Street
Post Office Box 369
Burlington, Vermont  05402-0369

A PROFESSIONAL CORPORATION

privacy was used to deny discovery of relevant and unprivileged materials in a civil action.[9]

Instead, it cites such like *Roe v. Wade,* 410 U.S. 113 (1972) (right to abortion) and *Cruzan v.*

*Missouri Department of Health,* 497 U.S. 261 (1990) (right to terminate life-saving medical care)

which bear no relationship to the discovery at issue in this case.[10]

     Plaintiff agrees that the documents produced should redact the names, addresses, phone

numbers, date of birth, social security numbers and e-mail addresses of victims of abuse, and

those that reported abuse.  This alleviates any privacy concerns.  *See U.S. Department of State v.*

*Ray,* 502 U.S. 164, 176 (1991) (while discussing FOIA, noting that "disclosure of such personal

information constitutes only a *de minimis* invasion of privacy when the identities of the [third

parties] are unknown.")

     The names of the other third parties identified in the documents are different.  The right

of privacy is not absolute.  Instead, even information that is ostensibly protected may be

disclosed if "a substantial government interest outweighs the burdened privacy right."  *O'Connor*

*v. Pierson*, *supra*, 426 F.3d 187, 202-203.  Courts considering the production of such documents

_____

    [9] Watchtower cites *Juarez v. Boy Scouts of America*, *supra*, for the proposition that some "compelling public need" must be proven before documents involving third parties may be discovered.  Motion at 16.  Notably, this requirement involves a claim of privacy under Article I, Section 1 of the California Constitution; not the Federal Constitution.  This provision obviously does not apply here.  Moreover, cases have limited this notion, finding that redaction of names and personal information of third parties is sufficient to protect third party privacy interests. *See Snibbe v. Superior Court,* 244 Cal.App.4th 184, 196 (Cal.App. 2014) ("[b]ecause the production of portions of redacted orders would not invade patient privacy, real parties need not show a compelling need for discovery"); *Poway Unified School District v. Superior Court,* 62 Cal.App.4th 1496, 1506 (Cal.App. 1998) (the parties can "address privacy concerns by redacting released materials.")

    [10] These cases deal with the right to personal autonomy rather than the right to confidentiality that would arguably be at issue here.  *See O'Connor v. Pierson,* 426 F.3d 187, 201 (2d. Cir. 2005) ("[t]he privacy right takes two somewhat different forms: the right to personal autonomy (i.e., the right to make certain choices free of unwarranted government interference) and the right to confidentiality (i.e., the right to hold certain information private.")

gravel &
shea | ATTORNEYS AT LAW

76 St. Paul Street
Post Office Box 369
Burlington, Vermont  05402-0369

A PROFESSIONAL CORPORATION

have found compelling (not just substantial) interests in the production of such materials.  In *Doe 2 v. Superior Court*, the court considered the privacy rights of third party molestation victims in a civil lawsuit.  132 Cal.App.4th 1504 (Cal.App. 2005).  The court found the "state has enough of an interest in discovering the truth in legal proceedings, that it may compel disclosure of confidential material."  *Id.* at 1520, citing *Palay v. Superior Court,* 18 Cal.App.4th 919, 933 (Cal.App. 1993).  Additionally, in deciding the state's interests were sufficient to justify the public dissemination (not just production in discovery) of psychological records of pedophile priests, the court in *In re Clergy Cases I* noted that:

> all citizens have a compelling interest in knowing if a prominent and powerful institution has cloaked in secrecy decades of sexual abuse revealed in the psychiatric records of counselors who continued to have intimate contact with vulnerable children while receiving treatment for their tendencies toward child molestation.

*Id.* at 1236.[11]  The same interest is present here.

Watchtower theorizes that "[t]he dissemination of such sensitive information could ruin the lives of the people involved and their families."  Motion at 15.  This Court has tools available to it to ensure that nothing of the sort happens.  This Court can order redaction of the names of victims of abuse.


V.      NO OTHER CONSIDERATIONS SUPPORT THE IMPOSITION OF THE
        PROTECTIVE ORDER SOUGHT BY WATCHTOWER.

Watchtower contends that a number of miscellaneous considerations support the issuance of a protective order, including the alleged burden in responding to the production requests and the fact that it is producing some of these documents in other litigation, allegedly in an effort to

---

[11] Notably, some of the individual priests whose information was disseminated were not parties to the underlying lawsuits and were not criminally convicted of the abuse.

gravel &
shea | ATTORNEYS AT LAW
76 St. Paul Street
Post Office Box 369
Burlington, Vermont  05402-0369
A PROFESSIONAL CORPORATION

- 22 -

demonstrate the documents' irrelevance.  Motion at 17-20.  The documents are readily available

and, as Watchtower concedes, are contained in a searchable database.

> A.  That Watchtower Has Repeatedly Been Ordered To Produce The Molestation Files In Other Matters (And Is Presently Doing So In Installments) Weakens, Rather Than Strengthens, Its Request For A Protective Order.

Watchtower argues that because it is producing the Molestation Files in another action

(*Padron v. Defendant Doe 1, et al*, San Diego Superior Court Case Number 37-2013-00067529-

CU-PO-CTL), a protective order is appropriate here.  Motion at 18.  The opposite is true.  Since

Watchtower is already gathering and producing the documents, it will pose no difficulty to

Watchtower to produce the documents in this case.

