```
 1                    UNITED STATES DISTRICT COURT
                             FOR THE
 2                       DISTRICT OF VERMONT
                       Case No. 1:14-cv-205
 3
       ANNESSA LEWIS,                          )
 4                                             )
                                    Plaintiff  )
 5     vs.                                     )
                                               )
 6     BELLOWS FALLS CONGREGATION OF JEHOVAH'S )
       WITNESSES, BELLOWS FALLS, VERMONT, INC; )
 7     WATCHTOWER BIBLE AND TRACT SOCIETY OF   )
       NEW YORK, INC; CHRISTIAN CONGREGATION   )
 8     OF JEHOVAH'S WITNESSES; and NORTON TRUE,)
                                               )
 9     _____Defendants )
```

10    RE:  Christian Congregation of Jehovah's Witnesses,
      Hearing on Motions
11    DATE:  January 5, 2016
      LOCATION:  Brattleboro, Vermont
12

13    APPEARANCES:

14    Honorable J. Garvan Murtha, District Judge

15    DEVIN MILES STOREY, The Zalkin Law Firm, PC
      12555 High Bluff Drive, Suite 301
16    San Diego, CA 92130

17    JEROME F. O'NEILL, Gravel & Shea, PC
      76 St. Paul Street, 7th Floor, PO Box 369
18    Burlington, VT 05402-0369

19    JENNIFER E. MCDONALD, WALTER E. JUDGE, JR.
      Downs Rachlin Martin, PLLC
20    199 Main Street, PO Box 190
      Burlington, VT 05402-0190
21
      IAN P. CARLETON, Sheehey, Furlong & Behm, PC
22    30 Main Street, 6th Floor, PO Box 66
      Burlington, VT 05402-0066
23
      PIETRO J. LYNN, BARBARA R. BLACKMAN,
24    Lynn, Lynn & Blackman, PC
      76 St. Paul Street, Suite 400
25    Burlington, VT 05401

1                    (Hearing begins at 10:30 a.m.)

2                    THE CLERK:  This is Civil Docket Number 14-cv-205,

3        Annessa Lewis versus Bellows Falls Congregation of Jehovah's

4        Witnesses of Bellows Falls, the Watchtower Bible and Tract

5        Society of New York, Inc., and Norton True.  Also, we're here

6        in re:  Christian Congregation of Jehovah's Witnesses.  Present

7        in the courtroom representing the Plaintiff are Attorneys

8        Jerome O'Neill and Devin Storey.  Also in the courtroom

9        representing Defendants are, excuse me, Attorneys Jennifer

10       McDonald, Pietro Lynn, Walter Judge, Jr., Barbara Blackman, and

11       Ian Carleton.  Representing Defendant True are Attorney Will

12       Kraham and Mr. Anthes.

13                    THE COURT:  And we are hearing various motions.

14                    THE CLERK:  And we are here on a motion hearing,

15       exactly.  Excuse me.

16                    THE COURT:  Okay.  Mr. Lynn, do you have something to

17       say?

18                    ATTORNEY LYNN:  Well, it was more in the way of

19       question and suggestion.  I know there are a series --

20                    THE COURT:  Well, why don't you let me go first?

21                    ATTORNEY LYNN: Glad to.  Thank you, Your Honor.

22                    THE COURT:  Welcome, all, first of all.  I see a

23       number of very prominent attorneys from Vermont and elsewhere,

24       I guess.  I was just reviewing the new amendments to the Civil

25       Rules which call for, it seems, more cooperation among parties

1    and the Court and also calls for scheduling orders and that

2    sort of thing which, at least, I don't follow the rules, I

3    guess, in the sense that we don't have these conferences early

4    on, and maybe I should change.  I don't know about the other

5    judges in Vermont, whether they are following the rules in the

6    sense that that calls for conferences and hearings instead of

7    just filing the discovery, the discovery schedule, which is

8    then approved by the Court and then there's no real contact,

9    normally, between the judge and the parties until something

10   develops, and I guess this is a development.

11        I am going to deal with all the motions this morning, and

12   I'll take them in the order that I reviewed them in.  Frankly,

13   I've spent a lot of time reviewing these, which is the first

14   time in a while that I've spent so much time going through

15   discovery and trying to figure out who's asking for what and

16   what objections there are and why.  So, certainly, I will hear

17   some arguments from all of you on the various motions.  I'm not

18   saying that the time will be limited, but it may be limited

19   depending on how long you go at it.  Again, bear in mind that

20   I've spent I don't know how many hours going through all these

21   things and have some preliminary ideas of how I'm going to

22   rule.  So do you want to say something else other than that,

23   Mr. Lynn, or I mean --

24        ATTORNEY LYNN: No, Your Honor.  I was, what I was

25   going to ask the Court is, given the volume of motions and what

1    seems to be at least a limited amount of time, how the Court

2    wanted to apportion the time as between the two parties and

3    which motions would go first.

4           THE COURT:  Well, I've decided which ones go first,

5    and, frankly, I will apportion the time.  If I feel people are

6    speaking too long, I'll tell them.

7           ATTORNEY LYNN: Thank you, Your Honor.

8           THE COURT:  All right?  Okay.  So, again, I've put

9    these in order perhaps the way that I think they should be

10   dealt with.  You may not agree with that.  But the first motion

11   I'd like to hear is the Plaintiff's Motion to Compel Watchtower

12   to provide documents requested in Plaintiff's First Request for

13   Production, and that includes, as I see it, Document 69, which

14   was filed on October 13 of last year, and that included 69-1,

15   which was the specific verbatim listing of each item sought

16   which is dated September 16, and also included Document 69-3,

17   which is, they're all exhibits to the Plaintiff's motion, but

18   that is Watchtower's Objections and Responses to Requests for

19   Production and also includes 69-4, which was or is Defendant's,

20   Defendant Watchtower's privilege log dated September 16 of '15,

21   and then there is a Document 84, which is Watchtower's

22   Opposition to Motion and 92, which is Plaintiff's reply.

23   In addition, on December 17 of last year, there was a letter

24   from Mr. Lynn which enclosed certain documents for review by

25   the Court, and those were Documents 2 through 4, 5 through 7, 8

1    through 10, and 17 through, 17 and 18 on the privilege log by

2    Defendant Watchtower.

3         So, just as a preliminary statement, it appears to me,

4    anyway, that the documents at issue in this motion are either

5    all listed or 99 percent listed on the privilege log.  So, if

6    I'm wrong, let me know that, but the ruling that I will make

7    will concern the privilege log and whether or not it should be

8    turned over or not, whether the documents should be turned

9    over.  I am seriously contemplating and will likely order that

10   there be a confidentiality agreement between the parties on

11   some, if not a majority, of these documents.  So I'll just give

12   you that preliminary statement, preliminary thought.

13        So, I guess, Mr. O'Neill, you're the Plaintiff, and it's

14   your motion if you want to go ahead.  I don't know.  Maybe Mr.

15   Zalkin is going to argue?

16             ATTORNEY O'NEILL: Devin Storey is here with me, Your

17   Honor.

18             THE COURT:  Oh, Mr. Storey?  I'm sorry.

19             ATTORNEY O'NEILL:  That's all right.  He is going to

20   argue the substantive motions related to the various motions to

21   compel that were filed by our side.

22             THE COURT:  Okay, all right.  So, Mr. Storey.

23             ATTORNEY STOREY:  Good morning, Your Honor.

24             THE COURT:  Morning.

25             ATTORNEY STOREY:  May it please the Court.  Sir, with

1    respect to this motion, it seems that the central objection

2    that Watchtower has made is the clergy-penitent privilege or

3    the religious privilege, and there are three topical reasons

4    why the assertion of privilege fails, and the first is on a

5    broad level.  Watchtower has and the Jehovah's Witnesses have a

6    very regimented way of responding to childhood sexual abuse

7    allegations.  There are policies and practices in place, and,

8    because of those policies, information of this type is

9    distributed within the organization to various people and can

10   never satisfy the requirements of confidentiality required for

11   application of the privilege.  So, on a broad level, documents

12   of this type cannot satisfy the privilege.

13        Secondarily, on a case-specific level, with respect to

14   Norton True, none of the documents can satisfy the requirements

15   of confidentiality or the requirement that there was a

16   spiritual, a communication seeking spiritual advice.  This is

17   not a circumstance where a penitent came to a clergyman and

18   made a confession.  This is a circumstance where a person's

19   accused of a heinous wrongdoing.  He was called before the

20   elders, and he denied doing anything.  So there is no

21   communication seeking spiritual advice.

22        And, third, on a document, on a document-specific level,

23   going through these requests, it's clear that some of these

24   documents don't contain any communication from a penitent to a

25   member of the clergy and others, pardon me, and others, Your

1    Honor.  There's been no effort to establish the actual
2    underlying privacy or confidentiality of any communication
3    from, to a member of the clergy.
4        So, looking first generally at the religious privilege, a
5    person has a privilege to refuse to disclose and to prevent
6    another from disclosing a confidential communication by the
7    person made to a member of the clergy in his professional
8    character as a spiritual advisor, and a confidential
9    communication is made privately and not intended for further
10   disclosure except to other persons present in furtherance of
11   the purpose of the communication.  It is the privilege
12   proponent's obligation to demonstrate application of the
13   privilege and their burden.
14       So, on the broad level I mentioned before, there are a
15   number of ways that a member of the clergy can learn of a
16   molestation allegation.  A victim can come forward and make a
17   complaint seeking some action be done.  A parent can do the
18   same.  Some other Witness could observe something, come to the
19   elders and say, I think you better look into this.  This person
20   is a threat.  There can be a call from the police or a custody
21   battle or a newspaper article.  A spouse of a molester could
22   come forward and state some concerns.  In any of those
23   circumstances, someone's coming forward and asking that action
24   be taken.  It's not a communication to an elder seeking
25   spiritual advice, and that's a fundamental problem in the

1   showing that's been made by the Defendants.  There's no showing

2   whatsoever as to why these particular documents or these

3   particular communications contained within these documents were

4   brought to the attention of the elders.  There's no showing

5   that there was a request for spiritual advice, and because of

6   that, the assertion of privilege fails.  Regardless, the

7   molestation complaints within the Jehovah's Witnesses are

8   subject to, regardless of the reason that someone came forward

9   to an elder, are subject to potentially broad disclosure.

10       Now, when a complaint comes in, the first thing that elder

11   does who gets it is call the legal department and ask for legal

12   advice:  Am I a mandatory reporter?  If so, the person calls

13   the police.  If not, the person still has complete discretion

14   to call the police if they so choose.  Now, the next thing that

15   happens is the elders will convene, and they'll discuss the

16   allegations.  They'll assign two people to investigate.  Those

17   elders will go out.  They'll talk to the accused.  They'll talk

18   to the accuser.  They'll speak to anyone else with relevant

19   information, come back, report to the Body of Elders, and, if

20   there's enough evidence, they'll form a judicial committee

21   which involves a third elder.  They'll go out and meet with the

22   accused again and determine what type of censure to impose.

23       After that, there's the possibility that the accused may

24   appeal.  If the accused appeals, another elder called the

25   Circuit Overseer who oversees 20 to 25 congregations of

 1    Jehovah's Witnesses in a geographic area will be contacted.

 2    He'll assemble an appeals committee from three separate elders

 3    in different congregations within that circuit to review the

 4    material.   Then the Service Department at Watchtower will be

 5    contacted.

 6         So, once the complaint comes in, there are any number of

 7    individuals who may be given access to the allegedly

 8    confidential information, and in the event that the person is

 9    disfellowshipped or excommunicated, they can seek

10    reinstatement, and that may happen four or five years down the

11    road, and if it does, you might have different elders in the

12    congregation who are going to be given access to all of the

13    materials to determine whether that person is eligible for

14    reinstatement.   If the person moves to another congregation, a

15    letter of introduction will be written, and, again, that same

16    allegedly confidential information will be disseminated to

17    others.   So these policies just don't allow for sufficient

18    confidentiality of documents or statements dealing with

19    childhood sexual abuse to qualify for privilege.

20         Now, on the case-specific level dealing with Norton True,

21    here we have a circumstance where my client's mother came

22    forward and made a complaint.   She came forward to the elders

23    and said, "Norton True molested my daughters", and, at that

24    point, there was investigation, there were discussions, there

25    were communications, but in the whole -- pardon me.   Norton

1    True didn't initiate that.  He didn't come forward seeking
2    spiritual advice.  Instead, he got called before the elders.
3    He answered their questions with denials.  So, in that
4    circumstance, there was no communication seeking spiritual
5    advice, which is a direct requirement of the statute and which
6    is missing, so, again, on that level, there is no
7    confidentiality and no privilege.
8         And then, in looking at the particular documents at issue,
9    a number of those documents are what are called S2 forms.
10   That's Documents 2, 3, 4, 8, and 18, and those documents are,
11   they're administrative documents where the local congregation
12   will send Watchtower a report and say, Hey, we think that, you
13   know, Member 1 and Member 2 and Member 3 meet the requirements
14   for appointments as a minister or servant or elder, and in
15   putting that together, what will happen is the elders will put
16   down their thoughts and say, This person seems to meet the
17   requirements because, but those are all the impressions of the
18   individual elders stating why the person meets the requirements
19   or not.  There is no communication from the individual to the
20   elders that's being communicated on to Watchtower.  So, in the
21   absence of a communication to a member of the clergy, there's
22   no privilege.
23        Documents 11, 12, 13, 14, 15, and 16 all involve
24   molestation allegations, and for the reasons discussed, those
25   -- pardon me -- those don't meet the requirements of the

1    statute.  So, for all those reasons, the clergy-penitent

2    privilege or religious privilege isn't applicable to these

3    documents or this type of document.

4        Now, the Defendants also argue that there's a First

5    Amendment privilege or entitlement to refuse to produce

6    documents in discovery, and they base that primarily on a case

7    called Serbian Eastern Orthodox Diocese vs. Milivojevich.  In

8    that case, you had a circumstance where Milivojevich had been a

9    bishop of the diocese.  He'd been removed and was suing to be

10   reinstated, and it was, effectively, it was a lawsuit over

11   who's the bishop and who has control of the diocese assets, and

12   the court in that case said, Look, we can't get involved with

13   that -- this is a Supreme Court case -- we can't get involved

14   with that.  We can't determine who is the proper bishop of a

15   diocese.  That's not for us.

16       But those cases and the cases that similarly determined

17   that the church shouldn't, the court shouldn't get involved in

18   church property disputes have been distinguished in cases of

19   this nature repeatedly by courts that have had to deal with

20   this issue, and the courts have said, Look, this isn't, you

21   know, a discovery issue like we've got here.  It doesn't decide

22   any point of dogma.  It doesn't decide who's going to be a

23   bishop.  It doesn't decide who can be a member or who can't.

