UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

| | | |
|---|---|---|
| ANNESSA LEWIS, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Case No. 1:14-cv-205 |
| | : | |
| BELLOWS FALLS CONGREGATION | : | |
| OF JEHOVAH'S WITNESSES, BELLOWS | : | |
| FALLS, VERMONT, INC.; WATCHTOWER | : | |
| BIBLE AND TRACT SOCIETY OF NEW | : | |
| YORK, INC.; and NORTON TRUE, | : | |
| | : | |
| Defendants. | : | |

RULING ON DEFENDANTS' MOTIONS
FOR SUMMARY JUDGMENT AND TO STRIKE
(Docs. 188, 196, 199, 206)

I.    Introduction

Plaintiff Annessa Lewis ("Lewis" or Plaintiff) commenced this diversity action in October

2014.  (Doc. 1.)  She alleges Norton True ("True"), a Ministerial Servant of the Jehovah's Witness

Church, sexually abused her when she was a child.  The claim remaining against Bellows Falls

Congregation of Jehovah's Witnesses, Bellows Falls, Vermont, Inc. (the "Congregation") and

Watchtower Bible and Tract Society of New York, Inc. ("Watchtower"), following motions

to dismiss, see Docs. 15, 35, is for negligence based on duties to perform an undertaking and to

supervise.  (Doc. 35.)  Lewis seeks damages for past and continuing "great pain of mind and body,

shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-

esteem, disgrace, humiliation, and loss of enjoyment of life," spiritual suffering, loss of earnings and

earning capacity, and expenses for medical and psychological treatment, therapy, and counseling, as

well as for being and continuing "to be prevented from performing [her] daily activities and

obtaining the full enjoyment of life."  (Doc. 20 (First Am. Compl. ("FAC")) ¶¶ 92, 107.)  The

Congregation, Watchtower, and True (collectively, "Defendants") move for summary judgment

dismissing the complaint in its entirety.  (Docs. 188, 199.)  Lewis opposes the motions (Docs. 193,

202) and Defendants filed replies (Docs. 195, 207).  Defendants also filed motions to strike

Plaintiff's statements of disputed material facts.  (Docs. 196, 206.)  The motions to strike are

unopposed.  For the following reasons, the Defendants' motions for summary judgment are granted.

II.     Background[1]

Annessa Lewis was the third of four siblings of a Jehovah's Witness family.  Her date of

birth is January 9, 1987.  The family moved to Vermont that year and began attending meetings at

the Bellows Falls Kingdom Hall in late 1987 or 1988.  The Congregation owns the Kingdom Hall in

Bellows Falls, Vermont.  Watchtower is a religious corporation located in Brooklyn, New York.

True, a married father of three, was a baptized member of the Bellows Falls Congregation from

1976 to 2012 and served as a ministerial servant from 1976-1986 and 1995-2012.[2]

True and Lewis's mother and father were baptized publishers at the time of the alleged

sexual abuse of Lewis.  A baptized publisher is a baptized member of the Jehovah's Witness church

who participates in field service and actively shares the message of the Bible.  True, a civil engineer,

also handled all aspects of the maintenance of the Kingdom Hall, along with two others, worked on

wastewater system issues, and kept the ventilation system running during meetings.  He assisted in

the magazine and literature departments and counted attendance at meetings, occasionally seating

attendees if attendance was high.  Lewis asserts these tasks were typically assigned to ministerial

---

[1]  The facts are gleaned from the parties' submissions, specifically their respective statements of fact and responses (Docs. 188-1, 193-1, 199-1, 202-2).  The Court notes instances in which the parties disagree.

[2]  True was not a formally appointed ministerial servant during 1990-1994.  (Doc. 193-1 ¶ 13.)

2

servants. (Doc. 193-1 ¶¶ 13-14, 25, 161.) She also states he hosted Congregation events at his farm and worked for Watchtower on the "Quick Build Kingdom Hall construction program" during the late 1980s and early 1990s, participated in construction projects, and worked as a Site Planning Coordinator for the Massachusetts Regional Build Committee. Id.; see also Doc. 193-2 ¶¶ 16-17, 19-22.

At the time of the sexual abuse of Lewis, Lewis's mother and True's daughter, Stacy Bathrick, were best friends. Stacy regularly babysat Lewis and her siblings during the early 1990s, including at the time of the abuse alleged in this case, which occurred when Lewis was roughly five years old or in preschool in 1991, 1992 or 1993. Stacy took Lewis to her father's home on the day of the abuse without Lewis's mother's awareness. Lewis alleges True took her to his horse barn and reached down her overalls under her underwear and touched her vagina. (Doc. 202-4 (Lewis Dep.) 124:1-5; 128:12-130:25.)

