UNITED STATES DISTRICT COURT
DISTRICT OF VERMONT

_____

ANNESSA LEWIS                    )

            VS               )   CASE NO: 1:14-CV-205

BELLOWS FALLS CONGREGATION OF )
JEHOVAH'S WITNESSES, BELLOWS
FALLS, VERMONT, INC., ET AL   )      MOTION HEARING

_____)


BEFORE:   HONORABLE J. GARVAN MURTHA
          SENIOR JUDGE



APPEARANCES:  DEVIN MILES STOREY, ESQUIRE
              The Zalkin Law Firm, P.C.
              12555 High Bluff Drive, Suite 301
              San Diego, California   92130
              Representing The Plaintiff


              JEROME F. O'NEILL, ESQUIRE
              Gravel & Shea, P.C.
              P.O Box 369
              Burlington, Vermont   05402
              Representing The Plaintiff

              (Appearances Continued)

DATE:         January 5, 2016


          TRANSCRIBED BY:  Anne Marie Henry, RPR
                    P.O. Box 1932
                  Brattleboro, Vermont   05302

```
 1                    APPEARANCES CONTINUED:

 2          IAN P. CARLETON, ESQUIRE
                Sheehey Furlong& Behm, P.C.
 3              P.O. Box 66
                Burlington, Vermont    05402
 4              Representing CCJW

 5

 6          JENNIFER E. McDONALD, ESQUIRE
                Downs, Rachlin & Martin, PLLC
 7              P.O. Box 190
                Burlington, Vermont    05402
 8              Representing CCJW

 9

10          PIETRO J. LYNN, ESQUIRE
            BARBARA R. BLACKMAN, ESQUIRE
11              Lynn, Lynn & Blackman, P.C.
                76 St. Paul Street, Suite 400
12              Burlington, Vermont    05402
                Representing Bellows Falls Congregation
13

14          WALTER E. JUDGE, JR., ESQUIRE
                Downs, Rachlin & Martin, PLLC
15              P.O. Box 190
                Burlington, Vermont    05402
16              Representing Bellows Falls Congregation

17

18          WILLIAM E. KRAHAM, ESQUIRE
                William E. Kraham, PLC
19              P.O. Box 447
                Brattleboro, Vermont    05302
20              Representing Norton True

21

22

23

24

25
```

```
 1              (The Court opened at 10:35 a.m.)

 2              THE CLERK:  This is civil docket number 14-cv-205,

 3   Annessa Lewis versus Bellows Falls Congregation of the

 4   Jehovah's Witnesses of Bellows Falls, Watchtower Bible and

 5   Tract Society of New York, Inc. and Norton True.  Also we're

 6   here in In re: Christian Congregation of Jehovah's

 7   Witnesses.

 8              Present in the courtroom representing the

 9   plaintiff are Attorneys Jerome O'Neill and Devin Storey.

10   Also in the courtroom representing defendants are Attorneys

11   Jennifer McDonald, Pietro Lynn, Walter Judge, Junior,

12   Barbara Blackman and Ian Carleton.  Representing defendant

13   True are Attorney Will Kraham and Mr. Anthes.

14              THE COURT:  And we are hearing various motions.

15              THE CLERK:  And we are here on a motion hearing,

16   exactly.  Excuse me.

17              THE COURT:  Mr. Lynn, do you have something to say

18   or --

19              MR. LYNN:  Well, obviously it was more in the way

20   of question and suggestion.  I know there are a series --

21              THE COURT:  Well, why don't you let me go first.

22              MR. LYNN:  Glad to.  Thank you, Your Honor.

23              THE COURT:  Welcome all, first of all.  I see a

24   number of very prominent attorneys from Vermont and

25   elsewhere I guess.  I was just reviewing the new amendments
```

 1   to the civil rules, which call for, it seems, more

 2   cooperation among parties and the Court.  And also calls for

 3   scheduling orders and that sort of thing, which, at least I

 4   don't follow the rules I guess, in the sense that we don't

 5   have these conferences early on.  And maybe I should change.

 6   I don't know about the other judges in Vermont, whether they

 7   are following the rules in the sense that it calls for

 8   conferences and hearings instead of just filing the

 9   discovery, the discovery schedule, which is then approved by

10   the Court.  And then there's no real contact normally

11   between the judge and the parties until something develops.

12   And I guess this is a development.

13          I am going to deal with all the motions this

14   morning.  And I'll take them in the order that I reviewed

15   them.  And, frankly, I spent a lot of time reviewing these,

16   which is the first time in a while that I've spent so much

17   time going through discovery and trying to figure out whose

18   asking for what and what objections there are and why.

19          So, certainly I will hear some arguments from all

20   of you on the various motions.  I'm not saying that the time

21   will be limited, but it may be limited depending on how long

22   you go at it.

23          Again, bear in mind, that I spent, I don't know

24   how many hours, going through all these things and have some

25   preliminary ideas of how I'm going to rule.

 1          So, you want to say something else other than, Mr.

 2    Lynn?

 3          MR. LYNN:  No, Your Honor.  I was, what I was

 4    going to ask the Court is given the volume of motions and

 5    what seems to be at least a limited amount of time, how the

 6    Court wanted to apportion the time as between the two

 7    parties and which motions would go first.

 8          THE COURT:  Well, I've decided which ones go

 9    first.  And, frankly, I will apportion the time.  If I feel

10    people are speaking too long I'll tell them.

11          MR. LYNN:  Thank you, Your Honor.

12          THE COURT:  Okay.  So, again, I've put these in

13    order perhaps the way that I think they should be dealt

14    with.  You may not agree with that, but the first motion I'd

15    like to hear is the plaintiff's motion to compel Watchtower

16    to provide documents requested in plaintiff's first request

17    for production.

18          And that includes, as I see it, document 69, which

19    was filed on October 13 of last year.  And that included

20    69-1, which was the specific verbatim listing of each item

21    sought, which is dated September 16.  And also include

22    document 69-3 which is, they are all exhibits for the

23    plaintiff's motion, but that is Watchtower's objections and

24    responses to requests for production.  And also includes

25    69-4, which was or is defendant's, defendant Watchtower's

1   privilege log dated September 16 of '15.

2          And then there is a document 8-4, which is

3   Watchtower's opposition to the motion and 92, which is

4   plaintiff's reply.

5          In addition, on December 17 of last year, there

6   was a letter from Mr. Lynn which enclosed certain documents

7   for review by the Court.  And those were documents two

8   through four, five through seven, eight through 10 and 17

9   through, 17 and 18 on the privilege log by Watchtower.

10          So, just as a preliminary statement, it appears to

11  me anyway that the documents at issue in this motion are

12  either all listed or 99 percent listed on the privilege log.

13  So if I'm wrong, let me know that, but the ruling that I

14  will make will concern the privilege log and whether or not

15  it should be turned over or not, whether the documents

16  should be turned over.

17          I am seriously contemplating and will likely order

18  that there be a confidentiality agreement between the

19  parties, some, if not a majority of these documents.  So

20  I'll just give you that preliminary statement, that

21  preliminary thought.

22          So, I guess Mr. O'Neill you are the plaintiff.

23  And it's your motion.  If you want to go ahead.  I don't

24  know, maybe Mr. Zalkin who is going to argue it?

25          MR. O'NEILL:  Devin Storey is here with me, Your

1    Honor.   And, Mr. Storey is --

2              THE COURT:   Mr. Storey.   I'm sorry.

3              MR. O'NEILL:   That's all right.   He is going to

4    argue the substantive motions related to the various motions

5    to compel that were filed by our side.

6              THE COURT:   Okay.   All right.   So, Mr. Storey?

7              MR. STOREY:   Good morning, Your Honor.

8              THE COURT:   Good morning.

9              MR. STOREY:   May it please the Court.   So with

10   respect to this motion, it seems that the central objection

11   that Watchtower has made is the clergy penitent privilege or

12   the religious privilege.   And there are three topical

13   reasons why the assertion of privilege fails.

14             And the first is on a broad level.   Watchtower

15   has, and the Jehovah's Witnesses have a very regimented way

16   of responding to childhood sexual abuse allegations.   There

17   are policies and practices in place.   And because of those

18   policies information of this type is distributed within the

19   organization to various people and can never satisfy the

20   requirements of confidentiality required for application of

21   the privilege.   So on a broad level documents of this type

22   cannot satisfy the privilege.

23             Secondarily, on a case specific level, with

24   respect to Norton True, none of the documents can satisfy

25   the requirements of confidentiality or the requirement that

1    there was a spiritual -- a communication seeking spiritual

2    advice.

3            This is not a circumstance where a penitent came

4    to a clergyman and made a confession.  This is a

5    circumstance where a person's accused of a heinous

6    wrongdoing.  He was called before the elders and he denied

7    doing anything.  So there is no communication seeking

8    spiritual advice.

9            And, third, on a document by document specific

10   level, going through these requests it's clear that some of

11   these documents don't contain any communication from a

12   penitent to a member of the clergy and others, pardon me,

13   Your Honor, there's been no effort to establish the actual

14   underlying privacy or confidentiality of any communication

15   from a member -- to a member of the clergy.

16           So looking first generally at the religious

17   privilege, a person has a privilege to refuse to disclose

18   and to prevent another from disclosing a confidential

19   communication by the person made to a member of the clergy

20   in his professional character as a spiritual adviser.  And a

21   confidential communication is made privately and not

22   intended for further disclosure except to other persons

23   present in furtherance of the purpose of the communication.

24   It is the privilege proponent's obligation to demonstrate

25   application of the privilege and their burden.

1          So on the broad level I mentioned before, there

2   are a number of ways that a member of the clergy can learn

3   of a molestation allegation.  A victim can come forward and

4   make a complaint seeking that some action be done, a parent

5   can do the same.  Some other witness could observe

6   something, come to the elders and say, hey, I think you

7   better look into this, this person's a threat.  There could

8   be a call from the police or a custody battle or a newspaper

9   article.  A spouse of a molester could come forward and

10  state some concerns.

11          In any of those circumstances, someone's coming

12  forward and asking that action be taken.  It's not a

13  communication to an Elder seeking spiritual advice.  And

14  that's a fundamental problem in the showing that's been made

15  by the defendants.  There's no showing whatsoever as to why

16  these particular documents or these particular

17  communications contained within these documents were brought

18  to the attention of the Elders.

19          There's no showing that there was a request for

20  spiritual advice.  And because of that, the assertion of

21  privilege fails regardless.

22          The molestation complaints within the Jehovah's

23  Witnesses are subject to, regardless of the reason that

24  someone came forward to an Elder, are subject to potentially

25  broad disclosure.

1        Now, when a complaint comes in the first thing

2   that Elder does who gets it is call the legal department and

3   ask for legal advice.  Am I a mandatory reporter?  If so,

4   the person calls the police.  If not, the person still has

5   complete discretion to call the police if they so choose.

6        Now, the next thing that happens is the Elders

7   will convene and they'll discuss the allegations.  They'll

8   assign two people to investigate.  Those Elders will go out,

9   they'll talk to the accused, they'll talk to the accuser,

10  they'll speak to anyone else with relevant information, come

11  back, report to the body of Elders.  And if there's enough

12  evidence they'll form a judicial committee, which involves a

13  third Elder.  They'll go out and they'll meet with the

14  accused again and determine what type of censure to impose.

15       After that there's the possibility that the

16  accused may appeal.  If the accused appeals another Elder

17  called the circuit overseer who oversees 20 to 25

18  congregations of Jehovah's Witnesses in a geographic area

19  will be contacted.  He'll assemble an appeals committee from

20  three separate Elders in different congregations within that

21  circuit to review the material.  Then the Service Department

22  at Watchtower will be contacted.

23       So, once the complaint comes in there are any

24  number of individuals who may be given access to the

25  allegedly confidential information.  And in the event that

1   the person is dis-fellowshiped or excommunicated they can

2   seek reinstatement.  And that may happen four or five years

3   down the road.  And if it does, you might have different

4   Elders in the congregation who are going to be given access

5   to all the materials to determine whether that person is

6   eligible for reinstatement.

7             The person moves to another congregation, pardon

8   me, the person moves to another congregation a letter of

9   introduction will be written.  And, again, that same

10  allegedly confidential information will be disseminated to

11  others.

12            So these policies just don't allow for sufficient

13  confidentiality of documents or statements dealing with

14  childhood sexual abuse to qualify for privilege.

15            Now, on the case specific level dealing with

16  Norton True, here we have a circumstance where my client's

17  mother came forward and made a complaint.  She came forward

18  to the Elders and said Norton True molested my daughters.

19  And at that point there was investigation, there were

20  discussions, there were communications.  But in the whole,

21  pardon me, Norton True didn't initiate that.  He didn't come

22  forward seeking spiritual advice.  Instead, he got called

23  before the Elders.  He answered their questions with

24  denials.

25            So in that circumstance there was no communication

1   seeking spiritual advice, which is a direct requirement of

2   the statute and which is missing.  So, again, on that level,

3   there is no confidentiality and no privilege.

4           And then in looking at the particular documents at

5   issue, a number of those documents are what are called S2

6   forms.  That's documents, two, three, four, eight and 18.

7   And those documents are, they are administrative documents

8   where the local congregation will send Watchtower a report

9   and say, hey, we think that, you know, member one and member

10  two and member three meet the requirements for appointments

11  as a Ministerial Servant or Elder.

12          And in putting that together what will happen is

13  the Elders will put down their thoughts.  Say, this person

14  seems to meet the requirements because.  Those are all the

15  impressions of the individual Elders stating why the person

16  meets the requirements or not.  There is no communication

17  from the individual to the Elders that's being communicated

18  on to Watchtower.  So in the absence of a communication to a

19  member of the clergy there's no privilege.

20          Documents 11, 12, 13, 14, 15 and 16 all involve

21  molestation allegations.  And for the reasons discussed

22  those, pardon me, those don't meet the requirements of the

23  statute.

24          So for all those reasons the clergy penitent

25  privilege or the religious privilege isn't applicable to

1    these documents or this type of document.

2            Now, the defendants also argue that there is a

3    First Amendment privilege or entitlement to refuse to

4    produce documents in discovery.  And they base that

5    primarily on a case called Serbian Eastern Orthodox Diocese

6    versus Milivojevich.  In that case we got a circumstance

7    where Milivojevich had been the bishop of the diocese.  He

8    had been removed.  And was suing to be reinstated.  And it

9    was effectively a -- it was a lawsuit over whose the bishop

10   and who has control of the diocese's assets.

11           And the Court in that case said, look, we can't

12   get involved with that.  That's a Supreme Court case.  We

13   can't get involved with that.  We can't determine whose the

14   proper bishop of a diocese.  That's not for us.

15           But those cases and the cases that similarly

16   determine that the church shouldn't get -- the Court

17   shouldn't get involved in church property disputes have been

18   distinguished in cases of this nature repeatedly by courts

19   that have had to deal with this issue.