Allegedly, Watchtower is producing the documents "to demonstrate to the trial court [in

the *Padron* case] that they contain nothing relevant"; and that "their content merely shows that

some men who had abused a child in their past later served in an appointed capacity in a

congregation."[12]  Motion at 18.  Watchtower's reference to the substance of the documents is

misleading, at best.  Plaintiff's California counsel has received multiple installments of

responsive documents but is prohibited by a protective order from discussing the content of the

documents in this case.  *See* Storey Dec. at ¶ 6.  In other words, Plaintiff cannot use the

substance of the documents to refute Watchtower's assertions here.

Even with this disadvantage, Watchtower's claims are demonstrably false.  Watchtower

is not producing the documents in the *Padron* matter to show that they are irrelevant; it is

producing them because the court ordered it to produce the documents.  *See* Storey Decl., Exhibit

---

[12] The documents will show far more.  As noted above, the documents show Watchtower's institutional awareness of child molestation well in advance of the molestation of Plaintiff, Watchtower's cover-up of molestation allegations and protection of molesters, and similar circumstances that should have impacted Watchtower's decision to believe True's denials.

gravel & shea | ATTORNEYS AT LAW

76 St. Paul Street
Post Office Box 369
Burlington, Vermont  05402-0369

A PROFESSIONAL CORPORATION

18.  However, orders to produce these documents – standing alone – have not historically been sufficient to secure Watchtower's compliance.  Watchtower was twice ordered to produce the documents and refused.  *See* Storey Decl. at ¶ 6.  In both actions, the court granted the plaintiffs' motions for terminating sanctions and entered Watchtower's default.  *See* Storey Decl., Exhibits 19, 20.  Only when a third court ordered Watchtower to produce these documents, and when another motion for terminating sanctions was pending (in *Padron*), did it begin to *partially* comply.  *See* Storey Decl. at ¶ 6.

Had Watchtower wanted to prove the documents are irrelevant, it could have merely submitted them to the court for *in camera* review.  Tellingly, it did not do so.

B.    Producing The Documents Will Result In No Substantial Burden.

While conceding that the responsive documents are housed in a searchable computer database (Motion at 17), Watchtower argues that production would be overly burdensome.  As to request number 65, this argument is moot because Watchtower is gathering and producing the documents in other litigation.  Motion at 17, 18.  Producing them here would require no additional effort.  As to request number 67, the documents can be obtained through a computer search and a code can be written to extract particularized categories of documents.  Plaintiff is willing to send in an expert to write a code to extract the documents and live with the results of the search.  There would be no need to do a manual search for other responsive documents as Watchtower alleges.

VI.    WATCHTOWER HAS NOT ESTABLISHED THE APPLICATION OF THE ATTORNEY CLIENT PRIVILEGE.

Watchtower asserts the attorney client privilege, ostensibly as to request number 67.  As to request number 65, the documents were sent from Elders in local congregations to the Service



gravel &
shea | ATTORNEYS AT LAW

76 St. Paul Street
Post Office Box 369
Burlington, Vermont  05402-0369
A PROFESSIONAL CORPORATION

- 24 -

Department; not the Legal Department.  Thus, documents responsive to request number 65

cannot be privileged.  As to request 67, Watchtower has not shown that any communication was

made in confidence.  *See* V.R.E. 502(a)(5); Reporter's Notes to V.R.E. 502 ("Vermont cases

recognize that the presence of an unrelated third person may defeat the privilege.")  It has not

demonstrated the purpose of the communications to be withheld.  For instance, the lawyer in the

Legal Department may have contacted the congregation to investigate an allegation, which

would not be privileged.  *See* Reporter's Notes to V.R.E. 502 ("lawyer employees of a

corporation are not within the privilege when they act in a purely business role, but are subject to

the privilege if they provide legal services similar to those that would be rendered by outside

counsel" (citations omitted).)  Watchtower has not met its burdens as the privilege proponent of

demonstrating the application of this privilege to any document and concedes it has not even

looked for responsive documents.  Motion at 18.  The Court should request they claim privilege.

<u>Conclusion</u>

For the foregoing reasons, this Court should deny Watchtower's motion for a protective

order.

Dated:          Burlington, Vermont
                October 29, 2015


                                        */s/ Jerome F. O'Neill*
                                        Jerome F. O'Neill, Esq.
                                        Gravel & Shea PC
                                        76 St. Paul Street, 7th Floor, P. O. Box 369
                                        Burlington, VT  05402-0369
                                        (802) 658-0220
                                        joneill@gravelshea.com

                                        and

gravel & shea
ATTORNEYS AT LAW
76 St. Paul Street
Post Office Box 369
Burlington, Vermont  05402-0369
A PROFESSIONAL CORPORATION                          - 25 -

THE ZALKIN LAW FIRM, P.C.
Irwin Zalkin, Esq.
Devin M. Storey, Esq.
12555 High Bluff Drive, Suite 301
San Diego, CA  92130
(858) 259-3011
irwin@zalkin.com
dms@zalkin.com

For Plaintiff

gravel &
shea | ATTORNEYS AT LAW

76 St. Paul Street
Post Office Box 369
Burlington, Vermont  05402-0369

A PROFESSIONAL CORPORATION

- 26 -