24   All it does is require that certain documents in the possession

25   of the Defendant be produced, and that doesn't, in any way,

1    implicate the First Amendment.  So the strong weight of
2    authority that we've cited in our briefs indicates that there
3    is no legitimate First Amendment issue here.
4         Other than that, the Defendants have argued that there are
5    third-party privacy issues at issue here, and the glaring one
6    is the privacy rights of any individual victims that are
7    identified in these documents, and we recognize that that
8    exists, and, you know, we'd recommend that the protective order
9    that the Court had mentioned earlier would be an adequate way
10   of protecting those interests.  To the extent that there are
11   others that the Defendants have indicated have privacy
12   interests such as Mr. True, presumably, also the elders that
13   were involved and the congregations involved, any interests
14   there are certainly subordinate to the Plaintiff's need to get
15   these documents and to get the information in the Defendant's
16   possession.  So, if the Court were to issue a protective order,
17   I think all of those concerns could be adequately addressed
18   while Plaintiff would still be entitled to the information that
19   she needs.
20        THE COURT:  Well, the normal procedure is for the
21   parties to put together a protective order for approval by the
22   Court.  So do you think that's possible?
23        ATTORNEY STOREY:  Well, with the Court's comments
24   this morning that a protective order appears appropriate to
25   your eyes, yes, I think we can do that, Your Honor.

1          THE COURT:  And do you agree that the documents you

2     seek are all on the privilege log, or is there more?

3          ATTORNEY STOREY:   There are some other documents.

4     There are other categories we've request.  For instance, there

5     is a type of document, it's called the "Body of Elders Letter",

6     and these are letters that Watchtower sent out.  They're policy

7     letters that go out to the congregations and are to be

8     followed, and we've asked for those, and we had butted heads

9     against the Defendant a little bit on this in that they had

10    offered to produce certain of them if we agreed to a protective

11    order.  We had, A, not wanted a protective order, and, B, we

12    had wanted a greater sample than they have offered.

13         Effectively, what these documents are, some of them are

14    going to deal specifically with child molestation or how a

15    judicial committee works, and the Defendants have offered to

16    produce those subject to a protective order, but others are

17    going to deal with Watchtower's ability to control the

18    congregation and what happens at the congregation level, which,

19    ultimately, we feel is going to be very relevant to an agency

20    issue that's going to come up later in this case, and that's

21    the reason that we've requested those documents.

22         THE COURT:  So are those mentioned?  I'm looking at

23    the Motion to Compel Bellows Falls Congregation.

24    Unfortunately, I don't have it attached to the Watchtower one,

25    but it appears to be Request Number 39, which talks about a

1    July 1, 1989 letter to all Bodies of Elders and so forth.

2              ATTORNEY STOREY:  Yes, Your Honor.

3              THE COURT:  Okay.  So that's all, except for those

4    items that are on the privilege log?

5              ATTORNEY STOREY:  No.  There's a couple other things.

6    We had requested that Watchtower produce a document called

7    "Branch Organization", and "Branch Organization", and it's also

8    in the moving papers, this is the document that's used by all

9    branches of Jehovah's Witnesses to govern how they function at

10   the branch level, which is effectively the national level, and

11   we've requested this information primarily, A, as it relates to

12   the question of control for an agency issue later and, B, for

13   punitive damages.  Ultimately, we are going to claim in this

14   case that the governing body of Jehovah's Witnesses who

15   formulated their policies acted maliciously and recklessly, and

16   what we expect to see from the Defendants is that the governing

17   body is not in any way related to Watchtower.  We think this

18   document will establish contrary, so we've requested that.

19             THE COURT:  Do you know what request that is?

20             ATTORNEY STOREY:  Pardon me?

21             THE COURT:  Do you know which request that is?

22             ATTORNEY STOREY:  I can get that for you in just a

23   second, Your Honor.  And then the other thing that's in the

24   motion is also the subject of the protective orders which are

25   the institutional awareness documents.  So we had -- that was

1    Request 65 and 67.

2           THE COURT:  Yes, okay.

3           ATTORNEY STOREY:  So we can take care of that in the

4    other motion.

5           THE COURT:  Exactly.

6           ATTORNEY STOREY:  So that's --

7           THE COURT:  Okay.

8           ATTORNEY STOREY:  Thank you, Your Honor.

9           THE COURT:  Thank you.  Mr. Lynn?

10          ATTORNEY LYNN: Thank you, Your Honor.  Good morning.

11          THE COURT:  Good morning.

12          ATTORNEY LYNN: Bear with me for just a second.  So,

13    Judge, I gather -- I don't want to misspeak, but I gather that

14    I am here now to talk about the documents in the privilege log,

15    and we'll get to the other documents that were the subject of

16    the motion for a protective order when that issue comes up.

17          THE COURT:  Correct.

18          ATTORNEY LYNN: Thank you, Your Honor.  Well, Judge,

19    I, of course, listened to the argument that was being raised

20    around the issue of the privilege, and I would remind the Court

21    that, in applying a Vermont privilege, it's not a bad starting

22    point to look at what the privilege is called.  It's called a

23    religious privilege, and that's under Rule 505.  And so, Judge,

24    let me back up for a moment and talk about, first of all, what

25    this case is about.  The claim here in this case is that

1    Annessa Lewis, sometime in either 1992 or '93, was

2    inappropriately touched on the chest at Norton True's house,

3    not in the Kingdom Hall, not in connection with any Jehovah's

4    Witness sponsored event, and that there was disclosure of this

5    some years later, '94 or '95, and, upon disclosure, that

6    certain documents were created.   Some of those documents are

7    now in the Court's possession.

8         The claims for liability that remain after the motions to

9    dismiss are twofold.   The first is that Mr. True was the agent

10   of Watchtower.   The second is that somehow there was, in the

11   allegation in the complaint for negligent undertaking was that

12   there were policies and procedures in place for zealous

13   protection of members of the congregation against known child

14   molesters and not that there was reliance on that.   The Court

15   specifically excluded that claim because it wasn't alleged, but

16   that, by virtue of some negligent conduct, it increased the

17   danger present to Ms. Lewis at that time, and I think it's

18   important to remember that in the context of what discovery is

19   relevant and what privileges ought to be upheld by the Court.

20        So, going back to this issue of religious privilege, Rule

21   505, the language -- I hesitate to do this, Judge, having heard

22   that you spent a lot of time with these issues.

23             THE COURT:  Yeah.

24             ATTORNEY LYNN: But I'll remind the Court anyway.

25             THE COURT:  I don't think you have to remind me about

1     the language.  I'm well aware of it.

2              ATTORNEY LYNN: All right.  So, Judge, the issue here

3     is, What was the purpose of this communication between the

4     elders at the Bellows Falls congregation and the elders at

5     Watchtower?  And, Your Honor, I think it's important to

6     remember that the, the elders at the Bellows Falls congregation

7     are what I would characterize as very part-time.  These are not

8     priests or ministers whose full-time job is to engage in

9     spiritual guidance and to be ministers or priests for the

10    congregation.

11         These are members of the community who have jobs like

12    everybody else and who find and devote the time necessary to be

13    elders in their congregation, and so, of course, one of the

14    procedures that exists when there are these kinds of very

15    serious allegations of sinful behavior is to seek guidance from

16    the more full-time elders at Watchtower around how

17    ecclesiastically to handle those kinds of allegations, and we

18    don't dispute that it sometimes triggers investigations and

19    sometimes that it triggers judicial committees, but these

20    judicial committees are all internal, ecclesiastical

21    organizations, and they are purely spiritual in nature.  They

22    have no authority civilly or criminally in the State of Vermont

23    but purely are church functions.

24         And so what we would suggest to you, Your Honor, is that

25    any documents that are generated in connection with those

1    communications between the elders, on the one hand, in Bellows

2    Falls seeking guidance on how spiritually to deal with an issue

3    fall perfectly within the confines of Rule 505.

4            THE COURT:  What about the confidentiality part of

5    that?

6            ATTORNEY LYNN:  Well, I think that we have presented

7    information through the affidavits that were appended to our

8    motion for protective order that indicates that, in fact, there

9    is an expectation that this is confidential, that it will

10   remain within the organization.  People are not at liberty to

11   go into the community at large and talk about these issues, and

12   that is why I would argue, Your Honor, that it is confidential.

13       What we haven't heard from Mr. Storey, and there is no

14   argument, is that we, we generally tell people -- in fact, what

15   you heard from Mr. Storey is that, when these communications

16   are made, the very first thing that is done is that the legal

17   department -- and we've asserted an attorney-client privilege

18   for those communications -- deals with the question of whether

19   the people bringing the report are mandatory reporters under

20   that state's laws and whether there's a privilege that would

21   prevent them from discussing that information.  And so, Your

22   Honor, absent that kind of statutory mandatory reporter

23   requirement, then the information is kept within the

24   organization.

25       Now, the victims, we agree that there is nothing that

1    would prevent others who are not involved in those confidential

2    communications to report that to the authorities, but, again,

3    what we're looking at now specifically are those communications

4    made by the elders in Bellows Falls to the elders at

5    Watchtower.

6          THE COURT:  Well, I guess I don't understand, as I

7    think as well as Mr. Storey said is that there are

8    communications, certainly, about the sexual abuse, perhaps by

9    alleged victims or their family, to Bellows Falls.  So how are

10   those considered confidential communications to a --

11         ATTORNEY LYNN: Well, if --

12         THE COURT:  -- ecclesiastical person?

13         ATTORNEY LYNN: I'm sorry, Your Honor.  I didn't mean

14   to interrupt you.  The communication within the church, of

15   course, is also confidential, but the communicant, the one

16   providing the information, is the one who has the right to

17   waive that privilege, and that person is entitled, if they

18   want, to tell the authorities or whomever they like about the

19   alleged abuse or sinful conduct, whatever that is, but what

20   we're seeing in this instance is the further communication by

21   the elders internally within the organization seeking guidance

22   and advice on how spiritually to handle allegations, whether

23   it's abuse or some other serious sin.

24         THE COURT:  Well, it's not spiritually.  I mean, if

25   they go to the legal department, they're asking for legal

1   advice.

2          ATTORNEY LYNN: Well, Your Honor, they go to the legal

3   department, as Mr. Storey said, for one specific purpose, and

4   that is to determine whether there is a requirement that it be

5   reported under the various laws of the various states.  There

6   has to be an interpretation as to who is a mandatory reporter,

7   but this is, those documents are different documents.  Those

8   are documents where, Your Honor, we believe that there is an

9   attorney-client privilege.  The first step in this analysis for

10  some of these documents is, Is there a religious privilege?

11  And the argument is, Your Honor, that these communications are

12  being made solely for the purpose of seeking spiritual,

13  religious organizational advice on how to handle allegations of

14  sin.  So, Your Honor, those are the arguments we would raise

15  with respect to the documents where we have raised the

16  religious privilege under Rule 505.

17          Now, the attorney-client privilege, Your Honor, those, we

18  believe that what we've heard from Mr. Storey and what you see

19  in the pleadings is very clear that, when there are allegations

20  of unlawful conduct, that those are, those are brought to the

21  lawyers, determinations are made about what is disclosable or

22  what is protected by privilege, who is a mandatory reporter,

23  and that is classically information that comes within the

24  context of attorney-client privilege.

25          THE COURT:  And you've submitted those to me,

1    correct?

2              ATTORNEY LYNN: We did, Your Honor.

3              THE COURT:  And I've looked at those, and I'm

4    prepared to make rulings on them.

5              ATTORNEY LYNN: Thank you, Your Honor.  We expected

6    so.  And then there is the other two privileges that we raised,

7    and, I guess, calling it third-party privacy privilege might be

8    stretching it, but there is, Your Honor, some deep concern that

9    this information be disseminated in a public way, that these

10   are allegations.  There is no criminal public proceeding that

11   we know of that goes to these issues.  In fact, I think, as the

12   Court is probably aware from the many pleadings submitted in

13   this case, that there is not even a DCF registry entry for Mr.

14   True, that he was removed from the registry after twice passing

15   polygraph examinations, and so we're concerned, not only for

16   him, but for others whose names are contained in these

17   documents that they become public, and I'm pleased to hear

18   there's now a willingness to agree to confidentiality.

19   Up until this moment, there has not been.

20             THE COURT:  All right.  And you are agreeable to that

21   as well?

22             ATTORNEY LYNN: On those issues, we are, Your Honor,

23   definitely.  The last issue is the First Amendment privilege,

24   and, Judge, we've cited a number of cases, but those cases that

25   we've cited almost universally stand for the proposition that

1    in this country there are, there is a status accorded to

2    religious organizations where the State ought to tread

3    carefully in, in trying to either force those organizations to

4    do things that are not consistent with their religious beliefs

5    or to force those organizations to disgorge information which

6    is deeply sensitive and central to their religious tenets.

7            And so, Your Honor, we think that, to the extent that this

8    court does not believe such a privilege exists -- we believe

9    that it does, but to the extent that this court does not

10   believe it exists, that, in any event, those cases ought to

11   inform its conduct or its decisions in this case around what

12   information is ordered produced and which information is not.

13           THE COURT:  Okay.

14           ATTORNEY LYNN: Thank you, Your Honor.

15           THE COURT:  Thank you.

16           ATTORNEY STOREY:  Your Honor, just very briefly in

17   response.  First, in following up on those particular requests

18   that I had mentioned, the request for the "Body of Elders

19   Letters" was Request 63, and the request for "Branch

20   Organization" was Request 66.

21           THE COURT:  And that's, those are different from the

22   other issue that we're going to be dealing with?

23           ATTORNEY STOREY:  They are.  They are.  Now, there

24   was something that Mr. Lynn said, and he said there's an

25   expectation that statements of this type would stay in the

1      congregation, and I point to the language of the statute and

2      say, That's not enough.  The language specifically says that

3      there can be no disclosure to someone not present, except in

4      furtherance of the purpose of the communication.  And we've

5      discussed this investigation process.  We've discussed the way

6      that a person who moves on to a new congregation would have a

7      letter of introduction written, discussions with the legal

8      department.

9          These are all for different purposes than the original

10      communication would have been, which would have been either a

11      communication seeking that some action be taken against a

12      molester or that there be some vigilance or potentially that

13      the molester himself had confessed, but, you know, we've got a

14      circumstance where the various multiple disclosures in the

15      organization and sometimes outside of the organization to

16      authorities are not made for the same purpose as the original

17      communication, and for that reason the argument that all of

18      this is intended to stay in the congregation fails as a matter

19      of law.

20          Now, there was something that was hammered pretty hard in

21      the briefs from Watchtower and was alluded to which is that

22      these communications are from elder to elder seeking spiritual

23      advice.  So, effectively, what this argument wants to do is

24      ignore where this information came from.  For instance, if

25      Congregant A comes to elder and says, Hey, we think that

1    Congregant B is molesting a child, and then the elder calls the
2    service department to discuss it, what you've heard is that,
3    because the elder is seeking legal or seeking spiritual advice
4    from Watchtower, everything going back to the first
5    communication is privileged.  Effectively, what the Defendant
6    wants to do is give any elder the ability to take unprivileged
7    material and make it privileged simply by communicating it to
8    the Watchtower, and that's antithetical to the confidentiality
9    that's required by the statute for application of privilege.
10        And, finally, with respect to the First Amendment issue, I
11   quote to a case, General Council on Finance and Administration
12   of the United Methodist Church vs. Superior Court.  This is a
13   case where Justice Rehnquist wrote an opinion serving as
14   Circuit Judge, and he talked about this doctrine of
15   ecclesiastical abstention, and what he said was that these
16   notions are, quote, "Not applicable to purely secular disputes
17   between third parties and a particular defendant, albeit a
18   religiously affiliated organization", and that's because the
19   reason for those First Amendment principles is to quote, avoid
20   a, quote, "Perceived danger that, in resolving interchurch
21   disputes, the State will become entangled in essentially
22   religious controversies or intervene on behalf of groups
23   espousing particular doctrinal beliefs".
24        We have none of that here.  We have a discovery dispute
25   asking that documents be produced.  The Court in no way is

1   being asked to weigh in on the validity or appropriateness of

2   those religious beliefs.  As such, the First Amendment doesn't

3   apply.  Thank you, Your Honor.