Lewis did not tell anyone of the abuse until 1996 when she was nine. That summer, her family attended a going-away party for another Congregation family at True's house. As the Lewis family was leaving, Lewis's younger sister Miranda said she had been "touched" by True; Lewis informed her mother he had also "touched" her. (Doc. 202-2 ¶¶ 40, 43.) At that time, Lewis knew what True had done to her was wrong. Lewis's mother reported the abuse to a Congregation elder, Matthew Reimann. Elders function as a sort of board of directors of a congregation handling administrative tasks, care for the spiritual needs of the congregation, and apply biblical principles to address allegations of sin and wrongdoing within a congregation. (Doc. 202-2 ¶ 15.)

Lewis's mother took her to a therapist for observation and also sought advice from Dr. Barbara Belcher-Timme, Psy. D., a psychologist and mandated reporter. In September 1996, the Vermont State Police were notified of Lewis's and Miranda's allegations and the girls met with

a detective.  In November, Lewis's mother was advised True would not be charged.  In late 1996 or early 1997, as a result of True's abuse, Lewis and her family stopped attending the Bellows Falls Congregation and joined the South Claremont, New Hampshire Congregation.  They left the Jehovah's Witness religion altogether in 2000, as a result of a degrading relationship with the congregation and religion caused by the incident with True.  Around 2001, when she was fourteen, Lewis saw Dr. Belcher-Timme.  Lewis understood her mother brought her to the psychologist because she was cutting herself.  (Doc. 202-2 at ¶ 88.)  She testified she was feeling depressed and "had some mental health issues going on" at that time.  (Doc. 202-4 (Lewis Dep.) 153:5-25.)

Lewis has always believed she was sexually abused by True.  The Lewis family discussed the molestation throughout Lewis's childhood and Lewis and her older sister specifically discussed it on many occasions during her teenage years.  When she was 14 or 15, Lewis began to experience flashbacks, and was interrupted in an attempt to be physically intimate with a boyfriend by memories of True sexually abusing her.  (Doc. 193-1 ¶¶ 135-36; Doc. 202-2 ¶¶ 97-99.)  She testified she first remembers experiencing depression around age 14 as it "intensified."  (Doc. 202-4 (Lewis Dep.) 99:21-24; 182:19-20.)  In high school, she posted about having experienced the abuse, talked about it with her boyfriend, and discussed it with close high school friends.  In a July 2004 journal entry, Lewis [mentioned] "the man who molested Miranda and I," and reflected on her experience with True, "Why is this old and trusted man's hand down my pants and no memories left of the sunny afternoons I used to lay out on the lawn with my dad."  (Doc. 202-2 ¶¶ 115-16, 119.)  In August 2004 entries, she wrote her history of men included "my sexual abuser," who she identifies as True, and referred to having been "sexually assaulted" by True.  Id. ¶¶ 121, 124, 126.  In 2014, Lewis wrote to a friend that she "used to talk about [the abuse] as part of the healing process, realizing it was an act done to me that I had no willing part in."  Id. ¶ 143.

Lewis asserts the Congregation and Watchtower have a policy of "vigilantly monitoring" accused molesters for the safety and protection of children whenever the molester is in the congregational setting. (Doc. 193-1 ¶¶ 22-23.) In 1990, True's daughter Stacy's step-daughter, Rebecca Bathrick, accused True, her step-grandfather, of sexual molestation. Congregation elders, including Reimann, were informed of the allegation, and that it was later withdrawn; the elders took no action against True. Id. ¶¶ 33-34. Lewis testified at her deposition that she was not aware prior to her case of the Bathrick allegation of abuse. (Doc. 193-12 (Lewis Dep.) at 173:4-14.)

III.    Discussion

    A.    Legal Standard

Summary judgment is appropriate only where the parties' submissions show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. The Court must resolve ambiguities and draw inferences in favor of the opposing party and decide whether a rational juror could decide in favor of that party under applicable law. Scott v. Harris, 550 U.S. 372, 378 (2007); Salahuddin v. Goord, 467 F.3d 263, 272 (2d Cir. 2006) (citation omitted). A material fact is one that "might affect the outcome of the suit." Roe v. City of Waterbury, 542 F.3d 31, 35 (2d Cir. 2008). To defeat summary judgment, a party must "do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). There must be "evidence on which the jury could reasonably find" for the opposing party. Jeffreys v. City of New York, 426 F.3d 549, 553-54 (2d Cir. 2005) (internal quotation marks and citation omitted). Accordingly, "as to any claim, or essential element thereof, for which the nonmoving party bears the burden of proof at trial, the nonmoving party must make a showing sufficient to establish the existence of that claim or element." Billado v. Parry, 937 F. Supp. 337, 341 (D. Vt. 1996). If the nonmoving party fails to do so, the moving party may obtain summary judgment by "simply

point[ing] out the absence of evidence to support the non-moving party's case." <u>Nora Beverages, Inc. v. Perrier Group of Am., Inc.</u>, 164 F.3d 736, 742 (2d Cir. 1998).