20           And the courts have said, look, this isn't, you

21   know, a discovery issue like we've got here.  It doesn't

22   decide any point of dogma.  It doesn't decide whose going to

23   be a bishop.  It doesn't decide who can be a member or who

24   can't.  All it does is require that certain documents in the

25   possession of the defendant be produced.  And that doesn't

1    in any way implicate the First Amendment.  So that the

2    strong weight of authority that we cited in our briefs

3    indicates that there is no legitimate First Amendment issue

4    here.

5              Other than that, the defendants have argued that

6    there are third party privacy issues at issue here.  And the

7    glaring one is the privacy rights of any individual victims

8    that are identified in these documents.  And we recognize

9    that that exists.  And, you know, we'd recommend that the

10   protective order that the Court had mentioned earlier would

11   be an adequate way of protecting those interests.

12             To the extent that there are others that the

13   defendants have indicated have privacy interests, such as

14   Mr. True presumably, also the Elders that were involved with

15   the congregations involved, any interests there are

16   certainly subordinate to the plaintiff's need to get these

17   documents and to get the information in the defendant's

18   possession.

19             So if the Court were to issue a protective order I

20   think all of those concerns could be adequately addressed

21   while plaintiff would still be entitled to the information

22   that she needs.

23             THE COURT:  Well, the normal procedure is for the

24   parties to put together a protective order for approval by

25   the Court.  So you think that's possible?

1          MR. STOREY:  Well, with the Court's comments this

2     morning that a protective order is appropriate to your eyes,

3     yes, I think we can do that, Your Honor.

4          THE COURT:  And do you agree that the documents

5     you seek are all on the privilege log or is there more?

6          MR. STOREY:  There are some other documents, there

7     are other categories we've requested.  For instance, there's

8     a type of document, it's called a Body of Elders Letter.

9     And these are letters that Watchtower sent out.  They are

10    policy letters that go out to the congregations and are to

11    be followed.

12         And we've asked for those.  And we had butted

13    heads against the defendant a little bit on this in that

14    they had offered to produce certain of them if we agreed to

15    a protective order.  We had, A., not wanted a protective

16    order and, B., we had wanted a greater sample than they have

17    offered.

18         Effectively what these documents are -- some of

19    them are going to deal specifically with child molestation

20    or how a judicial committee works.  And the defendants have

21    offered to produce those subject to a protective order.  But

22    others are going to deal with Watchtower's ability to

23    control the congregation and what happens at the

24    congregation level, which ultimately we feel is going to be

25    very relevant to an agency issue that's going to come up

1    later in this case.  And that's the reason that we've

2    requested those documents.

3         THE COURT:  So, are those mentioned, I'm looking

4    at the motion to compel Bellows Falls Congregation.

5    Unfortunately, I don't have it attached to the Watchtower

6    one.  But it appears to be request number 39, which talks

7    about July 1, 1989 letter to all bodies of Elders and so

8    forth?

9         MR. STOREY:  Yes, Your Honor.

10         THE COURT:  So, that's all except for those items

11    that are on the privilege log?

12         MR. STOREY:  No.  There's a couple other things.

13    We had requested that Watchtower produce a document called

14    Branch Organization.  And Branch Organization, and it's also

15    in the moving papers, this is a document that's used by all

16    branches of Jehovah's Witnesses to govern how they function

17    at the branch level, which is effectively the national

18    level.

19         And we've requested this information primarily,

20    A., as it relates to the question of control for an agency

21    issue later.  And, B., for punitive damages.  Ultimately we

22    are going to claim in this case that the governing body of

23    Jehovah's Witnesses who formulated their policies acted

24    maliciously and recklessly.  And what we expect to see from

25    the defendants is that the governing body is not in any way

```
 1   related to Watchtower.  We think this document will

 2   establish contrary.  So we've requested that.

 3           THE COURT:  Do you know what request that is?

 4           MR. STOREY:  Pardon me?

 5           THE COURT:  Do you know which request that is?

 6           MR. STOREY:  I can get that for you in just a

 7   second, Your Honor.  And then the, the other thing that's in

 8   the motion is also the subject of the protective orders,

 9   which are the institutional awareness documents.  So we had,

10   that was request 65 and 67.

11           THE COURT:  Yes, okay.  That's right.

12           MR. STOREY:  So we can take care of that on the

13   other motion.

14           THE COURT:  Exactly.

15           MR. STOREY:  So that's --

16           THE COURT:  Okay.

17           MR. STOREY:  Thank you, Your Honor.

18           THE COURT:  Thank you.  Mr. Lynn?

19           MR. LYNN:  Thank you, Your Honor.  Good morning.

20           THE COURT:  Good morning.

21           MR. LYNN:  Bear with me for just a second.  So,

22   Judge, I gather, I don't want to misspeak, but I gather that

23   I'm here now to talk about the documents in the privilege

24   log, and we'll get to the other documents that were the

25   subject of the motion for a protective order when that issue
```

1  comes up?

2          THE COURT:  Correct.

3          MR. LYNN:  Thank you, Your Honor.  Well, Judge, I,

4  of course, listened to the argument that was being raised

5  around the issue of the privilege.  And I would remind the

6  Court that in applying a Vermont privilege it's not a bad

7  starting point to look at what the privilege is called.

8  It's called a religious privilege.  And that's under Rule

9  505.

10         And so, Judge, let me back up for a moment and

11 talk about, first of all, what this case is about.  The

12 claim here in this case is that Annessa Lewis sometime in

13 either 1992 or '93 was inappropriately touched on the chest

14 at Norton True's house, not in the Kingdom Hall, not in

15 connection with any Jehovah's Witness sponsored event.  And

16 that there was disclosure of this some years later, '94,

17 '95.

18         And upon disclosure that certain documents were

19 created, some of those documents are now in the Court's

20 possession.  The claims for liability that remain after the

21 motions to dismiss are two-fold.  The first is that Mr. True

22 was the agent of Watchtower.  The second is that somehow

23 there was, and the allegation in the complaint for negligent

24 undertaking was that there were policies and procedures in

25 place for zealous protection of members of the congregation

1    against known child molesters.  And not that there was

2    reliance on that, the Court specifically excluded that claim

3    because it wasn't alleged, but that by virtue of some

4    negligent conduct it increased the danger present to

5    Ms. Lewis at that time.  And I think it's important to

6    remember that in the context of what discovery is relevant

7    and what privileges ought to be upheld by the Court.

8            So going back to this issue of religious

9    privilege, Rule 505, the language -- I hesitate to do this

10   Judge, having heard that you spent a lot of time with these

11   issues, but I'll remind the Court any way, the privilege --

12           THE COURT:  I don't think you have to remind me

13   about the language.  I'm well aware of it.

14           MR. LYNN:  All right.  So, Judge, the issue here

15   is what was the purpose of this communication between the

16   Elders at the Bellows Falls congregation and the Elders at

17   Watchtower.

18           And, Your Honor, I think it's important to

19   remember that the Elders at the Bellows Falls Congregation

20   are what I would characterize as very part-time.  These are

21   not priests or ministers whose full-time job is to engage in

22   spiritual guidance and to be ministers or priests for the

23   congregation.  These are members of the community who have

24   jobs like everybody else and who find and devote the time

25   necessary to be Elders in their congregation.

1              And so, of course, one of the procedures that

2      exist when there are these kinds of very serious allegations

3      of sinful behavior is to seek guidance from the more

4      full-time Elders at Watchtower around how ecclesiastically

5      to handle those kinds of allegations.

6              And we don't dispute that it sometimes triggers

7      investigations and sometimes that it triggers judicial

8      committees, but these judicial committees are all internal

9      ecclesiastical organizations and they are purely spiritual

10     in nature.  They have no authority civilly or criminally in

11     the State of Vermont, but purely are church functions.

12             And so what we would suggest to you, Your Honor,

13     is that any documents that are generated in connection with

14     those communications between the Elders on the one hand in

15     Bellows Falls seeking guidance on how spiritually to deal

16     with an issue fall perfectly within the confines of Rule

17     505.

18             THE COURT:  What about the confidentiality part of

19     that?

20             MR. LYNN:  Well, I think that we have presented

21     information through the affidavits that were appended to our

22     motion for a protective order that indicates that, in fact,

23     there is an expectation that this is confidential, that it

24     will remain within the organization.  People are not at

25     liberty to go into the community at large and talk about

1    these issues.

2            And that is why I would argue, Your Honor, that it

3    is confidential.  What we haven't heard from Mr. Storey, and

4    there is no argument, is that we generally tell people, in

5    fact, what you heard from Mr. Storey is that when these

6    communications are made, the very first thing that is done

7    is that the legal department, and we've asserted an

8    attorney-client privilege for those communications, deals

9    with the question of whether the people bringing the report

10   are mandatory reporters under that state's laws and whether

11   there's a privilege that would prevent them from discussing

12   that information.

13           And so, Your Honor, absent that kind of statutory

14   mandatory reporter requirement then the information is kept

15   within the organization.

16           Now, the victims, we agree that there's nothing

17   that would prevent others who are not involved in those

18   confidential communications to report that to the

19   authorities.  But, again, what we're looking at now

20   specifically are those communications made by the Elders in

21   Bellows Falls to the Elders at Watchtower.

22           THE COURT:  Well, I guess I don't understand, as I

23   think was, Mr. Storey said, is that there are communications

24   certainly about the sexual abuse perhaps by alleged victims

25   or their family to Bellows Falls.  So how are those

1    considered confidential communications to an ecclesiastical

2    person?

3              MR. LYNN:  Well, again, the communication, I'm

4    sorry, Your Honor, I didn't mean to interrupt you.

5              The communication within the church, of course, is

6    also confidential.  But the communicant, the one providing

7    the information, is the one who has the right to waive that

8    privilege.  Any person is entitled, if they want, to tell

9    the authorities, or whomever they like, about the alleged

10   abuse or sinful conduct, whatever that is.  But what we're

11   seeing in this instance is the further communication by the

12   Elders internally within the organization seeking guidance

13   and advice on how spiritually to handle allegations, whether

14   it's abuse or some other serious sin.

15             THE COURT:  Well, it's more than spiritually isn't

16   it?  I mean, they go to the legal department.  They are

17   asking for legal advice.

18             MR. LYNN:  Well, Your Honor, they go to the legal

19   department, as Mr. Storey said, for one specific purpose.

20   And that is to determine whether there is a requirement that

21   it be reported under the various laws of the various states.

22   There has to be an interpretation as to who is a mandatory

23   reporter.  But this is -- those documents are different

24   documents.  Those are documents where Your Honor we believe

25   that there is an attorney-client privilege.

1           The first step in this analysis for some of these

2    documents is, is there a religious privilege.  And the

3    argument is, Your Honor, that those communications are being

4    made solely for the purpose of seeking spiritual religious

5    organizational advice on how to handle allegations of sin.

6           So, Your Honor, those are the arguments we would

7    raise with respect to the documents where we have raised the

8    religious privilege under Rule 505.

9           Now the attorney-client privilege, Your Honor,

10   those, we believe that what we've heard from Mr. Storey and

11   what you see in the pleadings is very clear, that when there

12   are allegations of unlawful conduct that those are, those

13   are brought to the lawyers.  Determinations are made about

14   what is disclosable or what is protected by privilege, who

15   is a mandatory reporter, and that is classically information

16   that comes within the context of attorney-client privilege.

17           THE COURT:  You submitted those to me.

18           MR. LYNN:  We did, Your Honor.

19           THE COURT:  And I've looked at those.  And I'm

20   prepared to make rulings on them.

21           MR. LYNN:  Thank you, Your Honor.  We expected so.

22           And then, and then there is the other two

23   privileges that we raised, and I guess calling a third party

24   privacy privilege might be stretching it, but there is some,

25   Your Honor, deep concern that this information be

1    disseminated in a public way, that these are allegations,

2    there is no criminal public proceeding that we know of that

3    goes to these issues.

4           In fact, I think as the Court is probably aware

5    from the many pleadings submitted in this case, that there

6    is not even a DCF registry entry for Mr. True.  That he was

7    removed from the registry after twice passing polygraph

8    examinations.

9           And so we're concerned not only for him, but for

10   others whose names are contained in these documents that

11   they become public.  And I'm pleased to hear there's now a

12   willingness to agree to confidentiality.  Up until this

13   moment there has not been.

14          THE COURT:  All right.  And you are agreeable to

15   that as well?

16          MR. LYNN:  On those issues we are, Your Honor.

17   Definitely.

18          The last issue is the First Amendment privilege.

19   And, Judge, we cited a number of cases.  But those cases

20   that we've cited almost universally stand for the

21   proposition that in this country there are, there is a

22   status accorded to religious organizations where the state

23   ought to tread carefully in trying to either force those

24   organizations to do things that are not consistent with

25   their religious beliefs or to force those organizations to

1   discourage information which is deeply sensitive and central

2   to their religious tenets.

3           And so, Your Honor, we think that to the extent

4   that this Court does not believe such a privilege exists, we

5   believe that it does, but to the extent that this Court does

6   not believe it exists that in any event those cases ought to

7   inform its conduct or its decisions in this case around what

8   information is ordered produced and which information is

9   not.

10          THE COURT:  Okay.

11          MR. LYNN:  Thank you, Your Honor.

12          THE COURT:  Thank you.

13          MR. STOREY:  Your Honor, just very briefly in

14  response.  First, in following up on those particular

15  requests that I had mentioned, the request for the Body of

16  Elders letters was request 63.  And the request for the

17  branch organization was request 66.

18          THE COURT:  And those are different from the other

19  issue that we're going to be dealing with?

20          MR. STOREY:  They are.  They are.

21          Now, there was something that Mr. Lynn said.  And

22  he said there's an expectation that statements of this type

23  would stay in the congregation.  And I point to the language

24  of the statute and say that's not enough.  The language

25  specifically says that there can be no disclosure to someone

1   not present except in furtherance of the purpose of the

2   communication.

3           And we've discussed this investigation process,

4   we've discussed the way that, you know, a person who moves

5   on to a new congregation would have a letter of introduction

6   written, discussions with the legal department.  These are

7   all for different purposes than the original communication

8   would have been, which would have been either a

9   communication seeking that some action be taken against a

10  molester or that there be some vigilance or potentially that

11  the molester himself had confessed.

12          But, you know, we've got a circumstance where the

13  various multiple disclosures within the organization, and

14  sometimes outside of the organization to authorities, are

15  not made for the same purpose as the original communication.

16          And for that reason the argument that all of this

17  is intended to stay in the congregation fails as a matter of

18  law.

19          Now, there was something that was hammered pretty

20  hard in the briefs from Watchtower and was alluded to, which

21  is that these communications are from Elder to Elder seeking

22  spiritual advice.

23          So, effectively what this argument wants to do is

24  ignore where this information came from.  For instance, if

25  congregant A. comes to the Elder and says, hey, we think

1    that congregant B. is molesting a child, and the Elder calls

2    the Service Department to discuss it.  What you've heard is

3    that because the Elder is seeking legal or seeking spiritual

4    advice from Watchtower everything going back to the first

5    communication is privileged.