4            THE COURT:  Okay, thank you.

5            ATTORNEY LYNN:  Your Honor, if I could just briefly

6   speak to 63 and 66, because I don't think that there was

7   discussion about that up until this point, why they ought to be

8   produced.

9            THE COURT:  Okay.  Let me get them first.

10           ATTORNEY LYNN:  Yeah, please, Your Honor.

11           THE COURT:  Okay.  It's, is it Produce all "Body of

12   Elders Letters" distributed by you between January 1, 1975 and

13   September 30, 2014; is that the one you're talking about?

14           ATTORNEY LYNN:  Yeah, that's the first one, Your

15   Honor.

16           THE COURT:  Okay, go ahead.

17           ATTORNEY LYNN:  I'll remind the Court that the

18   allegations in this case have nothing to do with the year 2014

19   or 2015 or, frankly, the 2000's at all.  These are allegations

20   that arose from a time in the 1990's, and you'll see in

21   response to Request for Production Number 63 we offer, subject

22   to confidentiality, to produce documents that are, that at

23   least have some relevance to this case, but we do object as

24   irrelevant documents that extend beyond December 31st 1996, and

25   so, Judge, by virtue of that December 31st 1996 date, I think

1    what we're contemplating is that we'll produce everything up

2    and to and beyond the time of report to us of this abuse, even

3    though it was years before, in '94 or '95, but documents after

4    that date have no bearing, Your Honor, on the allegations of

5    liability or damages in this case.

6              THE COURT:  Okay.

7              ATTORNEY LYNN: And, likewise, you'll see in response

8    to 66 --

9              THE COURT:  That's about all "Branch Organization",

10   all iterations of "Branch Organization" between 1990 and the

11   present?

12             ATTORNEY LYNN: Yeah.  And, Your Honor, again, you'll

13   see that the objections that we raise to that are that it's

14   not, it's not relevant to the allegations in this case, that it

15   is far broader than what ought to be considered by the Court,

16   and let me remind the Court again that what we're dealing with

17   in this case is that there is, there was a policy of zealous

18   supervision, zealous care for those who were known to be child

19   molesters and that our conduct, either pursuant or inconsistent

20   with that policy, led to the abuse by virtue of increasing the

21   level of danger.  Those documents have nothing to do with that

22   theory of liability.

23        The argument we've heard from Counsel was that there are

24   some documents they are seeking which will show that Mr. True

25   was our agent.  Your Honor, what is undisputed before the Court

1    now is that Mr. True was not a ministerial servant.  He was not

2    an elder within the organization.  He was only, at the time of

3    this alleged abuse, a member of the congregation.  So any claim

4    that he was our agent is tenuous at best, but these claims,

5    these requests in 66 go far beyond trying to establish that a

6    ministerial servant or a member of the congregation is an agent

7    of Watchtower.

8              THE COURT:  And what about 69?  Well, 69, for you,

9    actually, is about insurance policies, which I don't think is

10   at issue, or is it?

11            ATTORNEY LYNN: I don't believe so, Your Honor.

12            ATTORNEY STOREY:  No, Your Honor, it's not.

13            THE COURT:  So I guess it was 69 if it applies to the

14   Bellows Falls congregation.  That was -- right?

15            ATTORNEY STOREY:  Yes, Your Honor.

16            THE COURT:  We don't have an issue with 69?

17            ATTORNEY STOREY:  We didn't raise this in our motion

18   with respect to Bellows Falls, however.

19            THE COURT:  Beg your pardon?

20            ATTORNEY STOREY:  We didn't raise that in our motion

21   with respect to Bellows Falls, so 69 shouldn't be an issue.

22            THE COURT:  Okay, all right.

23            ATTORNEY STOREY:  One brief thing.

24            THE COURT:  Well, just so I'm clear, so we're only

25   dealing, outside of the privilege log, we're only dealing with

1    then 63 and 66?

2              ATTORNEY STOREY:  Yes, because 65 and 67 will be with

3    the other motion.

4              THE COURT:  All right.  Go ahead.

5              ATTORNEY STOREY:  All right.  I'm sorry, Your Honor.

6    Just one brief thing.  Something that Mr. Lynn had said on

7    rebuttal was that it's undisputed that Norton True was not a

8    ministerial servant at the relevant time period, and that's not

9    the case.  It's certainty not undisputed.  We don't have any

10   information, and they've refused to give us information as when

11   he was and wasn't a ministerial servant, and so it's not an

12   undisputed issue.

13             ATTORNEY LYNN: Your Honor, we know that the

14   Plaintiff's mother was a member of the church at that time.  We

15   know that this is an issue we put front and center in the

16   pleadings to the Court, and we know that there is no factual

17   information from the Court, nor could there ever be, that

18   disputes the fact that he was not a ministerial servant at the

19   time of this alleged abuse.  So just simply saying it is

20   undisputed can't make it true.  And, by the way, if they really

21   had some serious concern about whether these statements were

22   true or not, I suspect we would have seen a discovery request

23   somewhere along the line that sought to ferret out that issue,

24   and that is not the case.  So, Judge, it is undisputed on the

25   record in this court in this case that he was not a ministerial

1    servant at the time.

2        What I would also say, Your Honor, as I look at 66 -- I

3    want to be clear about this -- that the request is, Please

4    produce all iterations of "Branch Organization" in effect

5    between 1990 and present.  So, Your Honor, again, there is no

6    relevance to that request and the theories of liability in this

7    case.  "Branch Organization" doesn't let us know to any

8    certainty whether Mr. True was an employee of Watchtower.

9    "Branch Organization's" members doesn't tell us whether there

10   was some policy in Bellows Falls that was not properly followed

11   or was overzealously followed.  This is, Your Honor, a fishing

12   expedition which is only illustrated by the fact that they're

13   looking for those iterations all the way up to present.

14       THE COURT:  Okay.  I think we've covered that, that

15   series, well, that motion.  Let me get myself in order here

16   again, and we'll go on to the next one.  So I think the next

17   one is similar, but it involves the Bellows Falls congregation,

18   and that is Document Request 68 of 10/13/15 which is the

19   Plaintiff's motion to compel Bellows Falls Congregation to

20   compel, and, again, it seems to me perhaps there are a couple

21   of others as has appeared now with Watchtower that weren't

22   covered by the privilege log, but what I did is I went through

23   the privilege log, compared it to the motion, and it appears

24   that those documents are the ones at issue.  There may be some

25   others, but I'll hear, I'll hear if there is.  So why don't you

1    go ahead again?

2                ATTORNEY STOREY:  Your Honor, in the interest of

3    brevity, I think the issues with respect to privilege and the

4    First Amendment so heavily overlap what we've just argued.  If

5    we could just have Bellows Falls argue, and I'll respond to

6    anything they raise, there's nothing further I can add.

7                THE COURT:  Okay.  Do you think there are other

8    documents, though, than the ones on the privilege log here?

9                ATTORNEY STOREY:  Again, it's the same as with

10   respect to Watchtower.  We had asked for Watchtower to produce

11   all "Body of Elders Letters" they had sent.  We had asked

12   Bellows Falls to produce "Body of Elders Letters" they had

13   received.  So they're going to be the same issues that were

14   just discussed.  There's nothing new or nothing different.

15               THE COURT:  Do you know which request that is?

16               ATTORNEY STOREY:  I can give that to you, Your Honor.

17               THE COURT:  All right, okay.  So who is going to

18   argue for Bellows Falls?

19               ATTORNEY MCDONALD:  Your Honor, and I agree with

20   Attorney Storey that the issues are extremely similar, although

21   I would like to stress on behalf of the local congregation that

22   our congregants, our elders understood that, when they were

23   seeking spiritual advice from either the elders in the local

24   congregation or seeking spiritual advice from the service

25   department, that these communications would be confidential.

1    It's an extremely important part of the religion.  It is

2    understood by members of the religion.  And Attorney Storey had

3    mentioned earlier that the policies of the Jehovah's Witness

4    religion don't lend themselves to our evidentiary protection of

5    religious communications, and we certainly disagree with that

6    point.

7         I would also like to draw the Court's attention to the

8    fact that numerous documents in the Bellows Falls privilege log

9    relate to individuals who are not parties to this action.  They

10   relate to, for example, Plaintiff's father and spiritual advice

11   that he received from our congregation, not in connection with

12   the allegations in this case.  They relate to other third

13   parties.  These communications have nothing to do with this

14   lawsuit.  We shouldn't be required to produce that.  That also

15   goes to the third-party privacy that our congregation obviously

16   is particularly concerned about.  Merely agreeing to a

17   confidentiality order, while we would certainly do that, there

18   are going to be names of individuals in there that have nothing

19   to do with this case, and the confidentiality order, even if

20   it's for attorneys' eyes only, is certainly not going to be

21   enough to cover that.

22             THE COURT:  Why not?

23             ATTORNEY MCDONALD:  Because those individuals, even

24   if they're going to be seen, their names are going to be seen

25   by the attorneys in that case, they shouldn't be required to

1    see or allowed to see that information about people who have

2    nothing to do with this litigation, don't even know about the

3    allegations of abuse, don't even know anything about this case,

4    but are merely mentioned in the documents as third-parties in

5    reference to other things.  I don't think a confidentiality

6    order covers that particular third-party privacy issue.

7              THE COURT:  Well, I assume what they're looking for,

8    perhaps, is other allegations against Mr. True.

9              ATTORNEY MCDONALD:  And we've -- and that may be, but

10   I'm also specifically speaking of third parties who have

11   nothing to do with that, that there may be reference to names

12   and other instances of seeking spiritual advice that are beyond

13   the scope of even abuse allegations.  I think --

14             THE COURT:  Well, again, I think that's the purpose

15   of a confidentiality order, that it remains with the lawyers,

16   and, unless there's a request that it be made public at a later

17   time, for instance, at trial or whenever, that's where it

18   stays.

19             ATTORNEY MCDONALD:  Certainly, Your Honor.  I think

20   the other point, and this is what Attorney Lynn just mentioned,

21   is that many of the documents which are in the Bellows Falls

22   privilege log are dated long after the period of the abuse, and

23   given the status of the claims in this case, the dates that the

24   abuse is alleged to have occurred, which is between 1991 and

25   1994, we would certainly submit that any documents beyond that

1    date and certainly documents in the late 90's and well into the

2    2000's should not be produced in this case and really don't

3    have anything to do with the claims.

4          THE COURT:  Okay.  Do you want to respond to that, or

5    do you think you have?

6          ATTORNEY STOREY:  Yes, Your Honor.  First, the

7    request to Bellows Falls for the "Body of Elders Letters" was

8    Request Number 64.

9          THE COURT:  I'm sorry.

10          ATTORNEY STOREY:  64, Your Honor.  And just two quick

11    points.  One, Bellows Falls points out that some of these

12    documents relate to Plaintiff's father, and they question

13    whether there's any relevance to those documents.  The response

14    would be that, ultimately, we're going to see arguments from

15    the Defendant trying to explain that any damages the Plaintiffs

16    suffered were not for molestation by True but were from other

17    friends, and without having seen this document, I don't know

18    what's in it, but I think it's exceedingly likely that the

19    subject of that document may be pointed to by the Defendants as

20    being a traumatic event or something of that sort that would

21    have caused damages.  So we need to be able to see it and to

22    assess it and take into account in our damages case in

23    responding to arguments that we may see from them.

24          And the second point would be that documents generated

25    after 2000, pardon me, 1996 are irrelevant.

1            THE COURT:  Are what?

2            ATTORNEY STOREY:  Irrelevant.  That seemed to be the

3  thrust of the argument about documents generated in 2006 or

4  2007.  What we know from their arguments and the briefing is

5  that there was a complaint, obviously, by each of my clients,

6  Annessa and her sister.  There was a complaint by another

7  person who was a step-granddaughter of Norton True, and in the

8  discovery they've indicated there was a complaint that came

9  along by someone else, and there are letters in the privilege

10  log from 2006 and 2012.  I don't know which of those deal with

11  the complaint by the other individual, but there had been a

12  report of molestation that came along regarding True at a later

13  date, and whether it provides notice or not or whether the

14  events occurred before my clients were abused, whether the

15  abuse occurred is going to be a disputed issue here, and having

16  another person who can testify about that is going to be

17  important.

18        You know, so documents generated, just because they're

19  generated after the abuse in this case doesn't mean they don't

20  contain relevant information or things that can relate to

21  events that occurred earlier in time.  So I would ask that

22  those documents be produced, even if they were dated after

23  1996.

24            THE COURT:  Okay.

25            ATTORNEY MCDONALD:  Your Honor, if I could briefly

1    address that last point.

2              THE COURT:  All right.

3              ATTORNEY MCDONALD:  I think that Attorney Storey's

4    argument highlights our concern for third-party privacy

5    interests.  Individuals, and we've mentioned this, and this

6    will come up in connection with the next motions, but names of

7    individuals that are within documents that were generated in

8    connection with seeking spiritual advice within our

9    congregation, those names of those individuals, they have a

10   right to privacy.  They have a right not to be contacted by

11   attorneys as in connection with a lawsuit that is not related

12   to them that they haven't brought.

13        They expected that, when they sought spiritual advice from

14   the elders within our congregation, that that advice would be

15   confidential, and I understand that's an argument in this case,

16   but they certainly did not expect to be contacted by

17   Plaintiff's Counsel for a Plaintiff they may not even

18   themselves know, particularly when, as Attorney Storey has

19   mentioned, that maybe there are documents that were generated

20   post-1996.  Those have nothing to do with notice pre-1991 when

21   Ms. Lewis's abuse is alleged to have occurred.  Thank you.

22             THE COURT:  Okay, thank you.  Anything else?

23             ATTORNEY STOREY:  No, Your Honor.

24             THE COURT:  All right.  So I think the last group

25   before I -- there may be one after this too.  Yes, there is.

 1    There's actually the motion by the Defendants to have the

 2    Plaintiff produce their, to them, discovery, but before we get

 3    to that, I think there are three related motions about other

 4    discovery.  I think there are two discovery issues in regard to

 5    both Watchtower, Bellows Falls, and Mr. Carleton's client, the

 6    third-party nonparty.  I shouldn't say that.  Anyway, the

 7    Christian Congregation of Jehovah's Witnesses.  So they're

 8    related.  Maybe I'll give you, Mr. Carleton, an opportunity to

 9    speak.  And, as I say, they seem to involve the other two

10    parties as well.  So, certainly, I'll give everybody else a

11    chance to speak if they wish to.