The court's function is not to resolve disputed issues of fact but only to determine whether there is a genuine issue of material fact to be tried. <u>See, e.g.</u>, <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 255 (1986); <u>Rule v. Brine, Inc.</u>, 85 F.3d 1002, 1011 (2d Cir. 1996). "If, as to the issue on which summary judgment is sought, there is any evidence in the record from which a reasonable inference could be drawn in favor of the opposing party, summary judgment is improper." <u>Fischl v. Armitage</u>, 128 F.3d 50, 56 (2d Cir. 1997) (internal quotation marks and citation omitted).

Credibility assessments, choices between conflicting versions of the events, and the weighing of evidence are matters for the jury, not for the court on a motion for summary judgment. <u>See, e.g.</u>, Fed. R. Civ. P. 56(e) 1963 advisory committee's note; <u>Anderson</u>, 477 U.S. at 255.

    B.    <u>The Congregation & Watchtower's Joint Motion for Summary Judgment</u>

        1.    <u>Statute of Limitations</u>

If the statute of limitations bars Lewis's claim, she cannot show an entitlement to relief and her complaint must be dismissed. <u>Brown v. Castleton State Coll.</u>, 663 F. Supp. 2d 392, 396 (D. Vt. 2009). Vermont has a six-year statute of limitations for actions based on "childhood sexual abuse," running from either the date "of the act alleged to have caused the injury or condition" or "the time the victim discovered that the injury or condition was caused by that act." Vt. Stat. Ann. tit. 12, § 522(a). The statute of limitations is tolled during the time a plaintiff is a minor. Vt. Stat. Ann. tit. 12, § 551. Lewis was born January 9, 1987. Accordingly, she has not been a minor since January 9, 2005, and the six-year limitations period would expire on January 9, 2011, unless the discovery rule extended the period. Lewis commenced this action on October 1, 2014. (Doc. 1.)

Lewis does not refer to specific dates she sustained or discovered her injuries in her complaint and does not allege how she discovered her injuries. She merely alleges that "prior to

6

[her] fifth birthday . . . Defendant True . . . touched [her] bare genitals" (FAC ¶ 49)[3] and "[w]ithin the six years predating the filing of this Complaint, [she] discovered that the injuries and conditions as to which she complains herein were caused by the childhood sexual abuse . . . and that Defendants were responsible for the injuries and conditions," (FAC ¶ 2). Lewis's remaining theories of liability against the Congregation and Watchtower are negligent performance of an undertaking and negligent supervision, both of which depend on their knowledge that True had been previously accused of abusing a minor. Lewis asserts she was not aware of the prior allegation against True prior to 2014. (Doc. 193 at 6.)

A right "accrues" when it comes into existence. Gabelli v. Sec. & Exch. Comm'n, 133 S. Ct. 1216, 1220 (2013). "Thus the 'standard rule' is that a claim accrues when the plaintiff has a complete and present cause of action." Id. (internal quotation marks and citation omitted). Under Vermont law, the date of accrual depends on "'the point at which a plaintiff should have discovered the basic elements of a cause of action: an injury caused by the negligence or breach of duty of a particular defendant.'" Clarke v. Abate, 80 A.3d 578, 580-81 (Vt. 2013) (quoting Earle v. State, 743 A.2d 1101, 1108 (Vt. 1999)) (emphasis added). While the statute uses the word "act" in conjunction with "injury or condition," Vt. Stat. Ann. tit. 12, § 522(a), the Vermont Supreme Court has "clarified that the word 'act' . . . should not be interpreted to refer solely to the alleged act of sexual abuse, but could refer also to the alleged act of negligence by a third party." Earle, 743 A.2d at 1104.

Affording Lewis the benefit of all reasonable inferences, her negligence claims against the Congregation and Watchtower are timely. Her claims, which include a foreseeability element, did not accrue until she discovered their knowledge of the prior allegation of abuse against True.

---

[3] Plaintiff alleges True molested her on "multiple occasions" (FAC ¶ 50) but has since acknowledged she recalls only one instance of abuse. (Doc. 193-1 ¶ 67.)

See Earle, 743 A.2d at 1103 (holding action did not accrue until plaintiff "knew at least that his injuries may have been a result of a breach of duty by defendant").  As she testified that she was not aware prior to her case of the other's abuse (Doc. 193-12 (Lewis Dep.) 173:4-14), and therefore could not have been aware of the Congregation or Watchtower's knowledge of the allegation, the filing of the complaint was timely.  Id. at 1108 (noting "there was no reason for plaintiff to suspect that [defendant] owed him a duty at all until he knew that [defendant] knew of [third party's] abuse of plaintiff").  Accordingly, the Congregation and Watchtower are not entitled to summary judgment on the basis of the expiration of the statute of limitations.