6           Effectively what the defendant wants to do is give

7    any Elder the ability to take unprivileged material and make

8    it privileged simply by communicating it to the Watchtower.

9    And that's antithetical to the confidentiality that's

10   required by the statute for application of the privilege.

11          And, finally, with respect to the First Amendment

12   issue, I quote to a case General Counsel and Finance and

13   Administration with the United Methodist Church versus

14   Superior Court.  This is a case where Justice Rehnquist

15   wrote an opinion serving as circuit judge.  And he talked

16   about this doctrine of ecclesiastical abstention.

17          And what he said was that these notions are quote,

18   not applicable to purely secular disputes between third

19   parties and a particular defendant albeit a religiously

20   affiliated organization.  And that's because, the reason for

21   those First Amendment principles is to, quote, avoid a,

22   quote, perceived danger that in resolving intra-church

23   disputes the state will become entangled in essentially

24   religious controversies or intervene on behalf of groups

25   espousing particular doctrinal beliefs.

1          We have none of that here.  We have a discovery

2    dispute asking that documents be produced.  The Court in no

3    way is being asked to weigh in on the validity or

4    appropriateness of those religious beliefs.  As such, the

5    First Amendment doesn't apply.  Thank you, Your Honor.

6          THE COURT:  Okay.  Thank you.

7          MR. LYNN:  Your Honor, if I could just briefly

8    speak to 63 and 66 because I don't think that there was

9    discussion about that up until this point why they ought to

10   be produced.

11         THE COURT:  Okay.  Let me get them first then.

12         MR. LYNN:  Yeah, please, Your Honor.

13         THE COURT:  Okay.  Is it, produce all Body of

14   Elders's letters distributed by you between January 1, 1975

15   and September 30, 2014?  Is that the one you're talking

16   about?

17         MR. LYNN:  Yeah, that's the first one, Your Honor.

18         THE COURT:  Okay.  Go ahead.

19         MR. LYNN:  I'll remind the Court that the

20   allegations in this case have nothing to do with the year

21   2014 or 2015 or, frankly, the 2000's at all.  These are

22   allegations that arose from a time in the 1990's.  And

23   you'll see in response to request for production number 63

24   we offer, subject to confidentiality, to produce documents

25   that at least have some relevance to this case, but we do

1    object as irrelevant documents that extend beyond

2    December 31, 1996.

3              And so, Judge, by virtue of that December 31, 1996

4    date, I think what we are contemplating is that we'll

5    produce everything up and to and beyond the time of report

6    to us of this abuse even though it was years before in '94

7    and '95.  But documents after that date have no bearing,

8    Your Honor, on the allegations of liability or damages in

9    this case.

10             And, likewise, you'll see in response to 66 --

11             THE COURT:  That's about all Branch

12   Organization -- all iterations of Branch Organization

13   between 1990 and the present?

14             MR. LYNN:  Yeah.  And, Your Honor, again, you'll

15   see that the objections that we raised to that are that it's

16   not, it's not relevant to the allegations in this case, that

17   it is far broader than what ought to be considered by the

18   Court.

19             And let me remind the Court again, that what we're

20   dealing with in this case is that there is, there was a

21   policy of zealous supervision, zealous care for those who

22   are known to be child molesters and that our conduct either

23   pursuant or inconsistent with that policy led to the abuse

24   by virtue of increasing the level of danger.

25             Those documents have nothing to do with that

 1    theory of liability.  The argument we've heard from counsel

 2    was that there are some documents they are seeking which

 3    will show that Mr. True was our agent.  Your Honor, what is

 4    undisputed before the Court now is that Mr. True was not a

 5    ministerial servant.  He was not an Elder within the

 6    organization.  He was only, at the time of this alleged

 7    abuse, a member of the congregation.  So any claim that he

 8    was our agent is tenuous at best, but these requests in 66

 9    go far beyond trying to establish that a ministerial servant

10    or a member of the congregation is an agent of Watchtower.

11              THE COURT:  And what about 69?  Sixty-nine for you

12    actually is about insurance policies, which I don't think is

13    at issue or is it?

14              MR. LYNN:  I don't believe so, Your Honor.

15              MR. STOREY:  No, Your Honor, it's not.

16              THE COURT:  So I guess it was 69 if it applies to

17    the Bellows Falls Congregation.  That was, right?

18              MR. STOREY:  Yes, Your Honor.

19              THE COURT:  We don't have an issue with 69?

20              MR. STOREY:  We didn't raise that in our motion

21    with respect to Bellows Falls, however.

22              THE COURT:  I beg your pardon?

23              MR. STOREY:  We didn't raise that in our motion

24    with respect to Bellows Falls.  So 69 shouldn't be at issue.

25              THE COURT:  All right.

1          MR. STOREY:  One brief thing.

2          THE COURT:  Well, just so I'm clear, so we're only

3    dealing -- outside of the privilege log we're only dealing

4    with then 63 and 66?

5          MR. STOREY:  Yes.  Because 65 and 67 will be with

6    the other motion.

7          THE COURT:  Right.  Okay.  Sorry.  Go ahead.

8          MR. STOREY:  I'm sorry, Your Honor.  Just one

9    brief thing.  Something that Mr. Lynn had said on rebuttal

10   was that it's undisputed that Norton True was not a

11   ministerial servant at the relevant time period.  And that's

12   not the case.

13         It's certainly not undisputed.  We don't have any

14   information, and they've refused to give us information, as

15   to when he was and wasn't a ministerial servant.  So it's

16   not an undisputed issue, Your Honor.

17         MR. LYNN:  Well, Your Honor, we know that the

18   plaintiff's mother was a member of the church at that time.

19   We know that this is an issue we put front and center in the

20   pleadings to the Court.  And we know that there is no

21   factual information from the Court, nor could there ever be,

22   that disputes the fact that he was not a ministerial servant

23   at the time of this alleged abuse.

24         So just simply saying it is undisputed can't make

25   it true.  And, by the way, if they really had some serious

1    concern about whether these statements were true or not, I

2    suspect we would have seen a discovery request somewhere

3    along the line that sought to ferret out that issue and that

4    is not the case.

5            So, Judge, it is undisputed on the record in this

6    Court in this case that he was not a ministerial servant at

7    the time.

8            What I would also say, Your Honor, as I look at

9    66, and I want to be clear about this, the request is,

10   please produce all iterations of branch organization in

11   effect between 1990 and present.  So, Your Honor, again,

12   there is no relevance to that request and the theories of

13   liability in this case.  Branch organization doesn't let us

14   know to any certainty whether Mr. True was an employee of

15   Watchtower.  Branch Organization Members doesn't tell us

16   whether there was some policy of Bellows Falls that was not

17   properly followed or was overzealously followed.

18           This is, Your Honor, a fishing expedition which is

19   only illustrated by the fact that they are looking for those

20   iterations all the way up to present.

21           THE COURT:  Okay.  I think we've covered that

22   motion.  Let me get myself oriented here again and we'll go

23   on to the next one.

24           So, I think the next one is similar, but it

25   involves the Bellows Falls Congregation.  And that is

1    document 68 of 10-13-15, which is the plaintiff's motion to

2    compel Bellows Falls Congregation to compel.

3            And, again, it seems to me perhaps there are a

4    couple of others as has appeared now with Watchtower that

5    weren't covered by the privilege log, but what I did is I

6    went through the privilege log and compared it to the

7    motion.  And it appears that those documents are the ones at

8    issue.  Maybe some others, but I'll hear if there is.

9            So, why don't you go ahead again.

10           MR. STOREY:  Your Honor, in the interest of

11   brevity, I think the issues with respect to privilege and

12   the First Amendment so heavily overlap what we've just

13   argued.  If we could just have Bellows Falls argue and I'll

14   respond to anything they raise.  There's nothing really

15   further that I can add.

16           THE COURT:  Okay.  Do you think there are other

17   documents though than the ones on the privilege log here?

18           MR. STOREY:  Again, it's the same as with respect

19   to Watchtower.  We have asked for Watchtower to produce all

20   Body of Elders letters it sent.  We had asked Bellows Falls

21   to produce Body of Elders letters it received.  So they are

22   going to be the same issues that were just discussed.

23   There's nothing new or nothing different.

24           THE COURT:  Do you know which request that is?

25           MR. STOREY:  I can give that to you, Your Honor.

1          THE COURT:  All right.  Okay.  So who is going to

2    argue for Bellows Falls?

3          MS. McDONALD:  Your Honor, and I agree with

4    Attorney Storey, that the issues are extremely similar,

5    although I would like to stress on behalf of the local

6    congregation that our congregants, our Elders understood

7    that when they were seeking spiritual advice from either the

8    Elders in the local Congregation or seeking spiritual advice

9    from the Service Department, that these communications will

10   be confidential.

11         It's an extremely important part of the religion.

12   It is understood by members of the religion.  And Attorney

13   Storey had mentioned earlier that the policies of the

14   Jehovah's Witnesses religion don't lend themselves to our

15   evidentiary protection of religious communications.  And we

16   certainly disagree with that point.

17         I would also like to draw the Court's attention to

18   the fact that numerous documents in Bellows Falls' privilege

19   log relate to individuals who are not parties to this

20   action.  They relate to, for example, plaintiff's father and

21   spiritual advice that he received from our congregation, not

22   in connection with the allegations in this case.  They

23   relate to other third parties.

24         These communications have nothing to do with this

25   lawsuit.  We shouldn't be required to produce that.  That

 1    also goes to the third party privacy that our congregation

 2    obviously is particularly concerned about.

 3            Merely agreeing to a confidentiality order, while

 4    we would certainly do that, there are going to be names of

 5    individuals in here that have nothing to do with this case.

 6    And the confidentiality order, even if it's for attorney's

 7    eyes only, is certainly not going to be enough to cover

 8    that.

 9            THE COURT:  Why not?

10            MS. McDONALD:  Because those individuals, even if

11    they are going to be seen, their names are going to be seen

12    by the attorneys in that case, they shouldn't be -- they

13    shouldn't -- they are required to see or allowed to see that

14    information about people who have nothing to do with this

15    litigation, don't even know about the allegations of abuse,

16    don't even know anything about this case, but are merely

17    mentioned in the documents as third parties in reference to

18    other things.  I don't think a confidentiality order covers

19    that particular third party privacy issue.

20            THE COURT:  Well, I assume what they are looking

21    for perhaps is other allegations against Mr. True?

22            MS. McDONALD:  And we -- and that may be, but I'm

23    also specifically speaking of third parties who have nothing

24    to do with that.  That there may be reference to names and

25    other instances of seeking spiritual advice that are beyond

1    the scope of even abuse allegations.

2           I think --

3           THE COURT:  Well, again, I think that's the

4    purpose of a confidentiality order that it remains with the

5    lawyers and unless there's a request that it be made public

6    at a later time, for instance, at trial, or whenever, that's

7    where it stays.

8           MS. McDONALD:  Certainly, Your Honor.  I think the

9    other point, and this is what Attorney Lynn just mentioned,

10   is that many of the documents, particularly in the Bellows

11   Falls privilege log, are dated long after the period of the

12   abuse.  And given the status of the claims in this case the

13   dates that the abuse is alleged to have occurred, which is

14   between 1991 and 1994, we would certainly submit that any

15   documents around that date, and certainly documents in the

16   late '90's and well into the 2000's, should not be produced

17   in this case and don't have anything to do with our clients.

18          THE COURT:  Okay.  Do you want to respond to that?

19          MR. STOREY:  Yes, Your Honor.  First, the request

20   to Bellows Falls for the Body of Elders letters was request

21   number 64.

22          THE COURT:  I'm sorry?

23          MR. STOREY:  Sixty-four, Your Honor.  And just two

24   quick points.  One, Bellows Falls points out that some of

25   these documents relate to plaintiff's father and they

1    question whether there's any relevance to those documents.

2    The response would be that ultimately we're going to see

3    arguments from the defendant trying to explain that any

4    damages the plaintiffs suffered were not from molestation by

5    True, but were from other things.

6            And without having seen this document, I don't

7    know what's in it, but I think it's exceedingly likely that

8    the subject of that document may be pointed to by the

9    defendants as being a traumatic event or something of that

10   sort that would have caused damages.

11           So we need to be able to see it to assess it and

12   take it into account in our damages case in responding to

13   arguments that we may seek from them.

14           And the second point would be that documents

15   generated after 2000 or, pardon me, 1996 are irrelevant.

16           THE COURT:  Are what?

17           MR. STOREY:  Irrelevant.  That seemed to be the

18   thrust of the argument about documents generated in 2006 or

19   2007.  What we know from their arguments in the briefing is

20   that there was a complaint obviously by each of my clients,

21   Annessa and her sister.  There was a complaint by another

22   person who was a step-granddaughter of Norton True.

23           And in the discovery they've indicated that there

24   was a complaint that came along by someone else.  And there

25   are letters in the privilege log from 2006, from 2012.  I

1    don't know which of those deal with the complaint by the

2    other individual, but there had been a report of molestation

3    that came along regarding True at a later date.

4            And whether it provides notice or not or whether

5    the events occurred before my clients were abused, whether

6    the abuse occurred is going to be a disputed issue here.

7    And having another person who can testify about that is

8    going to be important.

9            You know, so documents generated, just because

10   they are generated after the abuse in this case doesn't mean

11   they don't contain relevant information or things that can

12   relate to events that occurred earlier in time.

13           So I would ask that those documents be produced

14   even if they were dated after 1996.

15           THE COURT:  Okay.

16           MS. McDONALD:  Your Honor, if I could just briefly

17   address that last point?  I think that Attorney Storey's

18   argument highlights our concerns with third party privacy

19   interests.  Individuals, and we've mentioned this and this

20   will come up in connection with the next motion, but names

21   of individuals that are within documents that were generated

22   in connection to seeking spiritual advice within our

23   congregation, those names of those individuals, they have a

24   right to privacy.  They have a right not to be contacted by

25   attorneys in connection with a lawsuit that is not related

1    to them, that they haven't brought.

2            They expected that when they sought spiritual

3    advice from the Elders within their congregation that that

4    advice would be confidential.  I understand that's an

5    argument, but they certainly did not expect to be contacted

6    by plaintiff's counsel for a plaintiff they may not even

7    themselves know.  Particularly when, as Attorney Storey has

8    mentioned, that maybe there are documents that were

9    generated post-1996, those have nothing to do with notice

10   pre-1991 when Miss Lewis' abuse is alleged to have occurred.

11           THE COURT:  Okay.  Thank you.  Anything else?

12           MR. STOREY:  No, Your Honor.

13           THE COURT:  All right.  So, I think the last group

14   before I, well, there may be one after this too.  Yes, there

15   is.  There's actually the motion by the defendants to have

16   the plaintiff produce to them discovery.  But before we get

17   to that, I think there are three related motions about other

18   discovery.  I think there are two discovery issues in regard

19   to both Watchtower, Bellows Falls and Mr. Carleton's client,

20   the third party, non-party, I shouldn't say that.  Anyway,

21   the Christian Congregation of Jehovah's Witnesses.