12          ATTORNEY CARLETON:  Your Honor, in terms of

13    sequencing, I think it probably makes sense to hear from the

14    Watchtower and from Bellows Falls on those protective order

15    issues first.  Only because the CCJW is easier to say than

16    Christian Congregation of Jehovah's Witnesses, CCJW really is

17    kind of like the stepchild argument in this entire protective

18    order issue.  It came into being only in 2001, so all of the

19    arguments that are pertinent up to 2001 apply with greater

20    force from 2001 going forward.  So, you know, I'm happy to

21    speak on behalf of CCJW now, but I'm also -- my thought was

22    that it makes more sense to hear about the first protective

23    order concerns first.

24          THE COURT:  Okay.  If you don't want to speak first,

25    then I'll let somebody else do it.

1              ATTORNEY LYNN: May I, Your Honor?

2              THE COURT:  You may.

3              ATTORNEY LYNN: Thank you.

4              THE COURT:  So let me just set the record straight

5    for my purposes as well.

6              ATTORNEY LYNN:  Please do.

7              THE COURT:  We're dealing with, in this case,

8    Document 70, which is your, it's Defendant Watchtower's motion

9    for a protective order, and that regards Document Requests 65

10   and 67, which are the same as requested to Bellows Falls and, I

11   think, to the Christian Congregation as Documents 65 and 67.

12   Maybe I misspoke there.  Okay.  I think we're talking about 65

13   and 67 as far as you're concerned.

14             ATTORNEY LYNN: Yes.

15             THE COURT:  So I'm correct?

16             ATTORNEY LYNN: Yes.

17             THE COURT:  And, however, with Bellows Falls

18   Jehovah's Witnesses it's 66 and 67?

19             ATTORNEY LYNN:  They're all nodding their heads,

20   Judge.

21             THE COURT:  Right.  And then back to 65 and 67 for

22   Mr. Carleton's, right?

23             ATTORNEY CARLETON:  That's correct, Your Honor.

24             THE COURT:  Okay.  And then let me just refresh my

25   recollection.  65 is documents in response to a March 14, 1997

1    letter, correct?

2             ATTORNEY LYNN: Correct.

3             THE COURT:  And then 67 is any document referencing

4    any allegations of sexual abuse of children within Jehovah's

5    Witnesses church since, within the, within the church itself,

6    since 1960, and I think it was your response, Mr. Lynn, or a

7    response made to the motion that, that there are no documents

8    involving the Plaintiff, her parents, RB, BS, or True exist.

9             ATTORNEY LYNN: Correct.

10            THE COURT:  Correct?

11            ATTORNEY LYNN: Correct.

12            THE COURT:  And then your response to 67 was any

13   documents that pertain to the Plaintiff, her parents, sister

14   Miranda or RB and BS and True have been produced or are on the

15   privilege log?

16            ATTORNEY LYNN: Correct.

17            THE COURT:  Correct?

18            ATTORNEY LYNN: Yes.

19            THE COURT:  Okay.  So go ahead.

20            ATTORNEY LYNN:  All right.  As you can see, Your

21   Honor, the issue -- and let's start with 65 first, since it is

22   sequentially the first one that the Court encounters.  There

23   was a letter that was generated on March 14th 1997.  That

24   letter is in the record.  I am sure the Court has had an

25   opportunity to see it, and, essentially, it was a request for

1   information from the 14,400 congregations across this country
2   to provide us with specific information around known child
3   abusers, and there were responses that were sent.  I would tell
4   the Court that, that the responses are kept electronically, and
5   I think the Court saw the affidavit from Mr. Chapel which
6   discusses how we try to access that information.  A lot of it
7   is very difficult to access because the terms "child abuse" are
8   not used.

9        But, in any event, there has been at least one court
10   which, with redactions, has suggested we need to produce those
11   materials, and, as I understand it, that is underway, but, Your
12   Honor, you saw there are two courts which were very clear that
13   these were documents that went beyond the scope of discovery,
14   what ought to be proper discovery, and declined to order
15   production and granted a protective order, did not force us to
16   provide that information.  We think that those courts, New
17   Mexico and Ohio, got it right, and what I would suggest to the
18   Judge, Your Honor, is that this is particularly true in light
19   of the 2015 revisions to Rule 26 and the scope of appropriate
20   discovery.

21        As the Court knows that, having raised that very issue,
22   that, in fact, the scope of discovery seems to have narrowed
23   significantly, particularly where a large volume of documents
24   is being sought where significant efforts have to be made.
25   Remember, Your Honor, we, as counsel, will have to review all

1    of those materials, make determinations independent of anyone

2    else as to what is appropriately produceable and what is not,

3    and that is hours upon hours and hours of time.  Your Honor,

4    even if we got by the issues of relevance under Rule 26, it is

5    beyond the scope of appropriate discovery.

6         It is not proportional to what is really at issue in this

7    case, and what is really at issue in this case is what happened

8    in Bellows Falls around Mr. True and around the Lewises, and we

9    have demonstrated our willingness to either produce those

10   materials or provide a very significant description of them, in

11   fact, produce them in camera to the Court.  There is no

12   objection to those materials, if ordered by the Court, to

13   produce them on the issue of relevance, but, Your Honor, we

14   have a very significant argument around the relevance of

15   responses from New Mexico or responses from West Virginia about

16   whether somebody has allegations of child abuse against them,

17   particularly in light of the allegations or the liability

18   claims that survive in this case.

19        And, of course, what I would ask the Court to do is to

20   make a determination as to what is relevant information based

21   on the liability claims that survive the motion to dismiss, and

22   I'm not going to articulate what those were again, but, Your

23   Honor, there were very narrow claims that existed in this case

24   after the motion to dismiss, and it will be a difficult task,

25   near impossible task, for any convincing argument to be made

1    that somehow these materials from Alaska, letters that came in
2    in 1999 from Alaska in response to this 1997 letter, somehow
3    are relevant to these claims.
4        Now, the arguments raised by the Plaintiff to support the
5    production were as follows:  They have to review each one.
6    They have to review all of these because it establishes the
7    standard of care that somehow what may have happened after the
8    events in this case or 20 years before or in Alaska somehow
9    will inform whether the people in Bellows Falls followed a
10   policy which they allege was excellent, which was vigorous,
11   zealous watchfulness and care were there allegations of sexual
12   abuse, and, Your Honor, we would argue to you that there is no
13   conceivable relevance.
14       The second argument is that it will go to the
15   reasonableness of the policies and procedures, but, Judge,
16   their argument is, We had great policies and procedures.
17   That's not the issue in this case.  The issue in this case is,
18   Did we follow those policies and procedures?
19       The next argument is, Was it the reasonableness of whether
20   to accept the denials of Norton True, and, Your Honor, that,
21   that argument makes no sense.  Whether Norton True was
22   convincing to the people in Bellows Falls and, parenthetically,
23   when he passed the two polygraph tests and convinced the State
24   of Vermont to remove him from the Sex Offender Registry,
25   whether that was convincing or not has nothing to do with a

1    letter we received from Alaska.

2        The next argument they raise is that it was whether they

3    need the documents to know whether it was reasonable to accept

4    the recantation of another, another complainant who

5    subsequently recanted.  Your Honor, you saw in the materials

6    there was a woman named RB who raised initially allegations,

7    then withdrew the allegations against Mr. True, and somehow,

8    again, the argument is, by virtue of some three-line or

9    ten-line letter that doesn't give us the specifics from

10   Indiana, we're going to know whether the people in Bellows

11   Falls acted appropriately in accepting the recantation from RB,

12   but, Your Honor, again, the issue is here whether we followed a

13   policy that they say was vigorous and zealous, and so, again,

14   Your Honor, no relevance, no convincing argument as to why it

15   would ever be relevant to the claims that are alive in this

16   case.

17       And then the final argument is that somehow it is these

18   materials with unlimited dates in which they were, the alleged

19   acts occurred, unlimited in terms of the dates in which the

20   correspondence was sent, but somehow they are relevant to the

21   issue of punitive damages, and, as the Court well knows,

22   punitive damages focuses on the specific conduct directed to

23   this Plaintiff at the time, up to the time of the alleged harm.

24   What happened, again, in California or what happened in New

25   Mexico or what happened in Texas, Your Honor, has no bearing

1   whatsoever to punitive damages in this case.

2        It is our view, Your Honor, that these materials that are

3   being sought are wholly irrelevant.  And then the next step is,

4   even, even if the Court were to order their production, Your

5   Honor, consider for a moment the exercise we would have to go

6   through in determining whether they ought to be produced or

7   not.  We would have to then begin an analysis of privilege on a

8   state-by-state basis, because each state has subtly, sometimes

9   not so subtly, different laws around what is privileged and

10  what is not privileged.

11       We would have to consider third-party interests.

12  Remember, Your Honor, these documents will have the names of

13  people who are accused of sexual abuse.  There's no indication

14  that they have been -- in the documents there may or may not be

15  any indication as to whether they have been convicted, whether

16  the evidence is convincing or persuasive.  Your Honor, it is

17  our perspective that these are a large volume of documents that

18  have absolutely nothing to do with the issues central to this

19  case, and we think the courts in New Mexico and Ohio that have

20  rejected this request are the ones who got it right, and the

21  ones in California where, frankly, judges are elected, we

22  think, got it wrong.

23            THE COURT:  So, again, just to make sure that I'm, I

24  understand, you have already, that is, your client has already

25  turned over everything?  No, I'm sorry.  You're saying that you

1    reviewed all your files and there was nothing involving this

2    case?

3              ATTORNEY LYNN: Correct.

4              THE COURT:  Okay.

5              ATTORNEY LYNN: Everything that relates to this case

6    is either in the privilege log which we've submitted to the

7    Court or has already been produced.

8              THE COURT:  All right.

9              ATTORNEY LYNN:  And then so, as the Court is aware

10   from the decisions from various judges around the country, 65

11   is not a new discovery request.   67 is, and our perspective is

12   that this is sort of incrementally trying to expand the reach

13   of discovery for the cases that Plaintiff's law firm is

14   pursuing throughout the country, and so they will, in cases in

15   various forms, see if they can get more favorable rulings and

16   expand the database that they have available to them in

17   identifying potential claims, and, Your Honor, that may or may

18   not be true but certainly is the perspective of a client who

19   fails to understand how -- I'm looking at 67 now -- documents

20   referencing allegations of sexual abuse of children since 1960,

21   so almost 60 years, right, 60 years of documents they want us

22   to produce without any showing whatsoever that it is relevant

23   to any of the issues that matter in this case.   Judge, we --

24             THE COURT:  Well, I can tell you I'm not going to do

25   it to 1960.

1          ATTORNEY LYNN: Thank you, thank you.  Thank you very
2     much.  And so, Your Honor, those are the arguments that we
3     think are availing and persuasive.
4          THE COURT:  Okay.  Mr. Storey?
5          ATTORNEY STOREY:  Morning, Your Honor.  Two quick
6     points before jumping into the relevance issue.  First, you
7     know, there was the not-so-subtle insinuation that this request
8     is solely to solicit new clients, and I'd note that we've
9     repeatedly said, Redact the names of the victims.  We don't
10    need them.  We're clearly not seeking to solicit new clients.
11    We've requested this information because we believe it's very
12    relevant to the claims.
13         And, second, there were, at various times, representations
14    that we believe Watchtower's policies are great or excellent,
15    and I think the Court would be hard-pressed to find anywhere in
16    the Complaint where we said that the policies are great.  We
17    did allege that they failed to comply with the policy, but our
18    position is not and never has been that these policies were
19    greater than the state of the art.
20         Now, with respect to these particular documents, there was
21    some discussion about whether Watchtower has identified
22    everything with respect to Norton True and the Plaintiff, and
23    --
24         THE COURT:  Or has put it on their privilege log.
25         ATTORNEY STOREY:  Or has put it on their privilege

1    log, correct.  And it's neither here nor there with respect to
2    this particular request.  This particular request, Number 65
3    and 67, aren't specifically seeking information regarding
4    Norton True.  It's seeking to determine, What did this
5    organization know about molestation within its ranks generally?
6    So it's molestation explicitly by others other than True that
7    we're seeking to get information about.
8              THE COURT:  In other places?
9              ATTORNEY STOREY:  In other places at other times,
10   yes.
11             THE COURT:  Why?
12             ATTORNEY STOREY:  Well, a number of reasons, and,
13   first and foremost, the defense we have seen repeatedly from
14   Watchtower, and they've put on an expert in other cases, Dr.
15   Monica Applewhite, and she's testified, Look, Court, you have
16   to, in determining the standard of care and determining whether
17   the Defendant acted reasonably, you need to look at what was
18   known by society generally at the time of the abuse.  So they
19   don't want to look at today's standards.  They want to look at
20   what was known in -- in this case, it would be 1991 through
21   '94, sometime in that timeframe.  And that will be the
22   testimony they put on.  They'll have an expert witness talking
23   about what the state of the art was and the state of the
24   societal knowledge was about child abuse.
25             THE COURT:  Well --

1               ATTORNEY STOREY:  So -- I'm sorry.

2               THE COURT:  As it applies to Vermont, for instance,

3    or Bellows Falls area?

4               ATTORNEY STOREY:  Well, they haven't limited that.

5    You know, they've tried to put on testimony, or at least their

6    expert has testified in these cases that, you know, this is the

7    state of societal awareness in the United States during these

8    periods of time, so, given that, Watchtower acted reasonably.

9    So we've requested this information to combat that, to say,

10   Well, it's fine and well and good what society knew about

11   molestation at that time, but what did Watchtower know?  You

12   know, did it act reasonably in light of the information

13   available to it?

14              THE COURT:  So that expert was able to testify, I

15   guess, about that?

16              ATTORNEY STOREY:  We didn't go to trial on either

17   case, Your Honor.  She gave the testimony and was designated,

18   and we deposed her, but --

19              THE COURT:  So you don't know whether it would have

20   been admitted by the judge?

21              ATTORNEY STOREY:  Don't know if it would have been

22   admitted, correct, and I can tell you candidly that we would

23   have mounted a vigorous motion in limine to try to keep it out,

24   but, regardless, there's the possibility that they offer that

25   testimony.

1          THE COURT:  Should that, shouldn't your argument be

2     made at that point?

3          ATTORNEY STOREY:  Well, what you're hearing from them

4     is it's so difficult to produce.  If we wait until that time --

5          THE COURT:  Well, it seems to me it is a lot of stuff

6     they'd have to try and find.

7          ATTORNEY STOREY:  Some of it, yes.  Some of it, no.

8          ATTORNEY LYNN: Your Honor, I hate to interrupt, but

9     we did, in the pleadings, indicate to you we will not be

10    calling Dr. Applewhite in this case.  That issue is closed.

11         ATTORNEY STOREY:  Your Honor, at the same time, they

12    said, We're not going to call that witness, but in the very

13    next sentence they say, But you have to understand that what we

14    know now is not the same.  I mean, it's explicitly in the reply

15    brief.