      2.    Negligence (Count II)

A church may not be held liable for the torts of its agents under a respondeat superior theory.  See Doe v. Newbury Bible Church, 933 A.2d. 196, 200 (Vt. 2007) (stating a church may not be held vicariously liable for the torts of a pastor "without any regard to fault.").  A church can, however, be held directly liable for damages resulting from its negligence.  See Knelman v. Middlebury Coll., 898 F. Supp. 2d 697, 728 (D. Vt. 2012) (citing Brueckner v. Norwich Univ., 730 A.2d 1086, 1093 (1999)) (holding a principal may be directly liable for damages resulting from negligent supervision of its agents' activities).

To hold a defendant liable for negligence, a plaintiff must establish the defendant owed her a duty of care, it breached that duty of care, and she suffered damages that were caused by the breach. Turner v. Roman Catholic Diocese of Burlington, Vt., 897 A.2d 960, 974 (2009) (noting common law establishes the scope of the duty and a church's duty to protect minors from sexual abuse is not different from the duty owed by other institutions to which the common law applies).  Lewis's remaining negligence claims against the Congregation and Watchtower are based on alleged duties to perform an undertaking and to supervise True, see Doc. 35, and each requires the elements of negligence be met.

8

a.    <u>Negligent Performance of an Undertaking</u>

Lewis contends the Congregation and Watchtower were negligent based on a duty to perform an undertaking under Restatement (Second) of Torts § 323.  Section 323 addresses the negligent performance of undertakings to render services:

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if (a) his failure to exercise such care increases the risk of such harm, or (b) the harm is suffered because of the other's reliance upon the undertaking.

Restatement (Second) of Torts § 323.  Following the prior rulings on motions to dismiss, the parties agree the elements of Lewis's negligent undertaking claim are:  (1) whether the Congregation and/or Watchtower undertook to provide protective monitoring services; (2) failed to so monitor True; and (3) the failure increased the risk of harm to Plaintiff.  (Doc. 35 at 4-5; Doc. 188 at 21; Doc. 193 at 18.)

The Congregation and Watchtower argue Lewis's claim fails as a matter of law because they did not undertake to provide protective monitoring services, did not breach any duty, and there was no increased risk of harm.  (Doc. 188 at 20-24.)

Lewis contends the Congregation and Watchtower undertook a duty to monitor True's association with minors after learning of a prior allegation that True had molested a young child.  (Doc. 193 at 19-21.)  She points to a policy requiring congregation elders to "vigilantly monitor" accused molesters:  Elders "would be vigilant as to that individual's conduct around children in the congregation setting."  <u>Id.</u> at 19.  A factfinder could reasonably conclude the Congregation, at least, had undertaken such a duty.  <u>Sabia</u>, 669 A.2d at 1194 (observing "courts generally require very little action on the part of defendants to find an undertaking"); <u>see also</u> <u>Conti v. Watchtower Bible & Tract Soc'y of N.Y., Inc.</u>, 186 Cal. Rptr. 3d 26, 41 (Cal. Ct. App. 2015), <u>review filed</u> (May 27, 2015),

review withdrawn (July 8, 2015) (finding a church undertook to monitor a reported child molester even though the congregation was not informed of the monitoring policy). Lewis does not explain how Watchtower could have "vigilantly monitored" True in the congregation setting.

Lewis next argues the failure to competently exercise the duty to vigilantly monitor True, instead allowing him to be familiar with children in the Congregation setting, led to True's relationship with Lewis's family and his access to Lewis away from the Kingdom Hall. (Doc. 193 at 20.) Section 323(a) applies "only when the defendant's actions increased the risk of harm to the plaintiff relative to the risk that would have existed had the defendant never provided the services initially." Turbe v. Gov't of Virgin Islands, 938 F.2d 427, 432 (3d Cir. 1991). The Sabia court found the SRS's failure to respond to reported abuse could increase the risk of harm by sending the abuser a message "that he could act with impunity." 669 A.2d at 1194 ("[T]he continued abuse following SRS's failure to act posed an increased risk of harm by sending the message to the perpetrator that he could act with impunity."). Accordingly, a fact-finder could conclude the Congregation and Watchtower's failure to monitor True following reports he had molested a child encouraged him to molest others, increasing the risk of harm to Lewis. Id. (citing Doc. 35 at 6 ("failure to respond to reported abuse could increase the risk of harm by sending the abuser a message 'that he could act with impunity'").)

The fatal flaw in Plaintiff's argument is that Lewis's mother's friend, Stacy Bathrick, took Lewis to her father True's home while she was babysitting Lewis on the day the abuse occurred. Lewis's mother was not aware Bathrick sometimes took the Lewis children to True's home or that she did so on the day the abuse occurred. Even assuming the Congregation and Watchtower had a duty to vigilantly monitor True in the congregation setting and they breached that duty thereby increasing the risk of harm to Lewis, no reasonable factfinder could conclude that breach was the cause of Lewis's sexual abuse because a third party provided True access to Lewis at True's home.