22           So they are related.  Maybe I'll give you

23   Mr. Carleton an opportunity to speak.  And as I say, they

24   seem to involve the other two parties as well.  So certainly

25   I'll give everybody else a chance to speak if they wish to.

 1          MR. CARLETON:  Your Honor, in terms of sequency I

 2   think it probably makes sense to hear from the Watchtower

 3   and from Bellows Falls on the protective order issues first

 4   only because the, CCJW is easier to say than Christian

 5   Congregation of Jehovah's Witnesses.  CCJW really is kind of

 6   like the stepchild argument in this entire protective order

 7   issue.  It came into being only in 2001.

 8          And so all the arguments that are pertinent up to

 9   2001 apply with greater force from 2001 going forward.

10          So, you know, I'm happy to speak on behalf of CCJW

11   now, but I'm also -- my thought was that it makes more sense

12   to hear about the first protective order concerns first.

13          THE COURT:  Okay.  If you don't want to speak

14   first then I'll let somebody else do it.

15          MR. LYNN:  May I, Your Honor?

16          THE COURT:  You may.

17          MR. LYNN:  Thank you.

18          THE COURT:  So let me just set the record straight

19   for my purposes as well.

20          MR. LYNN:  Please do.

21          THE COURT:  We're dealing with, in this case,

22   document 70, which is your, it's defendant Watchtower's

23   motion for a protective order.  And that regards document

24   requests 65 and 67, which are the same as request to Bellows

25   Falls and I think to the Christian Congregation as documents

1   65 and 67.  Maybe I mis-spoke there.

2            Okay.  I think we're talking about 65 and 67 as

3   far as you're concerned, Mr. Lynn, correct?

4            MR. LYNN:  Yes.  Yes.

5            THE COURT:  And, however, with Bellows Falls

6   Jehovah's Witnesses it's 66 and 67.

7            MR. LYNN:  They are all nodding their head, Judge.

8            THE COURT:  Right.  And then back 65 and 67 to Mr.

9   Carleton's client, right?

10           MR. CARLETON:  That's correct, Your Honor.

11           THE COURT:  All right.  And let me just refresh my

12  recollection, but 65 is the documents in response to a

13  March 14, 1997 letter, correct?

14           MR. LYNN:  Correct.

15           THE COURT:  And then 67 is any documents

16  referencing any allegations of sexual abuse of children

17  within Jehovah's Witnesses Church since, within the church

18  itself since 1960.  And I think it was your response, Mr.

19  Lynn, or response made to the motion that there are no

20  documents involving the plaintiff, her parents, R.B., B.S.

21  or True exist.

22           MR. LYNN:  Correct.

23           THE COURT:  Correct?

24           MR. LYNN:  Correct.

25           THE COURT:  And then your response to 67 was, any

1   documents that pertain to the plaintiff, her parents, sister

2   Miranda or R.B. and B.S. and True have been produced or are

3   on the privilege log, correct?

4          MR. LYNN:   Correct.   Yes.

5          THE COURT:   Okay.   So, go ahead.

6          MR. LYNN:   The, as you can see, Your Honor, the

7   issue, and let's start with 65 first since it is

8   sequentially the first one that the Court encounters.   There

9   was a letter that was generated on March 14th, 1997.   That

10  letter is in the record.   I'm sure the Court has had an

11  opportunity to see it.

12         And essentially it was a request for information

13  from the 14,400 congregations across this country to provide

14  us with specific information around known child abusers.

15         And there were responses that were sent.   I would

16  tell the Court that the responses are kept electronically.

17  And I think the Court saw the affidavit from Mr. Chapel

18  which discusses how we try to access that information.   A

19  lot of it is very difficult to access because the terms

20  child abuse are not used.   But, in any event, there has been

21  at least one court which, with redactions, has suggested we

22  need to produce those materials.   And as I understand it

23  that is underway.

24         But, Your Honor, you saw there are two courts

25  which were very clear that these were documents that went

1    beyond the scope of discovery, what ought to be proper

2    discovery and declined to order production and granted a

3    protective order, did not force us to provide that

4    information.

5            We think that those courts, New Mexico and Ohio,

6    got it right.  And what I would suggest to the Judge, Your

7    Honor, is that this is particularly true in light of the

8    2015 revisions to Rule 26 and the scope of appropriate

9    discovery.

10           As the Court knows, that having raised that very

11   issue that, in fact, the scope of discovery seems to have

12   narrowed significantly, particularly where a large volume of

13   documents is being sought, where significant efforts have to

14   be made.

15           Remember, Your Honor, we as counsel, will have to

16   review all of those materials, make determinations

17   independent of anyone else as to what is appropriately

18   producible and what is not.  And that is hours upon hours

19   and hours of time.

20           Your Honor, even if we got by the issues of

21   relevance under Rule 26, it is beyond the scope of

22   appropriate discovery.  It is not proportional to what is

23   really at issue in this case.  And what is really at issue

24   in this case is what happened in Bellows Falls around

25   Mr. True and around the Lewises.

 1          And we have demonstrated our willingness to either

 2    produce those materials or provide a very significant

 3    description of them.  In fact, produce them in-camera to the

 4    Court.  There is no objection to those materials, if ordered

 5    by the Court, to produce them on the issue of relevance.

 6          But, Your Honor, we have a very significant

 7    argument around the relevance of responses from New Mexico

 8    or responses from West Virginia about whether somebody has

 9    allegations of child abuse against them, particularly in

10    light of the allegations or the liability claims that

11    survive in this case.

12          And, of course, what I would ask the Court to do

13    is to make a determination as to what is relevant

14    information based on the liability claims that survive the

15    motion to dismiss.

16          And I'm not going to articulate what those were

17    again.  But, Your Honor, there are very narrow claims that

18    exist in this case after the motion to dismiss.  And it will

19    be a difficult task, near impossible task, for any

20    convincing argument to be made that somehow these materials

21    from Alaska, letters that came in in 1999 from Alaska in

22    response to this 1997 letter somehow are relevant to these

23    claims.

24          Now, the arguments raised by the plaintiff to

25    support the production were as follows:  They have to review

1    each one, they have to review all of these because it

2    establishes the standard of care, that somehow what may have

3    happened after the events in this case or 20 years before or

4    in Alaska somehow will inform whether the people in Bellows

5    Falls followed a policy which they allege was excellent,

6    which was vigorous, zealous, watchfulness and care were

7    there allegations of sexual abuse.  And, Your Honor, we

8    would argue to you that there is no conceivable relevance.

9         The second argument is that it will go to the

10   reasonableness of the policies and procedures.  But, Judge,

11   their argument is we had great policies and procedures.

12   That's not the issue in this case.  The issue in this case

13   is did we follow those policies and procedures.

14        The next argument is, was it the reasonableness of

15   whether to accept the denials of Norton True.  And, Your

16   Honor, that argument makes no sense.  Whether Norton True

17   was convincing to the people in Bellows Falls, and

18   parenthetically when he passed the two polygraph tests and

19   convinced the state of Vermont to remove him from the sex

20   offender registry, whether that was convincing or not has

21   nothing to do with a letter we received from Alaska.

22        The next argument they raise is that it was --

23   whether they need the documents to know whether it was

24   reasonable to accept the recantation of another complainant

25   who subsequently recanted.  Your Honor, you saw the

 1    materials, there was a woman named R.B. who raised initially

 2    allegations then withdrew the allegations against Mr. True

 3    and somehow, again, the argument is, by virtue of some three

 4    line or 10 line letter that doesn't give us the specifics

 5    from Indiana we're going to know whether the people in

 6    Bellows Falls acted appropriately in accepting the

 7    recantation from R.B..  But, Your Honor, again, the issue is

 8    here, whether we followed a policy that they say was

 9    vigorous and zealous.

10         And so, again, Your Honor, no relevance, no

11    convincing argument as to why it would ever be relevant to

12    the claims that are alive in this case.

13         And then the final argument is that somehow it is

14    these materials with unlimited dates in which they were, the

15    alleged acts occurred, unlimited in terms of the dates in

16    which the correspondence was sent, but somehow they are

17    relevant to the issue of punitive damages.

18         And as the Court well knows punitive damages

19    focuses on the specific conduct directed to this plaintiff

20    at the time of, up to the time of the alleged harm.

21         What happened, again, in California, or what

22    happened in New Mexico, or what happened in Texas, Your

23    Honor, has no bearing whatsoever to punitive damages in this

24    case.  It is our view, Your Honor, that these materials that

25    are being sought are wholly irrelevant.

1          And then the next step is even if the Court were

2     to order their production, Your Honor, consider for a moment

3     the exercise we would have to go through in determining

4     whether they ought to be produced or not.  We would have to

5     then begin an analysis of privilege on a state by state

6     basis because each state has subtly, sometimes not so subtly

7     different laws around what is privileged and what is not

8     privileged.

9          We would have to consider third party interests.

10    Remember, Your Honor, these documents will have the names of

11    people who are accused of sexual abuse.

12         There's no indication that they have been -- in

13    the documents there may or may not be any indication as to

14    whether they've been convicted, whether the evidence is

15    convincing or persuasive.

16         Your Honor, it is our perspective that these are a

17    large volume of documents that have absolutely nothing to do

18    with the issues central to this case.

19         And we think the courts in New Mexico and Ohio

20    that have rejected this request are the ones who got it

21    right.  And the ones in California where, frankly, judges

22    are elected, we think got it wrong.

23         THE COURT:  So, again, just to make sure that I

24    understand, you have already, that is, your client has

25    already turned over everything, no, I'm sorry, you're saying

1    that you reviewed all your files and there are nothing

2    involving this case?

3            MR. LYNN:  Correct.

4            THE COURT:  Okay.

5            MR. LYNN:  Everything that relates to this case is

6    either in the privilege log, which we submitted to the

7    Court, or has already been produced.

8            THE COURT:  All right.

9            MR. LYNN:  And then, so as the Court is aware from

10   the decisions from various judges around the country, 65 is

11   not a new discovery request.  Sixty-seven is.  And our

12   perspective is that this is sort of incrementally trying to

13   expand the reach of discovery for the cases that plaintiff's

14   law firm is pursuing throughout the country.  And so they

15   will, in cases in various forms, see if they can get more

16   favorable rulings and expand the database that they have

17   available to them in identifying potential claims.

18            And, Your Honor, that may or may not be true, but

19   certainly is the perspective of a client who fails to

20   understand how, I'm looking at 67 now, documents referencing

21   allegations of sexual abuse of children since 1960.  So

22   almost 60 years, right, 60 years of documents they want us

23   to produce without any showing whatsoever that it is

24   relevant to any of the issues that matter in this case.

25            Judge, we believe --

1           THE COURT:  Well, I can tell you I'm not going to

2     do it to the 1960's.

3           MR. LYNN:  Thank you.  Thank you very much.  And

4     so, Your Honor, those are the arguments that we think are

5     availing and persuasive.

6           THE COURT:  Okay.  Mr. Storey?

7           MR. STOREY:  Good morning, Your Honor.  Two quick

8     points before jumping into the relevance issue.  First, you

9     know, there was the not so subtle insinuation that this

10    request is solely to solicit new clients.  And I'd note that

11    we've repeatedly said, redact the names of the victims, we

12    don't need it.  We're clearly not seeking to solicit new

13    clients.  We've requested this information because we

14    believe it's very relevant to the claims.

15          And, second, there were at various times

16    representations that we believe Watchtower's policies are

17    great or excellent.  And I think the Court would be hard

18    pressed to find anywhere in the complaint where we said the

19    policies are great.  We did allege that they failed to

20    comply with the policy, but our position is not and never

21    has been that these policies were great or the state of the

22    art.

23          Now, with respect to these particular documents,

24    there was some discussion about whether Watchtower has

25    identified everything with respect to Norton True and the

1    plaintiff.  And that --

2              THE COURT:  Or has put it on their privilege log?

3              MR. STOREY:  Or has put it on their privilege log,

4    correct.  And it's neither here nor there with respect to

5    this particular request.  This particular request number 65

6    and 67 aren't specifically seeking information regarding

7    Norton True.  It's seeking to determine what did this

8    organization know about molestation within its ranks

9    generally.

10             So it's molestation explicitly by others other

11   than True that we're seeking to get information about.

12             THE COURT:  In other places?

13             MR. STOREY:  In other places at other times, yes.

14             THE COURT:  Why?

15             MR. STOREY:  Well, a number of reasons.  And first

16   and foremost, the defense we have seen repeatedly from

17   Watchtower and they've put on an expert in other cases, Dr.

18   Monica Applewhite, and she's testified, look court, you have

19   to, in determining the standard of care and determining

20   whether the defendant acted reasonably, you need to look at

21   what was known by society generally at the time of the

22   abuse.

23             So, they don't want to look at today's standards.

24   They want to look at what was known in, in this case, it

25   would be 1991 through '94, sometime in that timeframe.  And

1    that will be the testimony they put on.

2            They'll have an expert witness talking about what
3    the state of the art was and the state of the societal
4    knowledge was about child abuse.   So --

5            THE COURT:   Well, as it applies to Vermont, for
6    instance, or Bellows Falls?

7            MR. STOREY:   Well, they haven't limited that.   You
8    know, they've tried to put on testimony or at least their
9    expert has testified in these cases that, you know, this is
10   the state of societal awareness in the United States during
11   these periods of time, so given that, Watchtower acted
12   reasonably.

13           So, we've requested this information to combat
14   that.   To say, well, that's fine, it's well and good what
15   society knew about molestation at that time, but what did
16   Watchtower know?   You know, did it act reasonably in light
17   of the information available to it?

18           THE COURT:   So that expert was able to testify I
19   guess about that?

20           MR. STOREY:   We didn't go to trial on either case,
21   Your Honor.   She gave the testimony and was designated.   We
22   deposed her.

23           THE COURT:   So you don't know whether it would
24   have been admitted by the judge?

25           MR. STOREY:   We don't know if it would have been

1   admitted, correct.  And I can tell you candidly that we

2   would have mounted a vigorous motion in limine trying to

3   keep it out, but regardless, there's the possibility that

4   they offered that testimony.

5           THE COURT:  Should that, should your argument be

6   made at that point?

7           MR. STOREY:  Well, what you're hearing from them

8   is it's so difficult to produce.  If we wait until that time

9   and we're on the --

10          THE COURT:  Well, it seems to me, it is a lot of

11  stuff they'd have to try and find to look through.

12          MR. STOREY:  Some of it yes, some of it no.

13          MR. LYNN:  Your Honor, I hate to interrupt, but we

14  did, in the pleadings, indicate to you that we will not be

15  calling Dr. Applewhite in this case.  So that issue is

16  closed.