16         ATTORNEY LYNN: Well -- I shouldn't interrupt.

17         THE COURT:  Why don't you wait?

18         ATTORNEY LYNN: Yeah.

19         ATTORNEY STOREY:  Sure.  I can get it for you in a

20    moment.  So that's issue one on relevance in terms of

21    responding to this argument that we expect that they will make

22    and have made repeatedly.  Secondarily, we have argued or the

23    Defendant has raised this issue of these actions that happened

24    in this case specifically, for example, True accused multiple

25    times of molesting children by RB, by my clients, and there was

1    a later accusation.  Each time he denied it, and each time
2    those accusations were accepted, and, to some extent,
3    Watchtower's experience in dealing with circumstances like this
4    where a person keeps skating on these allegations is going to
5    be relevant to deciding what they should have done in this
6    circumstance.  You know, if they understand that their policies
7    aren't sufficient to allow the elders at the local level to get
8    to the bottom of this stuff and they're letting these molesters
9    skate and there are subsequent allegations, then we need to be
10   able to look at whether Watchtower was reasonable in having the
11   policies they had and in taking the actions they had.
12        Additionally, we have a claim for punitive damages in this
13   case, and this information is relevant to two specific aspects
14   of punitive damages, first, to whether the Defendant acted with
15   malice and whether, or recklessness and whether punitive
16   damages are applicable or should be imposed at all, and the
17   test there is whether there's conduct manifesting personal ill
18   will or carried out under circumstances evidencing insult or
19   oppression or even by conduct showing a reckless or wanton
20   disregard of one's rights.
21        So, in looking at that particular standard, if, for
22   instance, these documents show that there were thousands of
23   complaints of child molestation in the Jehovah's Witnesses and
24   they knew that it was a very substantial problem but they
25   didn't take action sufficient to curb it, that would be very

1    relevant in our showing of reckless or wanton disregard of

2    someone's rights.

3         Now, secondarily, there's an issue with respect to the

4    valuation of punitive damages, and what the courts say -- and

5    this is Shaheen vs. Madden -- the most important indicia of the

6    reasonableness of the punitive damages award is the degree of

7    reprehensibility of the defendant's conduct, and in Carpentier

8    the court said, in assessing the reprehensibility of a

9    defendant's actions, a jury may consider whether the conduct

10   involved repeated actions or was an isolated event.  So, again,

11   the extent to which molestation was prevalent within the

12   organization would be relevant to determining the

13   reprehensibility of Watchtower's actions.  So, for a number of

14   reasons, the information we've requested is relevant, is

15   reasonably calculated to lead to the discovery of admissible

16   evidence, and this information should be produced.

17        Now, the Defendants have also made an argument about the

18   burden of producing, that we're looking for a lot, and there's

19   two responses to that.  There's two separate requests here.

20   Now, in looking at Request 65, which is the March 14th 1997

21   responses, those documents are being gathered pursuant to a

22   court order.  They are incrementally being produced to my firm.

23   They're subject to a protective order, so I can't discuss

24   what's in them, but we're getting them.  Watchtower is

25   producing them and will produce them.  So there's no additional

1    burden in requiring them to be produced in this case.  There's

2    no extra work that's going to go into it.  It's the same

3    documents that are going to get turned over.

4         So, with respect to Request 67, which is the broader

5    request for all complaints dating back to 1960, and, you know,

6    I'll start first with the reason for that request.  Now, the

7    document retention policy that was in effect at Watchtower up

8    until 1997 didn't require this type of material to be kept

9    forever.  This type of information was kept for a period of

10   time and could be discarded thereafter, and the "Branch

11   Organization" excerpts that we provided to the Court discuss

12   the policy for going through the files every couple of years

13   and getting rid of outdated material.

14        So you have a circumstance where, if we had simply

15   requested, you know, the complaints dating back to 1960, a lot

16   of things would be missing, so we asked for the second request,

17   which was generated later and would be more complete with

18   respect to certain aspects of the institutional awareness

19   dealing with elders and ministerial servants.  So we've asked

20   for both of these things to complement each other, these

21   requests, and to get the, you know, the most in-depth look at

22   what Watchtower knew at various points in time prior to the

23   molestation of the Plaintiffs.

24        And, you know, I've heard the vigorous objection from the

25   Defendants over, How could documents generated after the date

1    of the abuse possibly be relevant?  And it's going to be a

2    mixed bag.  Some of it's going to be.  Some of those letters

3    are going to refer to things that occurred earlier in time.

4    There will be, you know, people who were accused of abuse in

5    2001 or 2006 who had previously been accused and who that was

6    known to either Watchtower or the local congregation.  So the

7    date that a document was generated isn't going to immediately

8    mean that it can't be relevant.

9              THE COURT:  Okay?

10             ATTORNEY STOREY:  Yes.  Thank you, Your Honor.

11             ATTORNEY LYNN: Just a couple words, Judge.

12             THE COURT:  All right.

13             ATTORNEY LYNN:  First of all, this is -- I didn't

14   make this up.  I'm looking now at the Court's ruling on the

15   motion to dismiss based on the First Amended Complaint, Page 7.

16   The First Amended Complaint alleges the congregation and

17   Watchtower had a policy of vigilantly monitoring the reported

18   molesters for the safety and protection of children in the

19   congregation.  I mean, this is the basis of their only claim

20   that could ever possibly survive summary judgment, because this

21   ministerial servant issue is gone.

22        Judge, that is the narrow focus of this case, and to

23   somehow suggest we need a complete picture from 1960 and, yes,

24   it might be a mixed bag, meaning that almost nothing will have

25   any, no, nothing will have any bearing on this case, Judge,

1    that only illustrates the point I was trying to make earlier

2    which is this is, this is searching for documents generally for

3    purposes that have nothing to do with this case.  There is

4    nothing conceivably admissible about almost everything that

5    they've asked for in 65 and 67.  In fact, the things that are

6    admissible and that could ever be admissible are the things

7    that we have produced.

8            THE COURT:  So, Mr. Carleton, you want to enter into

9    this discussion?

10           ATTORNEY CARLETON:  Very briefly.

11           THE COURT:  Well, you can take as much time as you

12   want.  It was a long trip down here.

13           ATTORNEY CARLETON:  Thank you.  So, Your Honor, I

14   represent Christian Congregation of Jehovah's Witnesses or

15   CCJW.  I entered my appearance in this case on behalf of CCJW

16   shortly after CCJW filed its motion for protective order.  So

17   the only pleading that I've submitted to Your Honor is the one

18   that was submitted on Friday.  I'm going to try to be very

19   brief because, as I expected, Attorney Lynn did a very good job

20   of driving home the core issues of relevance and timing that we

21   believe also preclude discovery of Requests 65 and 67 to CCJW.

22       Just because I'm not sure if the Court has a full picture

23   of what CCJW is, let me take a minute to explain what the

24   organization is.  In 2000 CCJW was incorporated, really, for

25   spiritual reasons.  The Watchtower the world over is associated

1    with the publications that the Jehovah's Witnesses produce, and

2    there was some concern that people were losing sight of the

3    fact that it was really a religion and a spiritual

4    organization.  So CCJW was incorporated and took over all of

5    the communications back and forth between the congregations,

6    and that was an effort to sort of, you know, highlight the fact

7    that it was, indeed, a religion.

8          The only reason CCJW received a subpoena in this case was

9    to recognize corporate formalities.  It was at Attorney Lynn's

10   suggestion in a letter dated September 17th 2001 saying, Hey,

11   if we're going to argue over documents all the way up until the

12   present date, we need to honor the formalities of the

13   corporations.  Just send out that subpoena, and we'll go from

14   there.  So I'm positive that this court has already seen beyond

15   kind of the posturing that was in the some of the pleadings.

16   There's been no effort to hide documents.  There's been no

17   attempts to delay discovery, and there's been no attempt or

18   there's been no refusal by CCJW to respond in any way to the

19   subpoena.  CCJW did, in fact, respond on November, excuse me,

20   November 20th with responses, objections, production of

21   documents, and a privilege log.

22         Okay.  So we can set aside all of that.  Now, really, the

23   issue before the Court is the same one that was just argued a

24   moment ago, which is whether 65 and 67 are appropriate requests

25   for CCJW, and the issue there is simply one of timing.  The

1    March 14th 1997 letter went out exactly four full years before

2    CCJW even began sending and receiving communications.  You've

3    heard over and over that the Jehovah's Witnesses are a

4    disciplined organization, and that is indeed true.  In response

5    to the 1997 letter, Judge, there was a flurry of responses from

6    the 14,000-some-odd congregations around the country, but that

7    happened for 1997 and 1998, and that was a -- the '97 letter

8    was a call for retrospective disclosures, in other words, What

9    happened in the past?  What do you know about people in the

10   past that we should be concerned about?

11        What CCJW almost exclusively has received from 2001 onward

12   is reports from the congregations about activities and concerns

13   and allegations that were happening currently, not

14   retrospectively, so, plus, you have 15 years of them from 2001

15   to the present.  So the notion that we would be called upon to

16   find what we consider to be an irrelevant needle in an enormous

17   haystack of correspondence, I mean, enormous and difficult to

18   search, as has already been explained, is just beyond the

19   burdens that this court should impose upon CCJW for the

20   purposes that have been articulated by the Plaintiffs in this

21   particular case.

22             THE COURT:  So I'm not sure I have your response here

23   in front of me, but does CC --

24             ATTORNEY CARLETON:  CCJW.

25             THE COURT:  -- CCJW, do they have any documents

1    regarding again, True, the other initials, his, I'm sorry, her

2    parents, RB, BS, so forth --

3                 ATTORNEY CARLETON:  Well, to the extent that those

4    -- I'm sorry.

5                 THE COURT:  -- that are not on the privilege log of

6    Watchtower or Bellows Falls?

7                 ATTORNEY CARLETON:  I believe the answer to that

8    question is no.

9                 ATTORNEY STOREY:  Your Honor, there was a separate --

10   I'm sorry to step in here.  There was a separate privilege log

11   from CCJW.

12                THE COURT:  Yes.

13                ATTORNEY STOREY:  It identified, I believe, six or

14   seven items.

15                ATTORNEY CARLETON:  Correct.

16                ATTORNEY STOREY:  It's not before you now.  It will

17   be the subject of a future motion, though this court's order

18   may head that off.

19                THE COURT:  Okay.  I guess I missed that.

20                ATTORNEY CARLETON:  Yeah.  So we filed our motion for

21   protective order.  The Plaintiffs responded to it but didn't

22   raise a separate issue concerning the six documents that are on

23   that particular protective order.

24                THE COURT:  So that's not at issue?

25                ATTORNEY CARLETON:  That's not before the Court

1    today, no.

2              THE COURT:  I can't deal with it, I guess, huh?

3              ATTORNEY CARLETON:  I'm sorry.

4              THE COURT:  I can't deal with it?  I don't want to

5    have another one of these.

6              ATTORNEY CARLETON:  My guess is that Your Honor's

7    rulings today will give guidance to the parties in such a way

8    that we can probably take care of it ourselves, understanding

9    that the Court doesn't like to revisit the same issues over and

10   over.  But the bottom line is, to the extent that any of these

11   issues of relevance, overbreadth, undue burden, First Amendment

12   privileges, religious privileges, all those things apply to the

13   Watchtower, they apply doubly so to CCJW, because the documents

14   that are at issue there are just even further attenuated in

15   time, Your Honor.  So we would ask for the Court to grant that

16   portion of the protective order as part of its global ruling

17   today.

18             THE COURT:  Okay.

19             ATTORNEY CARLETON:  Thank you.

20             THE COURT:  Thank you.

21             ATTORNEY STOREY:  Your Honor, just --

22             ATTORNEY MCDONALD:  Go ahead.

23             ATTORNEY STOREY:  Oh, I'm sorry.  Go ahead.

24             ATTORNEY MCDONALD:  I was just going to address

25   whether you would like to take up Bellows Falls's motion for

1   protective order separately or whether we should just keep
2   going back and forth.
3          THE COURT:  Well, the issues are the same, are they
4   not?  Except your response is different, of course.
5          ATTORNEY MCDONALD:  The issues are the same.  Our
6   response is slightly different, although obviously raises all
7   the same issues that have already been discussed.
8          THE COURT:  Right.  I think you responded to the --
9   well, it was a little different.  Maybe we ought to take it.
10  After I hear from Mr. Storey on Watchtower, then we'll take
11  yours up.
12         ATTORNEY MCDONALD:  Certainly, Your Honor.
13         ATTORNEY LYNN: On Watchtower, Your Honor, or on CCJW?
14         THE COURT:  Well, we've heard -- we've heard from
15  both of you, correct?
16         ATTORNEY LYNN: Right.  I thought that Mr. Storey has
17  already responded to everything from Watchtower.  Of course, he
18  can say more.
19         THE COURT:  All right.  Well, why don't we take Mr.
20  Storey first, and then we'll deal with the issue with Bellows
21  Falls; how is that?
22         ATTORNEY LYNN: Thanks.  Sounds good, Judge.
23         ATTORNEY STOREY:  Thank you, Your Honor.  Just very
24  briefly, with respect to Watchtower, in the reply brief, Page 4
25  to 5, there had been, you know, a statement that they were

1    going, not going to offer Dr. Applewhite as an expert in this

2    case.  Plaintiff, next two sentences -- it's at the top of Page

3    5.  Plaintiff says Watchtower will ultimately defend that it

4    knows more about child abuse now than it did in 1990.  Today's

5    knowledge is no defense to what should have been done in 1990,

6    regardless of what was known about child abuse then.  So,

7    again, they're talking about -- even when in one sentence

8    they're saying, We're not going to use Dr. Applewhite, the very

9    next sentence they come back and say that today's knowledge is

10   no defense to what should have been done then.  So we need to

11   figure out what they knew then to be able to figure out what

12   they should have done and whether their actions were

13   reasonable, and that's the point.

14        Now, with respect to -- this Court had made a comment

15   earlier indicating that the time period was not going to go

16   back to 1960.

17             THE COURT:  Seems to me it's awfully long.

18             ATTORNEY STOREY:  Sure.  And what I would recommend,

19   perhaps, is Norton True was made a ministerial servant in 1976,

20   and perhaps that's a good start date, taking it up from 1976

21   through the time of the molestation in this case.  It's a

22   substantially truncated period of time with a direct tie to the

23   events in this case, and --

24             THE COURT:  I'm sorry.  Could you tell me again what

25   he became?

1          ATTORNEY STOREY:  A ministerial servant.  So that's

2     a, an appointed position functioning below the elders in the

3     congregation.  But it seems that that's a reasonable time

4     period tied to the case that maybe would fit the circumstances

5     a little bit better than the request.  Thank you.

6          THE COURT:  Okay, all right.  Ms. McDonald?

7          ATTORNEY MCDONALD:  Attorney Storey's argument is a

8     good segue into our motion.