Collins v. Thomas, 938 A.2d 1208, 1211 (Vt. 2007) (causation requires a plaintiff show the harm

would not have occurred "but for" the defendant's conduct such that the "tortious conduct was a

necessary condition for the occurrence of the plaintiff's harm" (internal quotation marks and

citations omitted)).  Drawing all inferences in Lewis's favor, because a factfinder could not

reasonably conclude the Congregation or Watchtower's breach was a necessary precondition for the

sexual abuse at True's home, summary judgment is granted as to the portion of Count II alleging

negligent performance of an undertaking.

> b.      Negligent Supervision of True

In Vermont, a claim of negligent supervision is based on the Restatement (Second) of

Agency § 213.  See Haverly v. Kaytec, Inc., 738 A.2d 86, 91 (Vt. 1999); Brueckner, 730 A.2d at 1093.

Accordingly,

> A person conducting an activity through servants or agents is subject to
> liability for harm resulting from his conduct if he is negligent or reckless:  (a) in
> giving improper or ambiguous orders or [sic] in failing to make proper regulations;
> (b) in the employment of improper persons or instrumentalities in work involving
> risk of harm to others[;] (c) in the supervision of the activity; or (d) in permitting, or
> failing to prevent, negligent or other tortious conduct by persons, whether or not his
> servants or agents, upon premises or with instrumentalities under his control.

Restatement (Second) of Agency § 213 (1958).  The elements of a negligent supervision claim are:

(1) the defendant conducts an activity through agents and (2) the defendant is negligent or reckless

in fulfilling the supervisory duty.  See Brueckner, 730 A.2d at 1093.  As the comments explain, a

principal is liable for employing "a vicious person to do an act which necessarily brings him in

contact with others while in the performance of a duty."  Restatement (Second) of Agency § 213,

comment d.  Liability exists, however, "only if all the requirements of an action of tort for

negligence exist."  Id. comment a; see also Haverly, 738 A.2d at 91.  As noted above, those elements

are that defendants owed a duty, they breached that duty, plaintiff suffered an injury, and the injury

was caused by the breach of duty.  Forseeability of the harm is relevant in determining whether there was a legal duty.  Knelman, 898 F. Supp. 2d at 728.

The Congregation and Watchtower argue Lewis's claim fails as a matter of law because True was not an agent or employee of either, the abuse did not occur on premises they controlled[4], and the abuse did not occur in connection with a church-sanctioned event.  (Doc. 188 at 18-20.)

Lewis contends the Congregation and Watchtower knew of a prior allegation that True had molested a young child, then knowingly placed True, who was their agent at the time of his abuse of Lewis, where he might come into contact with the public, and Lewis suffered a foreseeable harm. (Doc. 193 at 11-17.)

Under Vermont law, an agency relationship results when:  (1) "one party consents to another party acting as its agent;" (2) the agent "acquiesce[s] to the arrangement;" and (3) the agent is subject to the principal's control.  Kimco Leasing Co. v. Lake Hortonia Prop., 640 A.2d 18, 20 (Vt. 1993). Plaintiff also argues True was an apparent agent of the Congregation and Watchtower.  (Doc. 193 at 16-17.)  "An apparent agency relationship is initiated by the manifestation of the principal to a third party, who reasonably believes that the other individual is the agent."  Kimco Leasing Co., 640 A.2d at 20.[5]  An agency relationship "may be implied from the circumstances of a particular situation."  State v. Poutre, 581 A.2d 731, 735 (Vt. 1990).  Whether an agency relationship exists is a mixed question of law and fact.  Commercial Union Ins. Co. v. Alitalia Airlines, S.p.A., 347 F.3d

---

[4]  As the Court has noted, the Restatement does not expressly include a general premises element (Doc. 15 at 8 (citing Haverly, 738 A.2d at 91; Knelman, 898 F. Supp. 2d at 728)), and as the claim is not alleged under subsection (d), the Court will not address this argument.

[5]  Both parties occasionally confuse the concepts of apparent agency and apparent authority. See Doc. 193 at 16-17; Doc. 188 at 9 n.14.  "As a general rule, apparent authority is relevant where the agent purports to exercise a power which he or she does not have."  Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 759 (1998).  Here, the doctrine of apparent authority is inapplicable as the issue is whether there was an agency relationship, actual or apparent, not whether True exercised a power that he did not have.

448, 462 (2d Cir. 2003) (applying Restatement (Second) of Agency).[6]  Agency is a question of law for

the court where the material facts from which it is to be inferred are not in dispute.  3 C.J.S. Agency

§ 547 (1973).

Formation of an agency relationship requires the principal have the right to control the

conduct of the agent with respect to matters entrusted to him.  Restatement (Second) of Agency

§ 14; see also id. § 1 comment b ("The agency relation results if, but only if, there is an

understanding between the parties which, as interpreted by the court, creates a fiduciary relation in

which the [agent] fiduciary is subject to the directions of the [principal].  It is the element of

continuous subjection to the will of the principal which distinguishes the . . . agency agreement from

other agreements.").  An agent "holds a power to alter the legal relations" of the principal.  Id. § 12.