17          MR. STOREY:  Your Honor, at the same time, they

18  said we're not going to call that witness, but in the very

19  next sentence they say, but you have to understand that what

20  we know now is not the same.  I mean, it's explicitly in the

21  reply brief.

22          MR. LYNN:  Well, I shouldn't interrupt Your Honor.

23          THE COURT:  No, why don't you wait.

24          MR. LYNN:  Sure.

25          MR. STOREY:  I can get it for you in a moment.  So

1   that's issue one on the relevance in terms of responding to

2   this argument that we expect that they will make and have

3   made repeatedly.

4           Secondarily, we have argued or the defendant has

5   raised this issue of these actions that happened in this

6   case specifically.  For example, True.  But he is accused

7   multiple times of molesting children by R.B., by my clients.

8   And there was a later accusation.  Each time he denied it.

9   And each time those accusations were accepted.

10          And to some extent Watchtower's experience in

11  dealing with circumstances like this, where a person keeps

12  skating on these allegations, is going to be relevant to

13  deciding what they should have done in this circumstance.

14          You know, if they understand that their policies

15  aren't sufficient to allow the Elders at the local level to

16  get to the bottom of this stuff, and they are letting these

17  molesters skate, and there are subsequent allegations, then

18  we need to be able to look at whether Watchtower was

19  reasonable in having the policies they had and taking the

20  actions they had.

21          Additionally, we have a claim for punitive damages

22  in this case.  And this information is relevant to two

23  specific aspects of punitive damages.  First, to whether the

24  defendant acted with malice and whether, or recklessness,

25  and whether punitive damages are applicable or should be

1    imposed at all.

2            And the test there is whether there's conduct

3    manifesting personal ill-will or carried out under

4    circumstances evidencing insult or oppression or even by

5    conduct showing a reckless or wanton disregard of one's

6    rights.

7            So, in looking at that particular standard, if,

8    for instance, these documents show that there were thousands

9    of complaints of child molestation in the Jehovah's

10   Witnesses, and they knew that it was a very substantial

11   problem, but they didn't take action sufficient to curb it,

12   that would be very relevant to our showing of reckless or

13   wanton disregard of someone's rights.

14           Now, secondarily, there's an issue with respect to

15   the valuation of punitive damages.  And what the Court is

16   saying, and this is Shahi versus Madden, the most important

17   indicium of the reasonableness of a punitive damage award is

18   the degree of reprehensibility of the defendant's conduct.

19   And in Carptentier the Court said, in assessing the

20   reprehensibility of a defendant's actions a jury may

21   consider whether the conduct involved repeated actions or

22   was an isolated event.

23           So, again, the extent to which molestation was

24   prevalent within the organization would be relevant to

25   determining the reprehensibility of Watchtower's action.

1          So for a number of reasons, the information we've

2     requested is relevant, is reasonably calculated to lead to

3     discovery of admissible evidence and this information should

4     be produced.

5          Now, the defendants have also made an argument

6     about the burden of producing it, that we're looking for a

7     lot.  And there's two responses to that.  There's two

8     separate requests here.

9          Now, in looking at request 65, which is the

10    March 14th, 1997 responses, those documents are being

11    gathered pursuant to a court order.  They are incrementally

12    being produced to my firm.  They are subject to a protective

13    order so I can't discuss what's in them, but we are getting

14    them, Watchtower's producing them and will produce them.

15         So, there's no additional burden in requiring them

16    to be produced in this case.  There's no extra work that's

17    going to go into it.  It's the same documents.  They are

18    going to get turned over.

19         So, with respect to request 67, which is the

20    broader request for all complaints dating back to 1960, and,

21    you know, I'll start first with the reason for that request.

22    You know, the document retention policy that was in effect

23    at Watchtower up until 1997 didn't require this type of

24    material to be kept forever.  This type of information was

25    kept for a period of time and could be discarded thereafter.

1   And the Branch Organization excerpts that we provided to the

2   Court discuss the policy for going through the files every

3   couple of years and getting rid of outdated material.

4           So, you have a circumstance where if we had simply

5   requested, you know, the complaints dating back to 1960, a

6   lot of things would be missing.  So we asked for the second

7   request, which was generated later, and were more complete

8   with respect to certain aspects of the institutional

9   awareness, dealing with Elders Administerial Servants.

10          So we've asked for both of these things to

11  compliment each other, these requests, and to get the, you

12  know, the most in-depth look at what Watchtower knew at

13  various points in times prior to the molestation of the

14  plaintiffs.

15          And, you know, I've heard the vigorous objection

16  from the defendants over how could documents generated after

17  the date of the abuse possibly be relevant.  And it's going

18  to be a mixed bag.  Some of it's going to be.  Some of those

19  letters are going to refer to things that occurred earlier

20  in time.

21          There will be, you know, people who were accused

22  of abuse in 2001 or 2006 who had previously been accused and

23  who that was known to the Watchtower or the local

24  congregation.

25          So the date the document was generated isn't going

1    to immediately mean that it can't be relevant.

2              THE COURT:  Okay?

3              MR. STOREY:  Yes.  Thank you, Your Honor.

4              MR. LYNN:  Just a couple words, Judge?

5              THE COURT:  All right.

6              MR. LYNN:  First of all, this is, I didn't make

7    this up.  I'm looking now at the Court's ruling on the

8    motion to dismiss based on the first amended complaint, page

9    7.  The first amended complaint alleges the congregation and

10   Watchtower had a policy of vigilantly monitoring the

11   reported molester for the safety and protection of children

12   in the congregation.

13             I mean, this is the basis of their only claim that

14   could ever possibly survive summary judgment because this

15   ministerial servant issue is gone.

16             Judge, that is the narrow focus of this case.  And

17   to somehow suggest we need a complete picture from 1960 and,

18   yes, it might be a mixed bag, meaning, that almost nothing

19   will have any -- no, nothing will have any bearing on this

20   case.  Judge, that only illustrates the point I was trying

21   to make earlier, which is, this searching for documents

22   generally for purposes that have nothing to do with this

23   case.  There is nothing conceivably admissible about almost

24   everything that they've asked for in 65 and 67.  In fact,

25   the things that are admissible and that could ever be

1   admissible are the things that we have produced.

2            THE COURT:  So, Mr. Carleton, do you want to enter

3   into this discussion?

4            MR. CARLETON:  Very briefly.

5            THE COURT:  Well, you can take as much time as you

6   want.

7            MR. CARLETON:  Thank you.

8            THE COURT:  It was a long trip down here.

9            MR. CARLETON:  So, Your Honor, I represent

10  Christian Congregation of Jehovah's Witnesses or CCJW.  I

11  entered my appearance in this case on behalf of CCJW shortly

12  after CCJW filed its motion for protective order.

13           So the only pleading that I've submitted to Your

14  Honor is the one that was submitted on Friday.  I'm going to

15  try to be very brief because as I expected Attorney Lynn did

16  a very good job of driving home the core issues of relevance

17  and timing that we believe also preclude discovery request

18  65 and 67 to CCJW.

19           Just because I'm not sure if the Court has a full

20  picture of what CCJW is, let me take a minute to explain

21  what the organization is.

22           In 2000 CCJW was incorporated really for spiritual

23  reasons.  The Watchtower, the world over, is associated with

24  the publications that the Jehovah's Witnesses produce.  And

25  there was some concern that people were losing sight of the

1    fact that it was really a religion, and it's a spiritual

2    organization.

3           So CCJW was incorporated and took over all of the

4    communications back and forth between the congregations.

5    And that was an effort to sort of, you know, highlight the

6    fact that it was indeed a religion.

7           The only reason CCJW received a subpoena in this

8    case was to recognize corporate formalities.  It was at

9    Attorney Lynn's suggestion in a letter dated September 17,

10   2001 saying, hey, if we're going to argue over documents all

11   the way up until the present date we need to honor the

12   formalities of the corporations.  Just send out that

13   subpoena and we'll go from there.

14          So I'm positive that this Court has already seen

15   beyond kind of the posturing that was in some of the

16   pleadings.  There's been no effort to hide documents.

17   There's been no attempt to delay discovery.  And there's

18   been no attempt or there's been no refusal by CCJW to

19   respond in any way to the subpoena.

20          CCJW did, in fact, respond on November, excuse me,

21   November 20th, with responses, objections, production of

22   documents and a privilege log.  Okay.  So we can set aside

23   all of that.

24          Now, really the issue before the Court is the same

25   one that was just argued a moment ago, which is whether 65

and 67 are appropriate requests for CCJW.  And the issue

there is simply one of timing.

        The March 14th, 1997 letter went out exactly four

full years before CCJW even began sending and receiving

communications.  You've heard over and over that the

Jehovah's Witnesses are a disciplined organization.  And

that is indeed true.

        In response to the 1997 letter, Judge, there was a

flurry of responses from the 14,000 some odd congregations

around the country.  But that happened for 1997 and 1998.

And that was a retro -- the '97 letter was a call for

retrospective disclosures.  In other words, what happened in

the past, what do you know about people in the past that we

should be concerned about.

        What CCJW almost exclusively has received from

2001 onward is reports from the congregations of activities

and concerns and allegations that were happening currently,

not retrospectively.

        So the -- plus you have 15 years of them, from

2001 to the present.  So the notion that we would be called

upon to find what we consider to be an irrelevant needle in

the enormous haystack of correspondence, I mean, enormous,

and difficult to search, as has already been explained, is

just beyond the burdens that this Court should impose upon

CCJW for the purposes that have been articulated by the

```
 1   plaintiffs in this particular case.

 2              THE COURT:  So, I'm not sure I have your response

 3   here in front of me, but does CCJW --

 4              MR. CARLETON:  CCJW.

 5              THE COURT:  CCJW, do they have any documents

 6   regarding, again, through the other initials his, I'm sorry,

 7   her parents, R.B., B.S., so forth?

 8              MR. CARLETON:  Well, to the extent -- to the

 9   extent -- I'm sorry.

10              THE COURT:  That are not on the privilege log of

11   Watchtower or Bellows Falls?

12              MR. CARLETON:  I do not -- I believe the answer to

13   that question is no.

14              MR. STOREY:  Your Honor, there was a separate, I'm

15   sorry to step in here, there was a separate privilege log

16   from CCJW.

17              THE COURT:  Yes.

18              MR. STOREY:  It identified, I believe, six or

19   seven items.

20              MR. CARLETON:  Correct.

21              MR. STOREY:  It's not before you now.  It will be

22   the subject of a future motion, though this Court's order

23   may head that off.

24              THE COURT:  Okay.  I guess I missed that.

25              MR. CARLETON:  Yeah, so we filed our motion for
```

1    protective order.  The plaintiffs responded to it, but

2    didn't raise a separate issue concerning the six documents

3    that are on that particular protective order.

4              THE COURT:  Okay.  So that's not at issue?

5              MR. CARLETON:  That's not before the Court today,

6    no.

7              THE COURT:  All right.  I can't deal with it I

8    guess, huh?

9              MR. CARLETON:  I'm sorry?

10             THE COURT:  I can't deal with it?  I don't want to

11   have another one of these things.

12             MR. CARLETON:  My guess is that Your Honor's

13   rulings today will give guidance to the parties in such a

14   way that we could probably take care of it ourselves.

15             THE COURT:  Okay.  All right.

16             MR. CARLETON:  Understanding that the Court

17   doesn't like to revisit the same issues over and over, but

18   the bottom line is, to the extent that any of these issues

19   of relevance, over breadth, undue burden, First Amendment

20   privileges, religious privileges, all of those things apply

21   to the Watchtower, they apply doubly to CCJW because the

22   documents that are at issue there are just even further

23   attenuated in time, Your Honor.

24             So we would ask for the Court to grant that

25   portion of the protective order as part of its global ruling

```
 1   today.

 2            THE COURT:  Okay.

 3            MR. CARLETON:  Thank you.

 4            THE COURT:  Thank you.

 5            MR. STOREY:  Your Honor, just, oh, I'm sorry.

 6            MS. McDONALD:  Go ahead.

 7            MR. STOREY:  Go ahead.

 8            MS. McDONALD:  I was just going to address whether

 9   you would like to take up Bellows Falls' motion for

10   protective order separately or whether we should just keep

11   going back and forth?

12            THE COURT:  Well, the issues are the same, are

13   they not, except your response is different, of course?

14            MS. McDONALD:  The issues, the issues are the

15   same.  Our response is slightly different, although

16   obviously it raises all the same issues that have already

17   been discussed.

18            THE COURT:  Right.  I think you responded to

19   the -- well, it was a little different, maybe we ought to

20   take it after I hear from Mr. Story on Watchtower.  Then

21   we'll take yours up.

22            MS. McDONALD:  Certainly, Your Honor.

23            MR. LYNN:  On Watchtower, Your Honor, or on CCJW?

24            THE COURT:  Well, we've heard, we've heard from

25   both of you, correct?
```

1              MR. LYNN:  Right.  I thought that Mr. Storey has

2    already responded to everything from Watchtower.  Of course,

3    he can say more.

4              THE COURT:  All right.  Well, why don't we take

5    Mr. Storey first and then we'll deal with the issue of

6    Bellows Falls.  How's that?

7              MR. LYNN:  Thanks.  Sounds good, Judge.

8              MR. STOREY:  Thank you, Your Honor.  Just very

9    briefly.  With respect to Watchtower, in the reply brief

10   page four of five, there had been, you know, a statement

11   that they were going, not going to offer Dr. Applewood as an

12   expert in this case.

13             Plaintiff, next two sentences at the top of page

14   five, plaintiff says Watchtower will ultimately defend that

15   it knows more about child abuse now than it did in 1990.

16   Today's knowledge is no defense to what should have been

17   done in 1990, regardless of what was known about child abuse

18   then.

19             So, again, they are talking about -- even when in

20   one sentence they're saying we're not going to use Dr.

21   Applewhite, the very next sentence they come back and say

22   that today's knowledge is no defense to what should have

23   been done then.

24             So, we need to figure out what they knew then to

25   be able to figure out what they should have done and whether

1   their actions were reasonable.  And that's the point.

2          Now, with respect to, there was quite a bit of

3   comment earlier indicating that the time period was not

4   going to go back to 1960.

5          THE COURT:  It seems to me that's awfully long.

6          MR. STOREY:  Sure.  And what I would recommend

7   perhaps is Norton True was made a Ministerial Servant in

8   1976.  And perhaps that's a good start date, taking it up

9   from 1976 through the time of the molestation in this case.

10          It's a substantially truncated period of time with

11   a direct tie to the events in this case.

12          THE COURT:  I'm sorry, could you tell me again

13   what he became?

14          MR. STOREY:  A Ministerial Servant.  So that's an

15   appointed position functioning below the Elders in the

16   congregation.  But it seems that that's a reasonable time

17   period time to the case that maybe would, would fit the

18   circumstances a little bit better than the request.  Thank

19   you.