9          THE COURT:  All right.

10          ATTORNEY MCDONALD:  So Bellows Falls joined in

11     Watchtower's motion for protective order.  Obviously, the

12     issues on relevancy and religious privilege and the third-party

13     privacy interests of our congregants and the elders of the

14     congregation are certainly the same as the arguments

15     articulated by Attorney Lynn and Attorney Carleton.  What I

16     would like to specifically address to the Court first is that,

17     with respect to Number 66 -- that was the request for all, the

18     1997 letter -- Bellows Falls did not submit any responses to

19     that letter, so there are no documents in response to Number

20     66.

21          THE COURT:  All right.

22          ATTORNEY MCDONALD:  As to Number 67, and I believe

23     this is Attorney Storey's suggestion, that documents from 1976

24     starting with when Norton True was appointed as ministerial

25     servant to, I believe, the present concerning all allegations

1   of abuse whatsoever, I think that's his suggestion on narrowing
2   the scope of that request.  We, obviously, we would object to
3   -- we object to producing any documents in response to that and
4   suggest that that suggested revised scope does not resolve the
5   relevancy issues that we have here.
6           THE COURT:  How about if it's limited to allegations
7   against Mr. True?
8           ATTORNEY MCDONALD:  Could you say that again, Your
9   Honor?
10          THE COURT:  How about if it's limited to allegations
11  against Mr. True since 1976?
12          ATTORNEY MCDONALD:  I believe that we produced or
13  identified in the privilege log all documents that would be
14  responsive to any such request.  So, again, I think that kind
15  of takes us outside the 67 request, and it addresses the other
16  ones that we've already talked about in response to the motion
17  to compel.
18          THE COURT:  I'm sorry.  Is it 76 or 67?
19          ATTORNEY MCDONALD: 67, my apologies.  '76, I believe,
20  was the date suggested for the revised scope of the disclosure.
21          THE COURT:  Right.  And I'm sorry.  Where did we get
22  67?
23          ATTORNEY MCDONALD: 67 is the request for all
24  documents concerning allegations from 1960 onward --
25          THE COURT:  Right.

1          ATTORNEY MCDONALD:  -- that Attorney Storey has now

2     revised to 1976.  One issue, and this is particular, I think,

3     to Bellows Falls and Watchtower as well, is that the request

4     seeks all allegations.  There's no limit to known abusers.

5     There's no limit to individuals who have been convicted,

6     individuals who have been present before a judicial committee,

7     which is the biblically based process set in place by the

8     Jehovah's Witnesses.  This is all allegations.  They may very

9     well be unsubstantiated allegations.  They may be allegations

10    that were determined to have been false.

11          This is such a broad request.  It has nothing to do with

12    the issues that are at play in this case, which is, first, What

13    was the nature of the relationship between Mr. True and the

14    congregation and the relationship between Mr. True and the

15    Plaintiff, and then what Defendants knew about Mr. True.  The

16    request is far broader than that and, I don't think, has any

17    relevancy and certainly raises the privacy interests that we've

18    already discussed, and I think that the absence of that

19    connection is the reason that even this revised scope is just

20    absolutely beyond anything that will be proportional for

21    producing in discovery in this case, Your Honor.

22          THE COURT:  Okay.

23          ATTORNEY MCDONALD:  And, again, I think, to discuss,

24    as I anticipate Attorney Storey is going to also mention the

25    punitive damages claim in this case, I'm particularly concerned

 1    with the request for the allegations, because, again, that
 2    doesn't say what we knew, because these allegations not limited
 3    at all may very well be unsubstantiated, and then it gets into
 4    essentially a trial within a trial about whether these prior
 5    allegations concerning individuals that have really no other
 6    bearing on this case, whether those were substantiated or not
 7    and otherwise should have put us on notice of any issues within
 8    the congregation.  It, certainly, it's, you know, not only does
 9    it not have to do with anyone in this case, but trying to bring
10    into this case allegations that may very well have been
11    completely unsubstantiated, I think, is, again, beyond the
12    scope of anything that we should ever be required to produce.
13    Thank you, Your Honor.
14         THE COURT:  Okay.  You get to go again.
15         ATTORNEY STOREY:  Sure, thank you.  Just very briefly
16    in response, Your Honor, there were some arguments there about
17    third-party privacy and maybe some of these allegations were
18    made but they weren't substantiated, but, again, all of that
19    can be protected with the protective order that the Court had
20    spoken about earlier.  Preventing disclosure of any of this
21    material is going to prevent any harm from coming from the
22    production.  So I would argue that any third-party privacy
23    issues really shouldn't move the needle here or cause any
24    change in or produce, prevent production in any way because
25    they're going to be protected by the confidentiality agreement.

1      Thank you.

2                 THE COURT:  Okay.

3                 ATTORNEY MCDONALD:  Your Honor, briefly in response

4      to that, I think that that misses the point of the

5      confidentiality order and that also misses the point of my

6      argument, which is, These very well may be unsubstantiated

7      allegations, but absent criminal convictions, there's simply no

8      way for a confidentiality order to protect that information, or

9      to --

10                THE COURT:  Well, again, if it's a confidentiality

11     order, it's between all of you.  It doesn't go beyond that.

12                ATTORNEY MCDONALD:  The issue, I think, is also then

13     it gets to determining whether or not these allegations are

14     substantiated, which also goes to we get into these little mini

15     trials during this trial as to each document that would be

16     produced, and I think, again, the absence of any relevancy and

17     the issues that that may cause weighs heavily in favor of not

18     producing those documents.

19                THE COURT:  All right.  But, as you know, we're not

20     talking about a trial.  We're talking about discovery at this

21     point.  So, some of those, what you're saying may be true if it

22     comes to a trial.

23                ATTORNEY MCDONALD:  Yes, sir.  Thank you.

24                THE COURT:  Okay.  Anybody else want to enter into

25     the discussion about these motions?  All right.  So I think

1    this is an easy one.  There's a motion that was filed by both

2    Defendants, the Congregation and Watchtower, back on October 5

3    asking the Court to compel certain discovery.  There was no

4    response by the Plaintiff.  The Court didn't do anything, but

5    then all these other motions came in.  So I assume this is

6    moot.  Would that be right?

7              ATTORNEY JUDGE:  No, Your Honor, it's not moot.

8    Sorry, Your Honor.  Walter Judge on behalf of the Bellows Falls

9    Congregation.

10             THE COURT:  Right.

11             ATTORNEY JUDGE:  I can understand Your Honor's

12   perspective, which is that, since it hasn't been responded to,

13   perhaps it's just sufficient for the Court to order a blanket

14   discovery order, and if that's what the Court is inclined to

15   do, then I don't need to argue the specifics of what we're

16   looking for and what hasn't been produced, but I was prepared

17   to talk to Your Honor about what hasn't been produced that

18   we've requested.

19             THE COURT:  Well, what about your recent motion?  I'm

20   talking about the recent one you filed.  I'm talking about an

21   old one.

22             ATTORNEY JUDGE:  Oh, no, no.  Yes, you're absolutely

23   correct, Your Honor.  You're absolutely correct.  That old one

24   is moot.

25             THE COURT:  All right.  So that was easy.

1          ATTORNEY JUDGE:  That was easier than I made it,

2     that's for sure.

3          THE COURT:  Okay.  So that, that's Document 65 filed

4     on October 5 of '15, and that was a joint motion to compel, and

5     the Court is ruling that that is moot at this point, okay?

6          ATTORNEY JUDGE:  Thank you, Your Honor.

7          THE COURT:  All right.  So, yes, you are correct.

8     You do have a motion that was filed relatively recently, and it

9     was responded to recently, in fact, I think, yesterday.  So do

10    you want to go ahead and argue it?

11         ATTORNEY JUDGE:  Sure, yes.  Thank you, Your Honor.

12    Is it acceptable to the Court if I argue from counsel table?

13         THE COURT:  Fine.

14         ATTORNEY JUDGE:  Okay.  So, Your Honor, here's what

15    we still don't have:  We don't have any medical records from

16    Ms. Lewis from age 4 to age 21.  It is the Defendant's position

17    that those medical records must exist somewhere.  We don't have

18    the identification of Plaintiff's childhood pediatricians or

19    primary care providers during that period.  We don't have the

20    dates when she was treated by any of the medical doctors,

21    counselors, or therapists.  We don't have any identification of

22    all of the various, quote, friends that Plaintiff has spoken to

23    about her abuse over the years that she's admitted that she's

24    spoken to.  We don't have any therapy or counseling records at

25    all from before this lawsuit was filed in October of 2014.  We

1    don't have any journals or diaries, even though Plaintiff

2    admits that she kept at least one, and we don't have any texts,

3    emails, social media, etc., etc.

4         Now, we're talking about someone who is currently 28

5    years old.  I don't know if Ms. Lewis is different from

6    everyone else on the planet, but everyone else on the planet at

7    that age sends a thousand texts a day, a thousand emails a day,

8    and checks their Facebook status a thousand times a day.  We

9    don't have anything.

10        So let me just elaborate a bit.  In Plaintiff's answer to

11   her, to Interrogatory Number 4, she states that she told,

12   quote, various friends about the alleged molestation.  We have

13   been asking Counsel for weeks to identify some of those people,

14   and, so far, it hasn't happened, and this is particularly

15   frustrating because just a few days ago she produced a series

16   of what appear to be heavily redacted Facebook messages about

17   the alleged molestation, and we quickly tried to go through

18   those before today's hearing, and they mention, they talk about

19   the, the alleged molestation and this case that she was going

20   to bring with her sister Jenny and her brother Keith, Jr., and

21   some other unknown people whose names appear in the texts, but

22   we've never been provided with any of that information about

23   who they are and how they can be contacted, and we've been

24   asking for that for weeks.

25        As I said, the Plaintiff has not produced any information

1   about her childhood doctors.  Now, in this kind of case, Your

2   Honor, that information would obviously be relevant.  We're

3   talking about abuse that, according to the Plaintiff, occurred

4   sometime between '91 and '94 when she was between the ages of 4

5   and 7, and now she's 28 years old.  So, obviously, any medical

6   records from her childhood would be extremely relevant to

7   whether the abuse happened, did she ever talk to her doctors

8   about it, did her mother ever talk to the doctors about it, did

9   the doctors ever report it, did the doctors ever recommend

10  therapy, did the doctors do anything about it?

11      Not only do we not have a single medical record between

12  ages 4 and 18, but we don't even have the name of the

13  Plaintiff's pediatrician.  Now, I'm 55.  I remember the name of

14  my childhood pediatrician.  I went to him every year and so on

15  and so forth.  We're talking about a 28-year-old person.  If

16  she can't remember the name of her pediatrician, then her

17  mother can, and if her mother can't, her father can, and if

18  none of those people can remember the name of her pediatrician,

19  then her sisters can because they probably went to the same

20  childhood pediatrician.  Someone can remember the name of the

21  childhood pediatrician, but we are being told that she can't

22  remember who it was.  That's not credible.

23      In the opposition that was filed yesterday that the Court

24  just alluded to, Counsel says that, quote, most of her

25  childhood providers report having no records.  Well, we would

 1   like to know who those childhood providers are that are being

 2   referenced, because we've never been given the names of any of

 3   those people.  Also, in that opposition Counsel says the

 4   Defendants are free to subpoena those childhood care providers.

 5   Well, you can't send a subpoena if you don't know who they are,

 6   number one, and, number two, Counsel knows very well that we

 7   can send a subpoena to anyone we want and they're not going to

 8   send us any records without a signed authorization from the

 9   Plaintiff, which they've refused to provide.

10        In the heavily redacted Facebook notes, the handful of

11   notes that Plaintiff produced just a few days ago, they show

12   that she was planning her lawsuit in January of 2014, if not

13   earlier, but that's the first note in which she mentions that

14   she's about to file a lawsuit or that she's going to file a

15   lawsuit.  So I would respectfully suggest that that's two years

16   ago, and if steps had been taken when the Plaintiff

17   acknowledges that she was going to file a lawsuit in this case

18   to preserve records, medical records, therapy records, and so

19   on and so forth, those records might exist now.  We're being

20   told that those records don't exist.

21        For example, the Plaintiff acknowledges in her

22   interrogatory responses that, at age 14, she went to see a Dr.

23   Belcher-Timme, a therapist.  She was planning her lawsuit in

24   January of 2014.  We are now told that Dr. Belcher-Timme's

25   therapy records were destroyed within the last year.  Those are

1    the only records that Plaintiff says in which the, in which she

2    sought therapy before she filed this lawsuit, and now those

3    records are apparently destroyed.

4         We also have the Plaintiff's statement that she attended

5    family counseling therapy with her mother and possibly others

6    in 1996 when the parents were getting divorced.  And, by the

7    way, I should add that what we're talking about when we're

8    talking about these 1996 records and all the medical records

9    that apparently don't exist or Plaintiff doesn't know the name

10   of her pediatrician, as I said, those records would obviously

11   be relevant in any case in which a plaintiff is claiming

12   childhood sexual abuse and she's now an adult, but, in this

13   case, we have 1996 allegations, not allegations, but we have

14   1996 a father arrested for abusing the children.  We have 1996

15   a mother and father going through divorce proceedings, and we

16   have the mother's allegation in 1996, the mother's

17   acknowledgement in 1996 that one of her own therapy patients

18   who was living in her home sexually molested her children.

19        Now, if that doesn't make childhood medical and therapy

20   records relevant, I don't know what does.  So, so we have no

21   therapy records that preexist this lawsuit.  We have a claim

22   that they don't know who the Plaintiff's childhood medical care

23   provider was, and we have no records, and we are being told

24   that the records of Dr. Belcher-Timme have been recently

25   destroyed, and we have the family counseling from 1996 at which

1     Annessa, the Plaintiff in this case, was present and in which
2     apparently there was discussion about the abuse that Annessa
3     was alleging, and the Plaintiffs refuse to produce those
4     records because the mother won't raise, won't waive the
5     privilege for the release of those records.  Those records, we
6     are being told, are the only existing prelawsuit counseling
7     records that involve Annessa.  They should be produced.
8         The mother took part in the press conference that was
9     delivered in Plaintiff's Counsel's office in October, October
10    1st, September 30th 2014 promoting this lawsuit and announcing
11    this lawsuit.  The mother is a promoter of this lawsuit.  We do
12    not think that it's fair for her to stand on her claim of
13    privilege as to family counseling records at which Annessa was
14    present and the abuse was allegedly discussed, and if the other
15    plaintiff, Miranda, was also there at this counseling, at these
16    counseling sessions in 1996, that breaks the privilege even
17    further.
18        So we don't think, given that these are the only therapy
19    records on the Plaintiff that we are being told exist prior to
20    this lawsuit being filed, we don't think that we should have to
21    suffice with redacted records from those family counseling
22    sessions.  We think those family counseling records which
23    apparently still exist -- which is interesting because you've
24    got a therapist who still has records from 1996, and then
25    you've got a therapist who saw Annessa alone much later in

1    time, and those records have already been destroyed.  But, in

2    any case, the 1996 records for the family counseling should be

3    produced in full.  That's our position.