Here, Lewis points to True's hosting of Congregation parties and events at his farm;

assistance with wastewater system issues at the Kingdom Hall; assistance, along with two others,

with Kingdom Hall maintenance; assistance in the magazine and literature departments; and

counting attendance at meetings, including occasionally seating attendees if attendance was high; and

keeping the ventilation running as evidence that True was the Congregation's agent.  (Doc. 193

at 13-14.)  Lewis states the Congregation, through its elders, consented to True serving as its agent

for these purposes.  Id. at 15.  With regard to Watchtower, Lewis points to True's volunteering to

work on the "Quick Build Kingdom Hall construction program" during the late 1980s and early

1990s, participation in construction projects, and work as a Site Planning Coordinator for the

---

[6]  Plaintiff asserts the "existence of an agency relationship is a question of fact, as is the extent of the agent's authority."  (Doc. 193 at 13 (citing Estate of Sawyer v. Crowell, 559 A.2d 687, 690-91 (Vt. 1989)).)  The Crowell case involved the extent of a secretary's authority not her role as an agent.  Accordingly, the court's analysis focused on scope of authority and noted the "existence and extent of an agent's authority is a question of fact."  Crowell, 559 A.2d at 691 (citing cases).  A parenthetical notes the scope of authority is only a question of fact if the facts themselves are in dispute.  Id.

Massachusetts Regional Build Committee as evidence that True was Watchtower's agent.  Id. at 14-
15.  She asserts there is no question Watchtower "chose to employ True as an agent in connection
with this work with the Quick Build and on the Build Committees."  Id. at 15.  With regard to
control, however, Lewis makes no argument.

Lewis has pointed to no record evidence that True was subject to the Congregation's or
Watchtower's control.  For an actual agency relationship to be formed, in addition to mutual
consent to the agency, the agent must be subject to the principal's control.  Here, the Court can
discern no evidence that True was continually subjected to the will of either the Congregation or
Watchtower.[7]  Further, there is no allegation or evidence True held the power to alter the legal
relations of either the Congregation or Watchtower.  Accordingly, drawing all inferences in Lewis's
favor and crediting her assertions regarding True's activities within the Congregation and for
Watchtower, the Court determines a factfinder could not reasonably conclude an actual agency
relationship existed between True and the Congregation or between True and Watchtower because
the element of control was lacking.

To demonstrate an apparent agency relationship, Lewis must be able to prove that the
Congregation and Watchtower each manifested to Lewis that True had authority to act for them and
that Lewis reasonably believed, based on True's conduct, he possessed that authority.  Construing all
inferences in Lewis's favor, the Court determines a factfinder could not reasonably conclude either
the Congregation or Watchtower, by allowing True to serve in various ways within the Congregation

---

[7]  The allegations regarding control in the complaint are that Baptized Publishers submit to
the control of the church in all aspects of their lives and True served as a Ministerial Servant under
the control of the Congregation and Watchtower.  See FAC ¶¶ 42, 59.  Lewis has conceded True
was not an appointed Ministerial Servant at the time of the abuse (Doc. 193-1 ¶¶ 11, 13, 25), and has
not pointed to any evidence to support the general statement that all baptized publishers--including
her parents (id. ¶ 24)--were subject to the control of the church in all aspects of their lives.  As the
Court has already determined, there was no "special relationship" between True and the
Congregation.  (Doc. 15 at 9.)

and as a volunteer for Watchtower on its "Quick Build" program, manifested that True had authority to act for them. Further, there is no evidence, other than that Lewis incorrectly believed True was a ministerial servant, that Lewis reasonably believed True had authority to act for the Congregation or Watchtower.

In the absence of an agency relationship between the Congregation and True or Watchtower and True, Lewis's claim of negligent supervision must fail. Further, even if an agency relationship did exist, the Congregation and Watchtower breached their duty to supervise True, and the abuse was foreseeable because of their knowledge of a prior claim of abuse against True, Lewis's claim runs into the same fatal flaw as her negligent undertaking claim. A successful claim for negligent supervision, in addition to the specific elements, requires a demonstration of each of the general elements of negligence. No reasonable factfinder could conclude the Congregation or Watchtower's negligent supervision of True was the cause of Lewis's sexual abuse because a third party provided True access to Lewis at True's home. <u>Collins</u>, 938 A.2d at 1211 (causation requires a plaintiff show the harm would not have occurred "but for" the defendant's conduct such that the "tortious conduct was a necessary condition for the occurrence of the plaintiff's harm" (internal quotation marks and citations omitted)). Drawing all inferences in Lewis's favor, a factfinder could not reasonably conclude the Congregation or Watchtower's breach was a necessary precondition for the sexual abuse at True's home. Accordingly, summary judgment is granted as to the portion of Count II alleging negligent supervision.