20          THE COURT:  Okay.  Miss McDonald?

21          MS. McDONALD:  Attorney Storey's argument is a

22   good seg-way into our motion.  So the Bellows Falls joined

23   in Watchtower's motion for protective order.  Obviously the

24   issues on relevancy and religious privilege and the third

25   party privacy interests of our congregants and the Elders at

1    the congregation are certainly the same as the arguments

2    articulated by Attorney Lynn and Attorney Carleton.

3            What I would like to specifically address to the

4    Court first is that with respect to number 66, that was the

5    request for the 1997 letter, those did not submit any

6    responses to that letter.  So there are no documents in

7    response to number 66.

8            THE COURT:  All right.

9            MS. McDONALD:  As to number 67, and I believe this

10   is Attorney Storey's suggestion that documents from 1976,

11   starting when Norton True was appointed as Ministerial

12   Servant to, I believe, the present concerning all

13   allegations of abuse whatsoever, I think that's his

14   suggestion of narrowing the scope of that request.

15           We obviously, we would object to, we object to

16   producing any documents in response to that and suggest that

17   that suggested revised scope does not resolve the relevancy

18   issues that we have here.

19           THE COURT:  How about if it's limited to

20   allegations against Mr. True?

21           MS. McDONALD:  Could you say that again, Your

22   Honor?

23           THE COURT:  How about if it's limited to

24   allegations against Mr. True since 1976?

25           MS. McDONALD:  I believe that we produced or

1    identified in the privilege log all documents that would be

2    responsive to any such requests.  So, again, I think that

3    kind of takes us outside the 67 request.  And it addresses

4    the other ones that we've already talked about in response

5    to the motion to compel.

6                THE COURT:  I'm sorry, is it 76 or 67?

7                MS. McDONALD:  Sixty-seven.  My apologies.

8    Seventy-six I believe was the date suggested for the revised

9    scope of --

10               THE COURT:  Right.

11               MS. McDONALD:  -- the disclosure.

12               THE COURT:  And, I'm sorry, where do we get 67?

13               MS. McDONALD:  Sixty-seven is the request for all

14   documents concerning allegations from 1960 onward that

15   Attorney Storey has now revised to 1976.

16               One issue, and this is particular I think to

17   Bellows Falls and Watchtower as well, is that they request

18   these all allegations.  There's no limit to known abusers,

19   there's no limit to individuals who have been convicted,

20   individuals who have been present before a judicial

21   committee, which is the biblically based process set in

22   place by the Jehovah's Witnesses.

23               This is all allegations.  They may very we will be

24   unsubstantiated allegations.  They may be allegations that

25   were determined to have been false.  This is such a broad

1   request.   It has nothing to do with the issues that are in

2   play in this case which is, first, what was the nature of

3   the relationship between Mr. True and the congregation and

4   the relationship between Mr. True and the plaintiff.   And

5   then what defendants knew about Mr. True.   The request is

6   far broader than that and I don't think has any relevancy

7   and certainly raises the privacy interests that we've

8   already discussed.

9           And I think that, that, the absence of that

10  connection is the reason that even this revised scope is

11  just absolutely beyond anything that would be proportional

12  for producing in discovery in this case, Your Honor.

13          And, again, I think to discuss, as I anticipate

14  Attorney Storey is also going to mention, the punitive

15  damages claim in this case.   I'm particularly concerned with

16  the request for the allegations because, again, that doesn't

17  say what we knew because these allegations not limited at

18  all may very well be unsubstantiated.

19          And then it gets into essentially a trial within a

20  trial about whether these prior allegations concerning

21  individuals that have really no other bearing on this case,

22  whether those were substantiated or not, another rush to put

23  us on notice of any issues within the congregation.

24          It certainly, it's, you know, not only does it not

25  have to do with anyone in this case, but trying to bring

1    into this case allegations that may very well have been

2    completely unsubstantiated I think is, again, beyond the

3    scope of anything that we should ever be required to

4    produce.  Thank you, Your Honor.

5              THE COURT:  Okay.  You get to go again.

6              MR. STOREY:  Sure.  Thank you.  Just very briefly

7    in response, Your Honor.  There were some arguments there

8    about third party privacy and maybe some of these things,

9    allegations were made, but they weren't substantiated.  But,

10   again, all of that can be protected with the protective

11   order that the Court had spoken about earlier.  Preventing

12   disclosure of any of this material is going to prevent a

13   harm from coming from the production.

14             So, I would argue that any third party privacy

15   issues really shouldn't move the needle here or cause any

16   change in or prevent production anyway, because they are

17   going to be protected by the confidentiality agreement.

18   Thank you.

19             THE COURT:  Okay.

20             MS. McDONALD:  Your Honor, briefly in response to

21   that?  I think that that misses the point of the commonality

22   order and it also misses the point of my argument, which is

23   these very well may be unsubstantiated allegations, but

24   absent criminal convictions there's simply no way for a

25   confidentiality order to protect that information or to --

1              THE COURT:  Well, again, if it's a confidentiality

2      order between all of you, it doesn't go beyond that.

3              MS. McDONALD:  The issue I think is also then it

4      gets to determining whether or not these allegations are

5      substantiated, which also goes to -- we get into these

6      little mini trials from this trial as to each document that

7      would be produced.  And I think, again, the absence of any

8      relevancy and any issues that may cause weighs heavily in

9      favor of not producing those documents.

10             THE COURT:  All right.  Well, but as we know,

11     we're not talking about a trial, we're talking about

12     discovery at this point.  So --

13             MS. McDONALD:  Yes, Your Honor.

14             THE COURT:  -- some of what you're saying may be

15     true if it comes to a trial.

16             MS. McDONALD:  Thank you.

17             THE COURT:  Okay.  Anybody else want to enter into

18     the discussion about these motions?  All right.

19             So, I think this is an easy one.  There's a motion

20     that was filed by both defendants, the congregation and

21     Watchtower, back on October 5 asking the Court to compel

22     certain discovery.  There was no response by the plaintiff.

23     The Court didn't do anything.  But then all these other

24     motions came in.  So I assume this is mute.  Would I be

25     right?

1              MR. JUDGE:  No, Your Honor.  It's not mute.

2      Sorry, Your Honor.  Walter Judge on behalf of Bellows Falls

3      Congregation.

4              THE COURT:  Right.

5              MR. JUDGE:  I can understand Your Honor's

6      perspective, which is that since it hasn't been responded to

7      perhaps it's just sufficient for the Court to order a

8      blanket discovery order.

9              And if that's what the Court is inclined to do

10     then I don't need to argue the specifics of what we're

11     looking for and what hasn't been produced, but I was

12     prepared to talk to Your Honor about what hasn't been

13     produced that we've requested.

14             THE COURT:  Well, what about your recent motion?

15     I'm talking about the recent one you filed.  I'm talking

16     about an old one.

17             MR. JUDGE:  Oh, no.  No.  Yes, you're absolutely

18     correct, Your Honor.  You're absolutely correct.  That one

19     was mute.

20             THE COURT:  All right.  So that was easy.

21             MR. JUDGE:  That was easier than I made it.

22     That's for sure.

23             THE COURT:  Okay.  So that's document 65 filed on

24     October 5 of '15.  And that was a joint motion to compel.

25     And the Court is ruling that that is mute at this point.

1    Okay?

2            MR. JUDGE:  Thank you, Your Honor.

3            THE COURT:  All right.  So, yes, you are correct,

4    you do have a motion that was filed relatively recently.

5    And it was responded to recently.  In fact, I think

6    yesterday.

7            So, you want to go ahead and argue it?

8            MR. JUDGE:  Sure.  Yes.  Thank you, Your Honor.

9    Is it acceptable to the Court if I argue from counsel table?

10           THE COURT:  Fine.

11           MR. JUDGE:  Okay.  So, Your Honor, here's what we

12   still don't have.  We don't have any medical records from

13   Ms. Lewis from age four to age 21.  It is the defendant's

14   position that those medical records must exist somewhere.

15           We don't have the identification of plaintiff's

16   childhood pediatricians or primary care providers during

17   that period.  We don't have the dates when she was treated

18   by any of the medical doctors, counselors or therapists.  We

19   don't have any identification of all of the various, quote,

20   friends that plaintiff has spoken to about her abuse over

21   the years that she's admitted that she's spoken to.

22           We don't have any therapy or counseling records at

23   all from before this lawsuit was filed in October of 2014.

24   We don't have any journals or diaries, even though plaintiff

25   admits that she kept at least one.  And we don't have any

 1    texts, e-mails, social media, etcetera, etcetera.

 2            Now, we're talking about someone who is currently

 3    28 years old.  I don't know if Ms. Lewis is different from

 4    everyone else on the planet, but everyone else on the planet

 5    at that age sends a thousand texts a day, a thousand e-mails

 6    a day and checks their Facebook status a thousand times a

 7    day.  We don't have anything.

 8            So, let me just elaborate a bit.  In plaintiff's

 9    answer to her, to interrogatory number four she states that

10    she told, quote, various friends about the alleged

11    molestation.  We've been asking counsel for weeks to

12    identify some of those people and so far it hasn't happened.

13            And this is particularly frustrating because just

14    a few days ago she produced a series of what appeared to be

15    heavily redacted Facebook messages about the alleged

16    molestation.  And we quickly tried to go through those

17    before today's hearing and they mention, they talk about the

18    alleged molestation and this case that she was going to

19    bring with her brother -- her sister Jenny and her brother

20    Keith, Junior and some other unknown people whose names

21    appear in the texts, but we've never been provided with any

22    of that information about who they are and how they can be

23    contacted.  And we've been asking for that for weeks.

24            As I said, the plaintiff has not produced any

25    information about her childhood doctors.  Now, in this kind

of case, Your Honor, that information would obviously be
relevant.  We're talking about abuse that, according to the
plaintiff, occurred some time between '91 and '94 when she
was between the ages of four and seven.  And now she's 28
years old.

So, obviously any medical records from her
childhood would be extremely relevant to whether the abuse
happened, did she ever talk to her doctors about it, did her
mother ever talk to the doctors about it, did the doctors
ever report it, did the doctors ever recommend therapy, did
the doctors do anything about it.

Not only do we not have a single medical record
between ages four and 18, but we don't even have the name of
the plaintiff's pediatrician.  Now, I'm 55.  I remember the
name of my childhood pediatrician.  I went to him every year
so on and so forth.

We're talking about a 28 year old person.  If she
can't remember the name of her pediatrician then her mother
can.  And if her mother can't her father can.

And if none of those people can remember the name
of her pediatrician then her sisters can because they
probably went to the same childhood pediatrician.  Someone
can remember the name of the childhood pediatrician.  But we
are being told that she can't remember who it was.  That's
not credible.

1          In the opposition that was filed yesterday that

2    the Court just alluded to, counsel says that quote, most of

3    her childhood providers report having no records.  Well, we

4    would like to know who those childhood providers are that

5    are being referenced because we've never been given the

6    names of any of those people.

7          Also in that opposition counsel says that

8    defendants are free to subpoena those childhood care

9    providers.  Well, you can't send a subpoena if you don't

10   know who they are, number one.  And, number two, counsel

11   knows very well that we can send a subpoena to anyone we

12   want and they are not going to send us any records without a

13   signed authorization from the plaintiff, which they refuse

14   to provide.

15         In the heavily redacted Facebook notes, the

16   handful of notes that plaintiff produced just a few days

17   ago, they show that she was planning her lawsuit in January

18   of 2014, if not earlier.  But that's the first note in which

19   she mentions that she's about to file a lawsuit or that

20   she's going to file a lawsuit.

21         So I would respectfully suggest that that's two

22   years ago.  And if steps had been taken when the plaintiff

23   acknowledges that she was going to file a lawsuit in this

24   case to preserve records, medical records, therapy records,

25   and so on and so forth, those records might exist now.

1    We're being told that those records don't exist.

2              For example, the plaintiff acknowledges in her

3    interrogatory responses that at age 14 she went to see a Dr.

4    Belcher-Timme, a therapist.  She was planning her lawsuit in

5    January of 2014.  We are now told that Dr. Belcher-Timme's

6    therapy records were destroyed within the last year.

7              Those are the only records that plaintiff says in

8    which the, in which she sought therapy before she filed this

9    lawsuit.  And now those records are apparently destroyed.

10             We also have the plaintiff's statements that she

11   attended family counseling therapy with her mother, and

12   possibly others, in 1996 when the parents were getting

13   divorced.

14             And, by the way, I should add that what we're

15   talking about when we're talking about these 1996 records,

16   and all the medical records that apparently don't exist or

17   plaintiff doesn't know the name of her pediatrician, as I

18   said, those records would obviously be relevant in any case

19   in which a plaintiff is claiming childhood sexual abuse and

20   she's now an adult.

21             But in this case we have 1996 allegations, not

22   allegations, but we have 1996 a father arrested for abusing

23   the children.  We have 1996 mother and father going through

24   divorce proceedings.  And we have the mother's allegation in

25   1996, the mother's acknowledgment in '96 that one of her own

therapy patients who was living in her home sexually
molested her children.

Now, if that doesn't make childhood medical and
therapy records relevant I don't know what does.  So, so we
have no therapy records that pre-exist this lawsuit.  We
have a claim that they don't know who the plaintiff's
childhood medical care provider was.  And we have no
records.  And we are being told that the records of Dr.
Belcher-Timme have been recently destroyed.  And we have the
family counseling from 1996 at which Annessa, the plaintiff
in this case, was present and in which apparently there was
discussion about the abuse that Annessa was alleging.  And
the plaintiffs refused to produce those records because the
mother won't raise, won't waive the privilege for the
release of those records.

So records we are being told are the only existing
pre-lawsuit counseling records that involve Annessa.  They
should be produced.

The mother took part in the press conference that
was delivered in plaintiff's counsel's office in October,
October 1st, September 30th, 2014, promoting this lawsuit
and announcing this lawsuit.

The mother is a promoter of this lawsuit.  We do
not think that it's fair for her to stand on her claim of
privilege as to family counseling records which Annessa was

1    present and the abuse was allegedly discussed.

2              And if the other plaintiff Miranda was also there

3    at this counseling, at these counseling sessions in 1996

4    that breaks the privilege even further.

5              So we don't think, given that these are the only

6    therapy records, only that the plaintiff that we are being

7    told that exist prior to this lawsuit being filed.  We don't

8    think that we should have to suffice with redacted records

9    from those family counseling sessions.

10             We think those family counseling records, which

11   apparently still exist, which is interesting because you've

12   got a therapist who still has his records from 1996.  And

13   then you've got a therapist who saw Annessa alone much later

14   in time and those records have already been destroyed.

15             But in any case, the 1996 records for the family

16   counseling should be produced in full.  That's our position.

17             THE COURT:  All right.

18             MR. O'NEILL:  Your Honor, we're pleased for

19   Mr. Judge that he lead a life that permitted him to be able

20   to remember who his pediatrician is because he got regular

21   pediatrician visits having wished on every child that exists

22   on the planet going as far back as one can go.  That's not

23   true of the plaintiff in this case.