4            THE COURT:  Okay.

5            ATTORNEY O'NEILL: Your Honor, I'm very pleased for

6    Mr. Judge that he led a life that permitted him to be able to

7    remember who his pediatrician is because he got regular

8    pediatrician visits.  I would wish that on every child that

9    exists on the planet going back as far as one can go.  That's

10   not true of the Plaintiff in this case.  She led a chaotic

11   life.  The assault --

12           THE COURT:  She must have seen a doctor at some

13   point.

14           ATTORNEY O'NEILL: Pardon?  Oh, she did, but it was

15   chaotic.  It was irregular.  She has given us the names of

16   practices that she believes she went to.  We've talked to her

17   mother.  We've tried to chase them down, and we don't just sit

18   on our hands, and when we get, for example, So-and-so is no

19   longer in practice, we ask the question, Where are the records?

20   And we go to that source and try to find the records.  We've

21   gone, we've chased down every lead that we have.  We have a new

22   lead on a doctor who, our best guess based upon something in

23   Google, is about 90 years old, and we now think we know where

24   his records, if they existed, are kept, and we're going to try

25   to get those.

1        We vacuum records.  We don't have any disagreement about

2    the relevance.  There's no issue about that.  We've concurred

3    entirely.  We're glad to try to find the records.  We have

4    identified providers.  We have said specifically, We tried this

5    place.  They called us up and said no records.  We tried this

6    place.  They called us up and said no records.  Dr. Timme who

7    has been referenced, this is the first I've heard about her

8    destroying records within the last year.  I was accused of --

9            THE COURT:  He's talking about Belcher-Timme?

10           ATTORNEY O'NEILL:  Yeah, Belcher-Timme, exactly.  We

11   were accused of having delayed.  We requested the records

12   before suit was filed.  We can't produce records that don't

13   exist.  If they exist, my attitude with respect to records is

14   very simple.  Either you produce them, you make every effort to

15   get them.  We have and will continue to do so.  If we can't get

16   them, we will so state.  If there's an instance where they want

17   to depose a particular entity and that entity says, Well, in

18   order to be deposed, you need a release from the client, we'll

19   give it to them.  We're not going to hand out blanket releases.

20   I've seen them abused in the past.  But, in terms of getting

21   records, we'll get any that we can.

22       Let's spend a moment talking about this therapy session.

23   The fact is that Defendant Bellows Falls says, We should get

24   those records, we're entitled to those records, completely

25   ignores privilege.  There's a privilege with respect to it.

1    It's a counseling privilege.  I've had the litigation on this

2    issue, and if they want to go ahead and file a motion to compel

3    and cite the authorities, I will be glad to respond to it.  We

4    have asked for, and I'm told we're going to get --

5              THE COURT:  Privilege between whom?

6              ATTORNEY O'NEILL: The mother, who this was primarily

7    for the mother.  The children were there some of the time for

8    counseling, so it's joint counseling amongst the children and

9    with the mother.  We've talked to the therapist, and what the

10   therapist has said that he can get for us and we have asked him

11   to get for us is his, in his words, heavily redacted notes that

12   will show the parts that relate specifically to the daughters

13   where they are involved in some part of it.  He is the one who

14   told us, and I agree with him, that he cannot produce, without

15   authorization from the mother who has no interest in giving it,

16   the records of her work that she did in connection with the

17   therapy.  Privileges exist to block the flow of information.

18             THE COURT:  Well, have you turned that over yet?

19             ATTORNEY O'NEILL: No, we don't have it yet, Judge.

20   We're getting it from him.  Any, if we can find a record -- all

21   the records going back to childhood, any we can find we'll turn

22   over.  We've asked our client.  We've worked with the client.

23   We'll continue to do so.  We're not trying to hide any

24   information.  I've never hidden any information in my life.

25   I'm not about to start now.

1          THE COURT:  It is kind of curious, frankly, that the

2     suit's been filed two years and you're still trying to find

3     information.  I mean, you must have had some before you filed

4     the suit.

5          ATTORNEY O'NEILL: We didn't have any medical records

6     before we filed suit, Judge.  No, we didn't have any medical

7     records.  We did request some, but we haven't had any luck in

8     getting virtually anything.  There is a physician that she is

9     seeing -- excuse me.  I think it's -- I think we all know this

10    one, Dr. Jere, J-E-R-E, who has given us a summary, and we

11    said, Summary doesn't count.  We need the records.  Get us the

12    records.  So she's down in Dallas.  I will expect we'll have

13    those sooner than later.

14         I would be happy to have an order from the Court.  If you

15    want to give us an order that says -- and I was thinking of

16    dates -- You have to produce this information by, let's say,

17    January 30th, because it would be of some help to me in getting

18    some momentum in getting pieces like that done and out of the

19    way.  But, other ones, I can't produce what doesn't exist.  I

20    mean, whether or not Defense Counsel feels it's not credible is

21    not the issue with respect to it.

22         Now, I heard something said there that I scratched my head

23    when it was first stated.  All this about how text messages,

24    there are no texts, no emails, no Facebook, and these people

25    are on it all the time.  Well, some people are.  Some people

1    are not.  But, in the same breath a few minutes later just as I

2    was scratching that down, I heard, But they've turned over all

3    these redacted pages related to Facebook.  There's one text

4    that she has that she provided that relates to this.  We turned

5    it over.

6         The Facebook is redacted.  There's no question.  She

7    doesn't have to put her entire life -- anyone does.  So it's

8    the equivalent of going through, say, I want to see all the

9    mail, physical mail you've received over this period of time.

10   She used search terms.  She went back through and searched

11   through it.  I personally looked at every one of those and made

12   decisions about whether or not it was something that fell

13   within the scope, and, if in doubt, I said yes, and we turned

14   it over.  The problem with things like Facebook is you take a

15   look at something and you say, There's got to be something

16   missing here, and there may be, but, digitally, it's not there.

17   It doesn't exist.

18        We've turned over, I want to say, over a hundred pages of

19   documents relating to Facebook postings and comments that she's

20   gotten.  I've put them so that, if there's a comment that she

21   has made in a context, they get what was said from someone else

22   so that the information is there and it's available.  We have

23   done our best to and will continue to try to go ahead and

24   provide the information that's sought.  We can't produce that

25   which does not exist.

1      See, there was one other thing.  Things like, They must

2    exist somewhere, well, they don't must exist somewhere.  They

3    don't exist, at least we've been able to find.  If we can find

4    it, Judge, we'll either do one of two things.  Either we'll

5    turn it over, or we'll identify it to the other side if there

6    is a reason why it would not be produced, and I have in mind,

7    sometimes I've gotten in medical records that are wholly

8    unrelated to the subject, but I've identified to the other side

9    and said, If you want to file a motion to compel, do so.  I

10    don't think that will be necessary here because I don't think

11    we're going to turn up anything that falls into that category,

12    but if it exists, I'm glad to find it, glad to go ahead and

13    turn it over.

14      We need to get back to them with respect to other people

15    as to whom she thinks she may have discussed this.  The

16    Facebook postings are of some help with respect to it, but it's

17    a broad scope of people, and we'll try to add to what that is,

18    but I don't think there is that many more to add.  That's

19    essentially what our position is, Judge.  Thank you.

20            THE COURT:  All right.  Mr. Judge?

21            ATTORNEY JUDGE:  Your Honor, briefly, again, with all

22    due respect to Plaintiff's Counsel, if I just -- I can't

23    believe that no one in Plaintiff's family can remember who her

24    childhood pediatrician was, and, if she had more than one, that

25    no one in her family can remember who they were.

1        Point number two, we have asked the Plaintiff to give us a
2    signed authorization so that we can chase down the records.
3    The Plaintiff refuses to do that.  I've been doing this for 20,
4    23 years, Your Honor, and my experience is, if you ask a
5    hospital for a record or you ask a doctor's office for a record
6    and it's old and it's a lot of work to dig through the files
7    and find it, they tell you they don't exist.  If you pursue
8    them, they do eventually appear.

9        Now, in the case of Ms. Lewis, if she was on Dr. Dynasaur,
10   Medicaid may have the records.  If she was on Blue Cross Blue
11   Shield, they may have the records.  Her mother may still have
12   some of the records in her own personal files.  The idea that
13   this girl from age 4 to 21 is a blank slate medically, it's,
14   it's not feasible, Your Honor.  Dr. Lafleur is, I believe --
15   no.  Excuse me.  Dr. Roberts is the current therapist she has
16   seen.  She has been seeing that therapist since March of 2015,
17   five months after this lawsuit was filed.  What we have from
18   Dr. Lafleur, excuse me, Dr. Jones is only a summary of his
19   interpretation of the notes he took of her treatment.  We
20   should be entitled to the notes, at least.

21             THE COURT:  I think he said he's going to get them.

22             ATTORNEY O'NEILL: Absolutely.

23             ATTORNEY JUDGE:  What I thought I heard him say was
24   that they were going to be redacted, but if he's going to get
25   the full notes, that's fine.

```
 1            ATTORNEY O'NEILL:  No.  We'll get -- we've made it
 2    clear that that summary's not acceptable.  We want the full
 3    notes.
 4            ATTORNEY JUDGE:  And, as for the Facebook thing, Your
 5    Honor, or the Instagram thing or text messaging or emails or
 6    Gmails or Google mail, Instagram, whatever, we've been given,
 7    as of two days ago, three days ago, a handful of heavily
 8    redacted messages back and forth between her and her sister and
 9    her brother KJ, Keith Lewis, Jr.  We, you can't tell that those
10    are from Facebook.  Everything is redacted except a short
11    handful of notes that the Plaintiff has decided are relevant.
12    Where's the rest of the Facebook page?  Where are the rest of
13    these notes, and what was the basis for the redaction?  There
14    was no privilege log submitted.  So, you know, Your Honor, to
15    say that they've given us her Facebook page, that's not true.
16    We have no emails whatsoever, none, and we have no texts
17    whatsoever.  We have essentially no social media whatsoever.
18    We think that we should be given that.
19        As to her Facebook page, the notes that we got yesterday
20    or two days ago include a note back and forth between her and
21    one of her friends in which she said, Oh, I'm about to file a
22    lawsuit -- and this was January of 2014 -- against those darn
23    Jehovah's Witnesses, and the response that she got from her
24    friend was, Hey, you'd better turn your Facebook page private,
25    and the very next thing from Annessa to her friend was, Oh,
```

1    that's a good idea.  I'm going to do that now.  Why should we
2    suddenly be foreclosed from knowing what this woman's life was
3    as she described it on Facebook suddenly because she files a
4    lawsuit?
5              ATTORNEY O'NEILL: Judge, I'm not sure what planet
6    we're on here.  Turning a Facebook page private doesn't delete
7    a thing.  All it means is that it's limited as to who can see
8    it.  It doesn't mean that you can't, that the material is gone.
9    You're hearing things, to be direct, simply not true.  For
10   example, there was an instance, and I forgot about this one --
11   excuse me for going back to it -- where she hasn't produced the
12   diary.  We know there's at least one dairy.  We identified the
13   diary.  We said there was a diary she kept, and this is the
14   name of a website that keeps diaries, and she, in 2012 before
15   we ever got within a mile of this, decided she didn't want it,
16   she didn't want it seen, so she cut off the account.  We said
17   to her, Okay, what you need to do is go back to them and see if
18   they still have it.  Do they still have it archived?  She's
19   trying to do that.  We're trying to locate it.  We're not
20   saying it doesn't exist.
21       As it relates to the pediatrician, she has different
22   medical practices that she thinks that she went to.  Her life
23   was chaotic, so she went to various practices she thinks who
24   she went to.  We've tried to locate each of those practices.
25   We're trying to chase them down.  We've contacted them.  They

1    have no records.  They don't have anything.  Maybe it's because

2    they don't exist.  Maybe it's because she didn't go there.

3    We'll give the names to the other side.  They can subpoena

4    those practices, which is the best way to do it.

5              THE COURT:  Why not give them an authorization?

6              ATTORNEY O'NEILL: Because I've seen authorizations be

7    abused, Your Honor, and, if the Court wants us to give an

8    authorization, the only request I have with respect to it is

9    that it be addressed to a specific practice.  In other words,

10   if we can identify a practice or through any other method it's

11   possible to or if they say they want one for a particular

12   practice, I'm glad to get them an authorization directed to

13   that specific practice.  I'm just concerned about

14   authorizations for my client's medical records being misused in

15   some respect.

16             THE COURT:  Well, how are they going to be misused?

17             ATTORNEY O'NEILL: Because they could, for example,

18   request gynecological records, that sort of thing.  Those

19   aren't relevant in any way to these proceedings.  I mean, it's,

20   the suggestion that, you know, we have got heavily redacted

21   Facebook, we don't have any email, those Facebook postings,

22   from what I could see, are not Facebook postings.  They're all

23   email, entirely email within Facebook.  No texts?  They got one

24   text.  The only text that exists is referenced specifically in

25   the material that we turned over.  We're turning over the

1    material.

2         The Facebook material is chaotic.  From what I can gather,

3    and I haven't been on Facebook in two years, it's the nature of

4    Facebook.  I've looked at some of these.  I've seen the whole

5    page.  I can see the date.  I can see the time.  I can see the

6    sequence going through, and they just don't flow necessarily,

7    but the fact that she, that this is the nature of what it is.

8    If the question was, Okay, we want to see every letter you've

9    written and received since -- pick a date -- January 1, 2000,

10   just to pick one out of the air -- Your Honor wouldn't order

11   that.  You wouldn't say she has to turn over everything that

12   she's corresponded about.  What you would say legitimately is

13   that she has to turn over all the references that relate to her

14   mental health, that relate to sexual abuse, that relate to

15   Jehovah's Witnesses.

16        I've gone through those, and I had a paralegal go through

17   them, highlighted, took a look and said, What do we have here?

18   We've turned over anything and all that relates to it.  It's

19   the nature of the beast that it's going to be somewhat chaotic.

20   There just isn't any way around it, but we have turned over the

21   material.  We'll continue to turn over the material.  This

22   isn't hide the ball.  I don't like that.

23        THE COURT:  Well, I think it's time that I do give

24   you an order, and that is to respond to their requests by the

25   end of this month, and that means getting the names of doctors.

```
 1    Any, if it's a Facebook page that they're looking for -- I'm
 2    not familiar with Facebook myself -- but get it.
 3              ATTORNEY O'NEILL:  Speaks well of you.
 4              THE COURT:  Pardon me?
 5              ATTORNEY O'NEILL: It speaks well of you.
 6              THE COURT:  And any of the other issues -- frankly,
 7    it seems to me incredulous that you don't have some of this
 8    information now, two years after the lawsuit.
 9              ATTORNEY O'NEILL: I understand, Your Honor.
10              THE COURT:  You know?  We're trying to move this
11    along.  It's getting bogged down like some other cases I've got
12    that, well, by the time I retire, it may be another judge who's
13    going to hear this case, so --
14              ATTORNEY O'NEILL: I don't have any disagreement about
15    the substance of what the Court is saying at all, Your Honor.
16    We have been diligent.  We'll continue to.  I appreciate the
17    end of the month.  We will continue to pursue them.  We are
18    diligent about it ourselves, and we'll be even more so, and I
19    appreciate the order because it gives me the opportunity to
20    say, for example, to the doctor in Dallas, Look, I've got a
21    federal judge telling me your redacted document doesn't do it.
22    Give me the whole thing.
23              THE COURT:  All right.
24              ATTORNEY O'NEILL:  I'm grateful for that.
25              ATTORNEY JUDGE:  Your Honor, let me talk a little bit
```

1  about a signed medical authorization.  So what we're hearing

2  is, you know, Mr. Judge, if my client can remember a particular

3  medical practice that she went to, jeez, you know, I call them

4  up, and they tell me they have no records, so what else do you

5  want?  What if she can't remember a medical practice or a

6  hospital or something that she went to if we give them a

7  subpoena with an authorization and we get records, lo and

8  behold, in the Bellows Falls area?  Saying that we can -- Mr.