3.    <u>Punitive Damages</u>

Punitive damages are appropriate where there has been wrongful conduct that is "outrageously reprehensible" and proof of malice. <u>Fly Fish Vt., Inc. v. Chapin Hill Estates, Inc.</u>, 996 A.2d 1167, 1173 (Vt. 2010). Malice may be shown by conduct exhibiting "bad motive, ill will, personal spite or hatred, or reckless disregard." <u>Id.</u> In Vermont, the culpability required to support

an award of punitive damages based on reckless misconduct requires "evidence that the defendant acted, or failed to act, in conscious and deliberate disregard of a known, substantial, and intolerable risk of harm to the plaintiff, with the knowledge that the acts or omissions were substantially certain to result in the threatened harm." Id. at 1176.

In light of the above conclusions, Lewis's claim for punitive damages must also be dismissed.

C.    True's Motion for Summary Judgment

True moves for summary judgment arguing Lewis's claim is barred by the expiration of the statute of limitations on January 9, 2011, six years after her 18th birthday, or by October 1, 2008, six years before she filed suit, because she was aware of her injuries and that they were caused by True. (Doc. 199 at 1-2, 20). Lewis argues her cause of action against True did not accrue until approximately three years before she filed her lawsuit, when she first knew her injuries were caused by True's abuse, and therefore her action is timely. (Doc. 202 at 7-8.)

As explained above, if the statute of limitations bars Lewis's claim, she is not entitled to relief and her complaint must be dismissed. See Brown, 663 F. Supp. 2d at 396. Vermont's six-year statute of limitations for actions based on "childhood sexual abuse" runs from either the date "of the act alleged to have caused the injury or condition" or "the time the victim discovered that the injury or condition was caused by that act, and is tolled during the time a plaintiff is a minor. Vt. Stat. Ann. tit. 12, §§ 522(a), 551.

As noted, Lewis alleges that "prior to [her] fifth birthday . . . Defendant True . . . touched [her] bare genitals" (FAC ¶ 49)[8] and "[w]ithin the six years predating the filing of this Complaint, [she] discovered that the injuries and conditions as to which she complains herein were caused by

_____

[8] Plaintiff recalls only one instance of abuse. (Doc. 202-2 ¶¶ 9, 34.)

16

the childhood sexual abuse . . . and that Defendants were responsible for the injuries and conditions," (FAC ¶ 2). In opposition to True's motion, she argues a reasonable jury could conclude she did not and reasonably could not have discovered "an injury based upon her sexual abuse" until about three years prior to bringing the suit.

Lewis is correct that the Vermont Supreme Court has "emphasized that the question of when an injury reasonably should have been discovered is one of fact to be determined by the jury." Clarke, 80 A.3d 578, 581 (internal quotation marks and citation omitted). The Court, however, may determine the date a claim accrued if "there is no legally sufficient evidentiary basis for a reasonable jury to find for the nonmoving party." Id. (internal quotation marks and citation omitted). A cause of action accrues, and the statute of limitations begins to run, "when a plaintiff had information, or should have obtained information, sufficient to put a reasonable person on notice that a particular defendant may have been liable for the plaintiff's injuries." Earle, 743 A.2d at 1108 (internal quotation marks and citation omitted). The statute does not:

> provid[e] limitless causes of action, accruing every time a new condition is discovered. Normally, a plaintiff cannot claim that an additional limitations period is inaugurated when additional injuries arising from the same incident are discovered later. A cause of action is generally deemed to accrue at the earliest point at which a plaintiff discovers an injury and its possible cause.

Id. at 1106.

Here, the undisputed facts show Lewis was aware of True's sexual abuse of her and had sufficient information to put her on notice that abuse could have caused her emotional distress and physical manifestations of emotional distress before she turned 18. Lewis believes the sexual abuse occurred when she was roughly five, and she did not tell anyone until 1996 when she was nine. (Doc. 202-2 ¶ 10, 35.) In September 1996, Lewis and her younger sister, who also alleged she had been "touched" by True, id. ¶ 40, met with a Vermont State Police detective regarding the allegations. Id. ¶ 40, 64. In late 1996 or early 1997, as a result of True's abuse, Lewis and her family