24             She led a chaotic life.  The assault that has just

25   been referenced here --

1          THE COURT:  Well, she must have seen a doctor at

2     some point?

3          MR. O'NEILL:  Oh, she did.  But it was chaotic, it

4     was irregular.  She has given us the names of practices that

5     she believes she went to.  We've talked to her mother.  We

6     tried to chase them down.  And we don't just sit on our

7     hands and when we get, for example, so and so is no longer

8     in practice.  We asked the question, where are the records.

9     And we go to that source and try to find the records.

10         We've gone, we've chased down every lead that we

11    have.  We have a new lead on a doctor who our best guess,

12    based upon something in Google, he's about 90 years old.

13    And we now think we know where his records, if they existed,

14    were kept.  We're going to try to get those.

15         We don't have any disagreement about the

16    relevancy.  There's no issue about that.  We concur

17    entirely.  We're glad to try to find the records.  We have

18    identified providers.  We have said specifically, we tried

19    this place, they called us up and said no records.  We tried

20    this place, they called us up and said no records.

21         Now, Dr. Timme, who has been referenced, I

22    haven't -- this is the first I've heard about her destroying

23    records within the last year.  I was accused of --

24         THE COURT:  I think he was talking about

25    Belcher-Timme.

1          MR. O'NEILL:  Belcher-Timme, exactly.  Well, we

2    were accused of having delayed.  We requested the records

3    before suit was filed.  We can't produce records that don't

4    exist.  If they exist, my attitude with respect to records

5    is very simple, either you produce them, you make every

6    effort to get them, we have and we will continue to do so.

7    If we can't get them we'll just so state.

8          If there's an instance where they want to depose a

9    particular entity and that entity says with an order to be

10   deposed you need a release from the client, we'll give it to

11   them.  We're not going to hand out blanket releases.  I've

12   seen them abused in the past.  But in terms of getting

13   records we'll get any that we can.

14         Let's spend a moment talking about this therapy

15   session.  The fact is that defendant Bellows Falls says we

16   should get those records, we're entitled to those records,

17   completely ignores privilege.  There's a privilege with

18   respect to them.  It's a counseling privilege of the

19   litigation on this issue and if they want to go ahead and

20   file a motion to compel and cite the authorities I will be

21   glad to respond to it.  We have asked for, and I'm told

22   we're going to get --

23         THE COURT:  Privilege between whom?

24         MR. O'NEILL:  The mother, who this was primarily

25   for the mother, the children were there some of the time for

1    counseling.  So it's joint counseling amongst the children

2    and with the mother.

3         We've talked to the therapist.  And what the

4    therapist has said that he can get for us, and we've asked

5    him to get for us, is his, in his words, heavily redacted

6    notes that will show the parts that relate specifically to

7    the daughters where they are involved in some part.  He is

8    the one who told us, and I agree with him, that he cannot

9    produce without authorization from the mother, who has no

10   interest in giving it, the records of her work that she did

11   in connection with the therapy.

12        Privileges exist to block the flow of information.

13        THE COURT:  Well, have you turned that over yet?

14        MR. O'NEILL:  No, we don't have it yet, Judge.

15   We're getting it from him.  If we could find a record, all

16   the records going back to childhood, anything we can find

17   we'll turn over.  We've asked our client.  We've worked with

18   the client.  We'll continue to do so.  We're not trying to

19   hide any information.  I've never hidden any information in

20   my life.  I'm not about to start now.

21        THE COURT:  Well, it is kind of curious, frankly,

22   that the suit's been filed two years and you are still

23   trying to find information.  I mean, you must have had some

24   before you filed suit.

25        MR. O'NEILL:  We didn't have any medical records

1    before we filed suit, Judge.  No.  We didn't have any

2    medical records.  We did request some, but we haven't had

3    any luck in getting virtually anything.  There is a

4    physician that she's seeing, excuse me, I think it's a, I

5    many be wrong on this one, Dr. Jere, J-e-r-e, who has given

6    us a summary.  And we said a summary doesn't count, we need

7    the records, get us the records.

8         So he's down in Dallas, she, excuse me, down in

9    Dallas.  I expect we'll have those sooner than later.  I

10   would be happy to have an order from the Court, if you want

11   to give us an order that says, and I'll stick to the dates,

12   you have to produce this information by, let's say, January

13   30th, because it would be of some help to me in getting some

14   momentum and getting pieces like that done and out of the

15   way.

16        But, otherwise, I can't produce what doesn't

17   exist.  I mean, whether or not defense counsel feels it's

18   not credible is not the issue with respect to it.

19        Now, I heard something said there that I scratched

20   my head when it was first stated, all this about how text

21   messages, there are no texts, no e-mails, no Facebook, and

22   these people are on it all the time.  Well, some people are.

23   Some people are not.  But in the same breath a few minutes

24   later, just as I was scratching that down I heard, but

25   they've turned over all these redacted pages related to

Facebook.  There is one text that she has that she provided that relates to this.  We turned it over.

The Facebook is redacted.  There's no question. She doesn't have to put her entire life, anyone does, so it's the equivalent of going through say I want to see all the mail, physical mail you've received over this period of time.

She used search terms.  She went back through and searched through it.  I personally looked at every one of those and made decisions about whether or not it was something that fell within the scope.  And if in doubt I said, yes, and we turned it over.

The problem with things like Facebook is you take a look at something and you say, well, there's got to be something missing here.  And there may be, but digitally it's not there.  It doesn't exist.

We've turned over, I want to say, over a hundred pages of documents relating to Facebook postings and comments that she's gotten.  I've put them so that if there is a comment that she has made in any context they get what was said from someone else so that the information is there and it's available.

We have done our best to and will continue to try to go ahead and provide the information that's sought.  We can't produce that which does not exist.

1          Let's see if there's something, there was one

2     other thing.  Things like, they must exist somewhere.  Well,

3     they don't must exist somewhere.  They don't exist at least

4     we've been able to find it.  If we can find it, Judge, we'll

5     either do one of two things.  Either we'll turn it over or

6     we'll identify it to the other side if there is a reason why

7     it would not be produced.  And I have in mind sometimes I've

8     gotten in medical records that are wholly unrelated to the

9     subject, but identified to the other side and said, if you

10    want to file a motion to compel do so.  I don't think that

11    will be necessary here because I don't think we're going to

12    turn up anything that falls into that category.  But if it

13    exists I'm glad to find it, glad to go ahead and turn it

14    over.

15         We need to get back to them with respect to other

16    people as to whom she thinks she may have discussed this.

17    The Facebook postings are of some help with respect to it,

18    but it's a broad scope of people and we'll try to add to

19    what that is, but I don't think there's any more to add.

20    That's essentially our position, Judge.  Thank you.

21         THE COURT:  All right.  Mr. Judge?

22         MR. JUDGE:  Your Honor, briefly.  Again, with all

23    due respect to plaintiff's counsel, if -- I just, I can't

24    believe that no one in plaintiff's family can remember who

25    her childhood pediatrician was.  And if she had more than

1    one that no one in her family can remember who they were.

2          Problem number two, we have asked the plaintiff to

3    give us a signed authorization so that we can chase down the

4    records.  The plaintiff refuses to do that.

5          I've been doing this for 20, 23 years, Your Honor.

6    And my experience is if you ask a hospital for a record or

7    you ask a doctor's office for a record and it's old and it's

8    a lot of work to dig through the files and find it, they

9    tell you they don't exist.  If you pursue them they do

10   eventually appear.

11         Now, in the case of Ms. Lewis, if she was on Dr.

12   Dinosaur Medicaid may have the records.  If she was on Blue

13   Cross Blue Shield they may have the records.  Her mother may

14   still have some of the records in her own personal files.

15   The idea that this girl from age four to 21 is a blank slate

16   medically it's not feasible, Your Honor.

17         Dr. Laflure is, I believe, no, excuse me, Dr.

18   Roberts is the current therapist she has seen.  She has been

19   seeing that therapist since March of 2015, five months after

20   this lawsuit was filed.

21         What we have from Dr. Laflure, excuse me, Dr.

22   Jones, is only a summary of his interpretation of the notes

23   he took of her treatment.  We should be entitled to the

24   notes at least.

25         THE COURT:  I think he said he was going to get

1    them.

2            MR. O'NEILL:  Yeah, absolutely.

3            MR. JUDGE:  What I thought I heard him say was

4    that they were going to be redacted.  But if he's going to

5    get the full notes that's fine.

6            MR. O'NEILL:  No, we'll get -- we made it clear

7    that that summary is not acceptable.  We want the full

8    notes.

9            MR. JUDGE:  And as for the Facebook thing, Your

10   Honor, or the Instagram thing or text messaging or e-mails

11   or G-mails or Google mail, Instagram, whatever, we've been

12   given, as of two days ago, three days ago, a handful of

13   heavily redacted messages back and forth between her and her

14   sister and her brother K.J., Keith Lewis, Junior.

15           We, you can't tell that those are from Facebook.

16   Everything is redacted except a shorthand full of notes that

17   the plaintiff has decided are relevant.  Where's the rest of

18   the Facebook page?  Where is the rest of these notes?  And

19   what was the basis for the redaction?  There was no

20   privilege log submitted.  So, you know, you might have to

21   say that they've given us her Facebook page.  That's not

22   true.

23           We have no e-mails whatsoever.  None.  And we have

24   no texts whatsoever.  We have essentially no social media

25   whatsoever.  We think that we should be given access to her

1    Facebook page.

2            The notes that we got yesterday or two days ago

3    include a note back and forth between her and one of her

4    friends in which she said, oh, I'm about to file a lawsuit,

5    And this was January 2014, against those darn Jehovah's

6    Witnesses.  And the response that she got from her friend

7    was, hey, you better turn your Facebook page private.  And

8    the very next thing from Annessa to her friend was, oh,

9    that's a good idea.  I'm going to do that now.

10           Why should we suddenly be foreclosed from knowing

11   what this woman's life was as she described it on Facebook

12   suddenly because she files a lawsuit?

13           MR. O'NEILL:  Judge, I'm not sure what planet

14   we're on here.  Turning a Facebook page private doesn't

15   delete a thing.  All it means is that it's limited as to who

16   can see it.  It doesn't mean that you can't -- the material

17   is gone.  You're hearing things, to be direct, certainly not

18   true.

19           For example, there was an instance, and I forgot

20   about this one, excuse me for going back to it, where she

21   hasn't produced the diary.  We know there's at least one

22   diary.  We identified the diary.  We said there was a diary

23   she kept.  And it's the name of a website that keeps

24   diaries.  And she, in 2012, before we ever got within a mile

25   of this, decided she didn't want it, she didn't want it seen

1    so she cut off the account.

2            We said to her, okay, what you need to do is go

3    back to them and see if they still have it.  Do they still

4    have it archived.  She's trying to do that.  We're trying to

5    locate it.  We're not saying it doesn't exist.

6            As it relates to the pediatrician, she has

7    different medical practices that she thinks that she went

8    to.  Her life was chaotic.  So she went to various

9    practices.  She thinks she knows who she went to.  We've

10   tried to locate each of those practices.  We're trying to

11   chase them down.  We contact them.  They have no records.

12   They don't have anything.  Maybe it's because they don't

13   exist, maybe it's because she didn't go there.  We'll give

14   the names to the other side.  They can subpoena those

15   practices, which is the best way to do it --

16            THE COURT:  Why not give them an authorization?

17            MR. O'NEILL:  Because I've seen authorizations be

18   abused, Your Honor.  And if the Court wants us to give an

19   authorization the only request I have with respect to it is

20   that it be addressed to a specific practice.  In other

21   words, if we can identify a practice or through any other

22   method that's possible to where if they say, we want one for

23   a particular practice, I'm glad to get them an authorization

24   directed to that specific practice.

25            I just am concerned about authorizations for my

1    client's medical records being misused in some respect.

2              THE COURT:  Well, how are they going to be

3    misused?

4              MR. O'NEILL:  Well, because they could, for

5    example, request gynecological records, that sort of thing.

6    Those aren't relevant in any way to these proceedings.  I

7    mean, it's this suggestion that, you know, we have got

8    heavily redacted Facebook, we don't have any e-mail, those

9    Facebook postings, from what I can see, are not Facebook

10   postings.  They are all e-mail.  Entirely e-mail within

11   Facebook.

12             No texts.  They got one text.  The only text that

13   exists that is referenced specifically in the material that

14   we turned over.  We're turning over the material.  The

15   Facebook material is chaotic.  From what I can gather, and I

16   haven't been on Facebook in two years, it's the nature of

17   Facebook.

18             I've looked at some of these.  I've seen the whole

19   page.  I can see the date, I can see the time, I can see the

20   sequence going through and they just don't flow necessarily.

21   But the fact that she, that this is the nature of what it

22   is, if the question was, okay, we want to see every letter

23   you've written and received since, pick a date, January 1,

24   2000 just to pick one out of the air, Your Honor wouldn't

25   order that.  You wouldn't say she has to turn everything

1    that she's corresponded about.

2            What you would say legitimately is that she has to

3    turn over all the references that relate to her mental

4    health, that relate to sexual abuse, that relate to

5    Jehovah's Witnesses.

6            I've gone through those.  I had a paralegal go

7    through them.  Highlighted, took a look and said, what do we

8    have here.  We've turned over anything at all that relates

9    to it.  It's the nature of the beast that it's going to be

10   somewhat chaotic.  There just isn't any way around it.  But

11   we have turned over the material.  We'll continue to turn

12   over the material.  This isn't hide the ball.  I don't like

13   that.

14           THE COURT:  Well, I think it's time that I do give

15   you an order and that is to respond to their requests by the

16   end of this month.  And that means getting the names of

17   doctors, any, if it's the Facebook page that they are

18   looking for, I'm not familiar with Facebook myself, but --

19           MR. O'NEILL:  It speaks well of you.

20           THE COURT:  Pardon me?

21           MR. O'NEILL:  It speaks well of you.

22           THE COURT:  And any of the other issues.  Frankly,

23   it seems to me incredulous that you don't have some of this

24   information now, two years after the lawsuit.

25           MR. O'NEILL:  I understand, Your Honor.

1          THE COURT:  And we're trying to move this along.

2     It's getting bogged down like some other cases I've got

3     that, you know, by the time I retire it may be another judge

4     who is going to hear this case.

5          MR. O'NEILL:  I don't really disagree about the

6     substance of what the Court is saying at all, Your Honor.

7     We have been diligent.  We'll continue to.  I appreciate the

8     end of the month.  We will continue to pursue them.  We're

9     diligent about it ourselves.  And we'll be even more so.

10    And I appreciate the order because it gives me the

11    opportunity to say, for example, to the doctor in Dallas,

12    look, I've got a federal judge telling me your redacted

13    document doesn't do it, give me the whole thing.

14         THE COURT:  Right.

15         MR. O'NEILL:  I'm grateful for that.

16         MR. JUDGE:  Your Honor, let me talk a little bit

17    about a signed medical authorization.  So what we're hearing

18    is, you know, Mr. Judge, if my client can remember a

19    particular medical practice that she went to, geese, you

20    know, I call them up and they tell me they have no records

21    so what else do you want?