9  Judge, you can just serve subpoenas on the people that we've

10  identified to you.  You haven't identified anyone to us, and

11  you've already told us that the people that you can remember

12  don't have any records, and, three, we're not going to give you

13  signed medical records authorization, anyway.  No one is going

14  to produce records without a signed medical authorization.

15       THE COURT:  Well, he said he's going to for those

16  that can be identified.  He hasn't identified any as you've

17  said.  So --

18       ATTORNEY O'NEILL: Well, we have identified some,

19  Judge.  We have identified some, and we've used authorizations

20  to try to obtain the records.  In this one instance, Dr. Timme,

21  who they'd like to take the deposition of to verify when her

22  records were destroyed, she wants an authorization from our

23  client.  We said fine, no problem, so that she can be deposed.

24  Anybody that they want to depose, if they want a specific

25  authorization for that provider, glad to give it to them.

```
 1              ATTORNEY JUDGE:  We need to know who they are in
 2     order to get an authorization.
 3              ATTORNEY O'NEILL: So do we.
 4              THE COURT:  Right.  Well, he's going to do that --
 5              ATTORNEY O'NEILL: As best we can do it.
 6              THE COURT:  -- by the end of the month.
 7              ATTORNEY LYNN: And, Judge, we've got our own motion,
 8     but this is, this goes beyond the instant motion.  Then the
 9     question becomes, All right, so when do we finally get the
10     information that we're entitled to so that we can take the
11     deposition of the Plaintiff in Vermont?  Now, I know that's an
12     issue, right?  We've been told from the outset until yesterday
13     that that deposition has to take place in Texas.  We now, I
14     think, have agreement that that's going to take place in
15     Vermont, but, if not, I want that issue decided now so we don't
16     have to come back and bother Your Honor again with whether a
17     plaintiff filing in Vermont around issues that happened in
18     Vermont has to come to Vermont for a deposition.
19              ATTORNEY O'NEILL: Judge, I've always thought of ways
20     to work our way through these kinds of issues.  I haven't said
21     that, No, it has to happen in Texas, and, yes, it can happen in
22     Vermont.  For example, let's assume for purposes of
23     conversation that --
24              THE COURT:  Well, if she field the lawsuit here in
25     Vermont, she has to come here.  If they want her to come here,
```

1    she'll come here.

2              ATTORNEY O'NEILL: Understood.

3              THE COURT:  Okay?

4              ATTORNEY O'NEILL: Absolutely.  My suggestion about it

5    to the other side was -- and I understand the Court's order

6    with respect to it if that's what it's to be -- if they were

7    going to be down there doing some other depositions, we could

8    do it there.  If they want to do it here, we'll bring her here,

9    no problem.

10             THE COURT:  All right.  That resolves that.

11             ATTORNEY LYNN: Thank you, Your Honor.

12             THE COURT:  So let's get all those names together by

13   the end of the month and provide authorizations to the

14   Defendants for those people that you identified, and, you know,

15   move it along.  I mean, this is getting to be a little much,

16   frankly.  I don't want to hear any more of these motions.

17             ATTORNEY JUDGE:  I agree, Your Honor, and, in light

18   of what has just taken place, I think we're going to have to

19   extend the current discovery schedule.

20             THE COURT:  That's what I was going to discuss next.

21             ATTORNEY STOREY:  Your Honor, before we move on to

22   that --

23             THE COURT:  Yes.

24             ATTORNEY STOREY:  -- you had indicated you don't want

25   to hear any more of these motions.  Just, as a matter of where

```
 1    we are, there had been a subpoena to Christian Congregation of
 2    Jehovah's Witnesses, and they indicated that they had six or
 3    seven documents on a privilege log.  I assume it's all of the
 4    same things the Court just heard, and we may be able to work
 5    that out among ourselves, but it's possible that that may be an
 6    issue, and there's another subpoena to another congregation
 7    that also has a couple of documents.  So some of these issues
 8    are going to come back up.  Just making the Court aware of
 9    them.
10             THE COURT:  All right.  But we may not have another
11    hearing.  Because, frankly, if it's the same sort of argument
12    that's being made, then we'll decide it on paper.
13             ATTORNEY STOREY:  Understood.  Thank you, Your Honor.
14             ATTORNEY O'NEILL: Fine with us, Judge.
15             THE COURT:  All right.  So I'm not sure we can work
16    out this discovery order now, but it certainly, looking at it
17    before I came on the bench, it's, there's no way you can comply
18    with some of these things.  So what I will do is, hopefully,
19    I'll be able to get out an order about the discovery issues.
20    I'm not going to do anything about your request, Mr. Judge,
21    because I think I dealt with it.  I hope that ends it.  But, as
22    far as the other motions, we'll try to get an order out --
23    what's today, Tuesday -- by the end of the week, certainly.  So
24    then you'll have an idea of what I'm ordering.
25             I'm going to tell you ahead of time, however, that the
```

```
 1    order will include a confidentiality agreement that's ordered
 2    by the Court.  So, knowing that, I would order that that
 3    agreement by the parties be submitted to the Court by the 15th
 4    of this month, and then that should, in connection with my
 5    order, should at least move along the discovery as far as the
 6    opposition so far.  So let's see.  So that deals with requests
 7    and discovery at this point.  I don't know if there's going to
 8    be more discovery, but it's, I believe it says that -- no, it
 9    doesn't.  Doesn't mention when, actually, the discovery is
10    supposed to be answered, but you've got, for instance,
11    depositions taking place in November of last year.  I assume
12    those didn't take place.
13              ATTORNEY LYNN: You're correct, Judge.
14              THE COURT:  Have there been any depositions?
15              ATTORNEY LYNN: No, Judge.
16              ATTORNEY O'NEILL: No, Your Honor.
17              ATTORNEY LYNN: I'm sorry.  Two, Your Honor, of the
18    polygraphers.
19              THE COURT:  All right.  So -- well, I think that,
20    probably, the parties ought to sit down and figure out what you
21    can, how you can modify this.  Because for me to try to go
22    through at this point is probably --
23              ATTORNEY O'NEILL: I was going to suggest, Judge, that
24    we can work through this.
25              THE COURT:  All right.
```

1           ATTORNEY LYNN: I expect so, Your Honor.

2           THE COURT:  Why don't you submit that part of that

3    order by the 15th as well?

4           ATTORNEY LYNN: Thank you, Your Honor.

5           THE COURT:  All right?

6           ATTORNEY LYNN: Yes.

7           THE COURT:  And, hopefully, it won't carry this case

8    into the next century.

9           ATTORNEY JUDGE:  At the risk of doing exactly that,

10   Your Honor, can I just raise one minor point, which is for

11   clarification purposes only?  On the Court's order from the

12   bench on our motion to compel --

13          THE COURT:  Yes.

14          ATTORNEY JUDGE:  -- can we clarify that that include

15   her entire Facebook page, please?

16          ATTORNEY O'NEILL: Absolutely not, Your Honor.  I

17   mean, this is, it is the equivalent of going back in someone's

18   life and saying, I want all of your correspondence that goes

19   back over a period of time.  There are things that are

20   relevant, and they're entitled to those.  I'm glad to give them

21   to them, no hesitancy, but turning over everything that exists

22   with respect to one's life, if we're going to deal with that

23   issue, I'd really like to brief that issue, because I think the

24   law is completely to the contrary with respect to that.  If the

25   Court would entertain it, I would really like to brief the

1    issue.

2            THE COURT:  Well, I'm not prepared to order -- see,

3    I'm not familiar, frankly, with Facebook.  I don't know what's

4    there, what isn't, whether it goes back to whenever you started

5    the page.

6            ATTORNEY JUDGE:  Facebook goes back to 2004, and we

7    assume this woman probably started a Facebook page in 2008 or

8    some -- she was in college from 2008 to 2012.  Every college

9    kid has a Facebook page.  What she, what her hundreds of

10   friends are allowed to know about her life and everyone in her

11   family is on her Facebook page.  Why is that excluded from us,

12   the Defendants in this case?

13           THE COURT:  Well, I expect the argument is to her

14   privacy matters.

15           ATTORNEY JUDGE:  A privacy that she's disseminating

16   to potentially hundreds of people?

17           THE COURT:  Well, not, not certainly about any issues

18   in this case, but --

19           ATTORNEY JUDGE:  Well, I'll give you an example, only

20   because Your Honor says that he's not terribly familiar with

21   Facebook, and I can understand that.  Facebook users post, the

22   typical Facebook user posts, on a daily or weekly basis, what

23   they've been up to.  This is what I did today.  I went

24   horseback riding.  Here's a picture of me on the horse,

25   whatever.  How is that not relevant to her claim that her life

1   has been destroyed by an incident in 1991, '92, '93?

2           ATTORNEY O'NEILL: Your Honor, we all have moments of

3   difficulty in our lives.  We all have moments of going well.

4   The fact that someone is having a good time riding their horse

5   -- I don't think she rides a horse -- doesn't mean that she's

6   not damaged in some respect.  The same way going back through

7   someone's life and looking through letters that they may have

8   written that talks about parts of their lives.  Discovery

9   that's relevant here should be provided.  The pages, the email

10  messages that, back and forth on Facebook, we have provided

11  with respect to this, but it doesn't mean that there has to be

12  a wholesale invasion of someone's life.

13      She isn't saying that it's destroyed her life.  She's

14  married.  She has a child.  She has a job.  She's going through

15  life and dealing with it.  She's got difficult issues.  We're

16  prepared and have provided.  Anything that relates to the

17  childhood sexual abuse or the Jehovah's Witnesses has been

18  brought forth, and if we find something more, we'll bring it

19  forth.  We're trying to get that diary as I've indicated.

20          ATTORNEY JUDGE:  Here's the problem, Your Honor.

21  When they say, We'll produce anything from her Facebook page

22  that talks about abuse or that talks about Jehovah's Witnesses,

23  it omits everything in her life that is relevant that doesn't

24  talk about abuse or Jehovah's Witnesses.  A Facebook page is

25  the modern equivalent, for anyone who's under the age of 50 or

1    whatever, of a diary of your life.  That is relevant, and, if
2    Your Honor is not prepared to order it now, then I want to
3    brief that issue on why the Court should order her to turn that
4    over.
5              THE COURT:  Well, what do you have now?
6              ATTORNEY O'NEILL: What I have right now, Judge, is we
7    have -- Facebook as I, when I was involved in it, what I get,
8    basically has two components, essentially.  One is what people
9    post on it all the time on their public page or their private
10   page.  They can limit who sees it, however they want to go
11   about it.  And then there are emails -- think of it as texting,
12   if you will -- that people use within Facebook to communicate
13   with other people.  What we have done is we asked her to go
14   through, and she did searches using various search terms that
15   would indicate anything to do with, for example, sexual abuse,
16   Jehovah's Witnesses, mental health issues, those kinds of
17   things -- and if they want us, they've got some more terms they
18   want us to use, glad to use those to search -- searched, found
19   those, and they're actually showing up highlighted in the
20   material we've turned over.  So all of those emails, if you
21   will -- I think that's a fair way to describe them -- that
22   relate in any way to this in a broad sense, we have produced.
23   So those we have turned over.
24             THE COURT:  So what about the first part you talked
25   about?

1        ATTORNEY O'NEILL:  I don't think there's anything

2    there that relates to it, Judge, but I will double back-check

3    with her to make sure.  In fact, what I will do is I will ask

4    her for us to have an authorization so we can take a look

5    through them.  So, that way, there isn't any confusion with

6    respect to what it is.  We'll take a look at it ourselves and

7    go back through and see what's there.

8        THE COURT:  You don't even have that at all?

9        ATTORNEY O'NEILL: No, I don't typically ask the

10   clients for access to it, but I will get, ask her for access to

11   it and see what's there.  If there's something that is germane

12   in some respect, falls within the scope of discovery as it's

13   defined here, we'll turn it over.

14       ATTORNEY JUDGE:  And we would want to know in

15   connection with that, and certainly an order in connection with

16   that, whether, when she filed this lawsuit in, on October 1st

17   2014 or going back to when her notes say that she was about to

18   file this lawsuit in January of 2014, have you deleted anything

19   from your Facebook page, and don't delete anything from your

20   Facebook page.  But, but, Your Honor, my basic position is that

21   the Plaintiff should not get to decide from the diary, the

22   online diary of Plaintiff's life that only the few messages or

23   days when she's having a bad day and she's blaming it on the

24   Jehovah's Witnesses, only that's relevant to us.  No.  For the

25   ten bad days that she has, according to her Facebook page, and

1    the thousand good days that she has, both are relevant.

2              THE COURT:  Well, first, what I would order is that

3    you obtain, either on your own or through her, the Facebook

4    page which, I guess, includes not emails and so forth, but what

5    she posts, I guess, right?

6              ATTORNEY O'NEILL: Sure, and what other people post on

7    it, Judge.

8              THE COURT:  What other people post?

9              ATTORNEY O'NEILL: Sure.

10             THE COURT:  And either provide that to Counsel, which

11   I think you probably don't want to do, or provide it to the

12   Court for an in-camera inspection, and I'll determine, frankly,

13   whether all of or some of it should be turned over.

14             ATTORNEY O'NEILL: Sure.

15             THE COURT:  All right?

16             ATTORNEY O'NEILL: Absolutely.

17             THE COURT:  So let's do that by the 30th.

18             ATTORNEY O'NEILL: Should not be a problem, Judge.

19   The only -- I might have to ask for a little latitude on that

20   because sometimes getting it out of Facebook can be an issue.

21   Let's leave it at the 30th.  If there's a problem, we'll come

22   back to the Court.  We'll work very hard so that it's not an

23   issue.  Shouldn't be.

24             THE COURT:  All right, okay.  That it?  Okay.  So,

25   again, submit a confidentiality order by the 15th and also a

1    revised discovery order, and then the Plaintiff is going to

2    turn over, do what I ordered by the 30th, okay?  All right.

3    Thank you.

4

5    (Whereupon at 12:55 p.m. the hearing was adjourned.)

6

7

8

9

10                    *   *   *   *   *

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          C E R T I F I C A T I O N

2          I, Sunnie Donath, certify that the foregoing is a correct

3     transcript from the record of proceedings in the

4     above-entitled matter.

5

6

7

8

9

10          ___January 20, 2016___          /s/ Sunnie E. Donath

11               Date                       Sunnie E. Donath

12

13

14

15

16

17

18

19

20

21

22

23

24

25