17

stopped attending the Bellows Falls Congregation and joined the South Claremont, New Hampshire Congregation, id. ¶ 79, and they left the Jehovah's Witness religion altogether in 2000, id. ¶ 83. Around 2001, Lewis saw psychologist Dr. Barbara Belcher-Timme, Psy. D.[9]  Id. ¶ 87.  The Lewis family discussed the alleged molestation throughout Lewis's childhood and Lewis and her older sister specifically discussed it on many occasions during her teenage years.  Id. ¶¶ 84, 93-94.  When she was 14 or 15, Lewis began to experience flashbacks, and was interrupted in an attempt to be physically intimate with a boyfriend by memories of True sexually abusing her.  Id. ¶¶ 97-99.  She testified she first remembers experiencing depression around age 14 as it "intensified."  (Doc. 202-4 (Lewis Dep.) 99:21-24; 182:19-20.)  In high school, she posted about having experienced the abuse, talked about it with her boyfriend, and discussed it with close high school friends.  (Doc. 202-2 ¶ 104.)  In a July 2004 journal entry, Lewis mentioned "the man who molested Miranda and I," and reflected on her experience with True, "Why is this old and trusted man's hand down my pants and no memories left of the sunny afternoons I used to lay out on the lawn with my dad."  Id. ¶¶ 115-16, 119.  In August 2004 entries, she wrote her history of men included "my sexual abuser," who she identifies as True, and referred to having been "sexually assaulted" by True.  Id. ¶¶ 121, 124, 126.  In 2014, Lewis wrote to a friend that she "used to talk about [the abuse] as part of the healing process, realizing it was an act done to me that I had no willing part in."  Id. ¶ 143.

A reasonable factfinder could conclude Lewis's cause of action against True accrued at the time of the abuse as she has always believed she was sexually abused by True.  See Doc. 202-2 ¶ 112. A reasonable factfinder could also conclude she knew during her teenage years that her mental health issues were impacted by True's abuse.  Id. ¶¶ 97-99.  For the Court to determine as a matter

---

[9]  Lewis understood her mother brought her to the psychologist because she was cutting herself.  (Doc. 202-2 at ¶ 88.)  She testified she was feeling depressed and "had some mental health issues going on" at that time.  (Doc. 202-4 (Lewis Dep.) 153:5-25.)

of law the date a claim accrued, however, there must be no legally sufficient evidentiary basis for a reasonable jury to find for the non-moving party.

Assuming her cause of action did not accrue immediately and that she was not aware of a direct link, and drawing all reasonable inferences in her favor, no reasonable factfinder could find she was not on sufficient notice True's abuse could have caused her flashbacks, depression, and cutting by the time she was 18. Lewis had sufficient information to put a reasonable person on notice that True may have been liable for her injuries: she knew she was sexually abused by True and she knew she suffered flashbacks of the abuse during sexual activity during her teens. Lewis does not allege suppression of the memory of the abuse[10], and admits she suffered intense depression during her teen years, but asserts she did not receive effective counseling to help her understand that she had been impacted.[11] The law, however, does not require absolute knowledge of a link to trigger accrual of the statute of limitations. Earle, 743 A.2d at 1106 ("A cause of action is generally deemed to accrue at the earliest point at which a plaintiff discovers an injury and its possible cause." (second emphasis added)). Accordingly, the Court determines Lewis's claim accrued prior to her 18th birthday because there is no legally sufficient evidentiary basis for a reasonable jury to find otherwise. Id. (noting the statute of limitations does not provide limitless causes of action, accruing every time a new condition is discovered). Though the limitations period

_____

[10] Cf. Hammer v. Hammer, 418 N.W.2d 23, 25 (Ct. App. 1987) (acknowledging sexual abuse victims may develop coping mechanisms that might obscure the source of their injuries).

[11] Lewis places great emphasis on the Vermont Supreme Court's reversal of the trial court's statute of limitations determination in Clarke v. Abate, 80 A.3d 578 (Vt. 2013). (Doc. 202 at 9-10.) That case, however, is factually distinguishable from Lewis's because the Clarke plaintiff was not sure she had been sexually abused by her doctor as he treated her hip/groin injury and "could not have reasonably discovered the alleged legal injury until she learned through media reports that defendant had been charged with assaulting other women in a similar manner." 80 A.3d at 586. Here, Lewis testified she had always believed she was sexually abused, and therefore knew of her legal injury.

was tolled while she was a minor, the six-year period began to run on January 9, 2005, and expired

on January 9, 2011.  Because Lewis commenced this action on October 1, 2014 (Doc. 1), her action

is not timely and must be dismissed with regard to Defendant True.  <u>Brown</u>, 663 F. Supp. 2d at 396.

Accordingly, True's motion for summary judgment is GRANTED.

       D.    <u>Defendants' Motions to Strike</u>

The Congregation and Watchtower as well as True have filed motions to strike Lewis's

statements of disputed material facts.  (Docs. 196, 206.)  The motions to strike are unopposed.

Given the disposition of Defendants' motions for summary judgment, the motions to strike are

denied as moot.

IV.    <u>Conclusion</u>

The Congregation and Watchtower's joint motion for summary judgment (Doc. 188) is

GRANTED.  True's motion for summary judgment (Doc. 199) is GRANTED.  Defendants'

motions to strike Lewis's statements of disputed material facts (Docs. 196, 206) are DENIED as

moot.  The case is dismissed with prejudice.

       SO ORDERED.

Dated at Brattleboro, in the District of Vermont, this 30th day of March, 2017.


              /s/ J. Garvan Murtha
              Hon. J. Garvan Murtha
              United States District Judge