22         What if she can't remember a medical practice or a

23    hospital or something that she went to, if we give them a

24    subpoena with an authorization and we get records low and

25    behold in the Bellows Falls area.

1          Saying that we can -- Mr. Judge, you can just

2    serve subpoenas on the people that we've identified.  You

3    haven't identified anyone to us.  And you've already told us

4    that the people that you can remember don't have any

5    records.  And, three, we're not going to give you signed

6    medical records authorization anyway.  No one is going to

7    produce records without a signed medical authorization, Your

8    Honor.

9          THE COURT:  Well, he said he's going to for those

10   that can be identified.  He has identified any, as you said.

11   So --

12        MR. O'NEILL:  Well, we have identified some,

13   Judge.  We have identified some.  And we've used

14   authorizations to try and obtain the records.  In this one

15   instance, Dr. Timme, who they would like to take the

16   deposition of to verify when her records were destroyed, she

17   wants an authorization from our client.  We said, fine, no

18   problem, so that she can be deposed.

19        Anybody they want to depose, if they want a

20   specific authorization for that provider glad to give it to

21   them.  It's no hardship.

22        THE COURT:  Go ahead.

23        MR. JUDGE:  We need to know who they are in order

24   to get an authorization.

25        THE COURT:  Right.

1            MR. O'NEILL:  So do we.

2            THE COURT:  Well, he's going to do that.

3            MR. O'NEILL:  It's the best we can do.

4            THE COURT:  By the end of the month.

5            MR. LYNN:  And, Judge, we've got our own motion,

6    but to the extent -- this goes beyond the instant motion.

7    Then the question becomes, all right, so when do we finally

8    get the information that we're entitled to so that we can

9    take the deposition of the plaintiff in Vermont.

10           Now, I know that's an issue, right.  We've been

11   told from the outset until yesterday that that deposition

12   has to take place in Texas.  We now, I think, have agreement

13   that that's going to take place in Vermont, but if not I

14   want that issue decided now so we don't have to come back

15   and bother Your Honor again with whether a plaintiff filing

16   in Vermont around issues that happened in Vermont has to

17   come to Vermont for a deposition.

18           MR. O'NEILL:  Judge, we've always found ways to

19   work our way through these kind of issues.  I haven't said,

20   that no, it has to happen in Texas.  Yes, it can happen in

21   Vermont.

22           For example, let's assume for purposes of

23   conversation that they --

24           THE COURT:  If she filed the lawsuit here in

25   Vermont she's going to come here.  If they want her to come

1  here she'll come here.

2          MR. O'NEILL:  So be it.  Understood.

3          THE COURT:  Okay?

4          MR. O'NEILL:  Absolutely.  My suggestion about it

5  to the other side was, and I understand the Court's order

6  with respect to it if that's what it's to be, if they were

7  going to be down there doing some other depositions we could

8  do it there.  If they want to do it here we'll bring her

9  here.  No problem.

10          THE COURT:  All right.  That resolves that.

11          MR. LYNN:  Thank you, Your Honor.

12          MR. JUDGE:  Thank you, Your Honor.

13          THE COURT:  So, let's get all that, all those

14  names together by the end of the month and provide

15  authorizations to the defendants for those people that you

16  identify.  And, you know, move it along.  I mean, this is

17  getting to be a little much, frankly.  I don't want to hear

18  any more of these motions.

19          MR. JUDGE:  I agree, Your Honor.  And in light of

20  what has just taken place, I think we're going to have to

21  extend the current discovery schedule.

22          THE COURT:  That's what I was going to discuss

23  next.

24          MR. STOREY:  Your Honor, before we move on to

25  that?

1              THE COURT:  Yes.

2              MR. STOREY:  You have indicated that you don't

3    want to hear any more of these motions.  Just, as a matter

4    of where we are, there had been a subpoena to Christian

5    Congregation of Jehovah's Witnesses.  And they indicated

6    they had six or seven documents on a privilege log.  I

7    assume it's all of the same things the Court just heard and

8    we may be able to work that out amongst ourselves.

9              THE COURT:  Okay.

10             MR. STOREY:  But it's possible that that would be

11   an issue.  And there's another subpoena to congregation,

12   another congregation that also has a couple of documents.

13             So some of these issues are going to come back up.

14   I'm just making the Court aware of it.

15             THE COURT:  All right.  But, I mean, we may not

16   have another hearing because, frankly, if it's the same sort

17   of argument that's being made then we'll decide it on the

18   papers.

19             MR. STOREY:  Understood.  Thank you, Your Honor.

20             MR. O'NEILL:  That's fine with us, Judge.

21             THE COURT:  All right.  So I'm not sure we can

22   work out this discovery order now, but it certainly, looking

23   at it before I came on the bench, it's, there's no way you

24   can comply with some of these things.

25             So what I will do is, hopefully I'll be able to

1   get out an order about the discovery issues.  I'm not going

2   to do anything about your request, Mr. Judge, because I

3   think I dealt with it.  I hope that ends it.  But as far as

4   the other motions we'll try to get an order out, what's

5   today, Tuesday, by the end of the week certainly.

6           So, then you'll have an idea of what I'm ordering.

7   I'm going to tell you ahead of time, however, that the order

8   will include the confidentiality agreement that's ordered by

9   the Court.  So knowing that, I would order that that

10  agreement by the parties be submitted to the Court by the

11  15th of this month.  And then that should, in connection

12  with my order, should at least move along the discovery as

13  far as the opposition so far.

14          So, let's see, so that deals with requests in

15  discovery at this point.  I don't know if there's going to

16  be more discovery, but it's, I believe it says that -- no,

17  it doesn't.  It doesn't mention when actually the discovery

18  is supposed to be answered.  But you've got, for instance,

19  depositions taking place in November of last year.  I assume

20  those didn't take place.

21          MR. LYNN:  You're correct, Your Honor.

22          THE COURT:  Have there been any depositions?

23          MR. LYNN:  No, Judge.

24          MR. STOREY:  No, Your Honor.  There have been two

25  or three, Your Honor.

1              MR. LYNN:  I'm sorry, two, Your Honor of the

2    paleographers.

3              THE COURT:  The what?

4              MR. LYNN:  Paleographers.

5              THE COURT:  Oh.  All right.  So, well, I think

6    that probably the parties ought to sit down and figure out

7    what you can, how you can modify this.  Because for me to

8    try to go through it at this point is probably --

9              MR. O'NEILL:  I was going to suggest, Judge, that

10   we can work through this.

11             THE COURT:  All right.  So --

12             MR. LYNN:  I expect so, Your Honor.

13             THE COURT:  -- why don't you submit that order by

14   the 15th as well.

15             MR. LYNN:  Thank you, Your Honor.

16             THE COURT:  All right?

17             MR. LYNN:  Yes.

18             THE COURT:  And hopefully it won't carry this case

19   into the next century.

20             MR. JUDGE:  At the risk of doing exactly that,

21   Your Honor, can I just raise one minor point, which is, for

22   clarification purposes, on the Court's order from the bench

23   on our motion to compel.

24             THE COURT:  Yes.

25             MR. JUDGE:  Can we clarify that that include her

1    entire Facebook page, please?

2          MR. O'NEILL:  Absolutely not, Your Honor.  I mean,

3    this is, it is the equivalent of going back in someone's

4    life and saying, I want all of your correspondence that goes

5    back over a period of time.  There are things that are

6    relevant and they are entitled to those.  I'm glad to give

7    them to them.  No hesitancy.  But turning over everything

8    that exists with respect to one's life, if we're going to

9    deal with that issue, I really would like to brief that

10   issue because I think the law's completely to the contrary

11   with respect to it.  If the Court would even entertain it I

12   would really like to brief the issue.

13         THE COURT:  Well, I'm not prepared to order that

14   her -- see I'm not familiar, frankly, with Facebook.  I

15   don't know what's there and what isn't.  Whether it goes

16   back to whenever you started the page.

17         MR. JUDGE:  Facebook goes back to 2004.  And we

18   assume this woman probably started a Facebook page in 2008

19   or some -- she was in college from 2008 to 2012.  Every

20   college kid has a Facebook page.

21         What she -- what her -- hundreds of friends are

22   allowed to know about her life.  And everyone in her family

23   is on her Facebook page.  Why is that excluded from us, the

24   defendants in this case?

25         THE COURT:  Well, I expect the argument is there

1  are certain privacy matters.

2          MR. JUDGE:  A privacy that she's disseminating to

3  potentially hundreds of people?

4          THE COURT:  Well, not, not certainly about any

5  issues in this case, but --

6          MR. JUDGE:  Well, I'll give you an example, only

7  because Your Honor says that he's not terribly familiar with

8  Facebook, and I can understand that.  Facebook users post --

9  the typical Facebook user posts on a daily or a weekly basis

10  what they've been up to.  This is what I did today, I went

11  horseback riding.  Here's a picture of me on the horse.

12  Whatever.

13          How is that not relevant to her claim that her

14  life has been destroyed by an incident in 1991, '92 and '93?

15          MR. O'NEILL:  Your Honor, we all have moments of

16  difficulty in our lives.  We all have moments of going well.

17  The fact that someone is having a good time riding a horse,

18  I don't think she rides a horse, doesn't mean that she's not

19  damaged in some respect.

20          The same way going back through someone's life and

21  looking through letters that they may have written that

22  talks about parts of their lives.  Discovery that's relevant

23  here should be provided.  The pages, the e-mail messages

24  back and forth on Facebook we have provided with respect to

25  it.  But it doesn't mean that there has to be a wholesale

1   invasion of someone's life.

2          She isn't saying this destroyed her life.  She's

3   married.  She has a child.  She has a job.  She's going

4   through life and dealing with it.  She's got difficult

5   issues.  We're prepared and have provided anything that

6   relates to the childhood sexual abuse or the Jehovah's

7   Witnesses has been brought forth.  And if we find something

8   more we'll bring it forth.  We'll try to get the diaries

9   that I indicated, for example.

10          MR. JUDGE:  Here's the problem, Your Honor.  When

11   they say we'll produce anything from her Facebook page that

12   talks about abuse or that talks about Jehovah's Witnesses,

13   they omit everything in her life that is relevant that

14   doesn't talk about abuse or Jehovah's Witnesses.

15          A Facebook page is the modern equivalent of anyone

16   whose under the age of 50, or whatever, of a diary of your

17   life.  That is relevant.  And if Your Honor is not prepared

18   to order it now then I want to brief that issue on why the

19   Court should order her to turn that over.

20          THE COURT:  Well, what do you have now?

21          MR. O'NEILL:  What I have right now, Judge, is we

22   have -- Facebook, as I was involved in it, what I get has

23   basically two components essentially.  One is what people

24   post to there all the time on their public page or their

25   private page.  They can limit who sees it, however they want

1    to go about it.

2              And then there are e-mails, think of it as

3    texting, if you will, that people use within Facebook to

4    communicate with other people.

5              What we have done is, we asked her to go through,

6    and she did searches using various search terms that would

7    indicate anything to do with, for example, sexual abuse, the

8    Jehovah's Witnesses, mental health issues, those kinds of

9    things.

10             And if they want us -- if they've got some more

11   terms they want us to use I'm glad to use those to search.

12   The search found those and they are actually showing up

13   highlighted in the material that we've turned over.

14             So all of those e-mails, if you will, I think

15   that's a fair way to describe them, that relate in any way

16   to this in a broad sense, we have produced.  So those we

17   have turned over.  So we --

18             THE COURT:  So, what about the first part you

19   talked about?

20             MR. O'NEILL:  I don't think there's anything there

21   that relates to it, Judge, but I will double back check with

22   her to make sure.

23             In fact, what I'll do is I will ask her for us to

24   have an authorization so we can take a look through it.  So

25   that way there isn't any confusion with respect to what it

1    is.

2              We'll take a look at it ourselves and go back

3    through and see what's there.

4              THE COURT:  So you don't even have that at all?

5              MR. O'NEILL:  No, I don't typically ask the

6    clients for access to it, but I will ask her for access to

7    it and see what's there.  If there is something that is

8    germane in some respect, falls within the scope of discovery

9    as defined here we'll turn it over.

10             MR. JUDGE:  And we will want to know in connection

11   with that, and certainly an order in connection with that,

12   whether, when she filed this lawsuit in October 1st, 2014,

13   or going back to when her notes say that she was about to

14   file this lawsuit in January 2014, have you deleted anything

15   from your Facebook page and don't delete anything from your

16   Facebook page.

17             But, Your Honor, my basic position is that the

18   plaintiff should not get to decide from the diary, the

19   online diary of plaintiff's life that only the few messages

20   or days when she's having a bad day and she's blaming it on

21   the Jehovah's Witnesses only that's relevant to us.  No.

22   For the 10 bad days that she has according to her Facebook

23   page and the thousand good days that she has, both are

24   relevant.

25             THE COURT:  Well, first, what I would order is

1   that you obtain, either on your own or through her, the

2   Facebook page, which I guess includes not e-mails and so

3   forth, but what she posts, right?

4             MR. O'NEILL:  True.  And what other people post on

5   it, Judge.

6             THE COURT:  What other people post.

7             MR. O'NEILL:  Sure.

8             THE COURT:  And either provide that to counsel,

9   which I think you probably don't want to do, or provide it

10  to the Court for an in-camera inspection and I'll determine,

11  frankly, whether all or some of it should be turned over.

12            MR. O'NEILL:  Sure.

13            THE COURT:  All right?

14            MR. O'NEILL:  Absolutely.

15            THE COURT:  So let's do that by the 30th.

16            MR. O'NEILL:  Should not be a problem, Judge.  The

17  only -- I might have to ask for a little latitude on that

18  because sometimes getting it out of Facebook can be an

19  issue.  Let's leave it at the 30th and if there's a problem

20  we'll come back to the Court.  We'll work very hard so that

21  it's not an issue.  Shouldn't be.

22            THE COURT:  All right.  Okay.  That it?  Okay.

23            So, again, submit the confidentiality order by the

24  15th.  And also a revised discovery order.  And then the

25  plaintiff is going to turn over, do what I ordered by the

```
 1  30th.  Okay?

 2            MR. STOREY:  Thank you, Your Honor.

 3            MR. LYNN:  Thank you, Your Honor.

 4            MR. JUDGE:  Thank you, Your Honor.

 5            MR. O'NEILL:  Thank you, Your Honor.

 6            (The Court recessed at 12:54 p.m.)

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    C E R T I F I C A T E

 2

 3          I, Anne Marie Henry, Official Court Reporter for

 4   the United States District Court, for the District of

 5   Vermont, do hereby certify that the foregoing pages are a

 6   true and accurate transcription of the taped proceedings in

 7   the aforementioned matter to the best of my skill and

 8   ability.

 9

10          _____

11                    Anne Marie Henry, RPR
                      Official Court Reporter
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```